373 F.Supp.2d 7 (2005)
In re "AGENT ORANGE" PRODUCT LIABILITY LITIGATION.
The Vietnam Association for Victims of Agent Orange/Dioxin; Phan Thi Phi Phi; Nguyen Van Quy and Vu Thi Loan, Individually and as Parents and Natural Guardians of Nguyen Quang Trung and Nguyen Thi Thuy Nga, Their Children; Duong Quynh Hoa, Individually and as Administratix of the Estate of Her Deceased Child, Huynh Trung Son; Ho Kan Hai, Individually and as Parent and Natural Guardian of Nguyen Van Hoang, Her Child; Ho Thi Le, Individually and as Administratix of the Estate of Her Deceased Husband, Ho Xuan Bat; Nguyen Muoi; Nguyen Dinh Thanh; Dang Thi Hong Nhut; Nguyen Thi Thu, Individually and as Parent and Natural Guardian of Nguyen Son Linh And Nguyen Son Tra, Her Children; Vo Thanh Hai, Nguyen Thi Hoa, Individually and as Parents and Natural Guardians of Vo Thanh Tuan Anh, Their Child; Le Thi Vinh; Nguyen Thi Nham; Nguyen Minh Chau; Nguyen Thi Thoi; Nguyen Long Van; Tong Thi Tu and Nguyen Thang Loi; On Behalf of Themselves and Others Similarly Situated, Plaintiffs,
v.
The Dow Chemical Company; Monsanto Company; Monsanto Chemical Company; Pharmacia Corporation; Hercules Incorporated; Occidental Chemical Corporation; Ultramar Diamond Shamrock Corporation; Maxus Energy Corporation; Thompson Hayward Chemical Company; Harcros Chemicals Inc.; Uniroyal, Inc; Uniroyal Chemical, Inc.; Uniroyal Chemical Holding Company; Uniroyal Chemical Acquisition Corporation; C.D.U. Holding, Inc.; Diamond Shamrock Agricultural Chemicals, Inc.; Diamond Shamrock Chemicals; Diamond Shamrock Chemicals Company; Diamond Shamrock Corporation; Diamond Shamrock Refining and Marketing Company; Occidental Electrochemicals Corporation; Diamond Alkali Company; Ansul, Incorporated; Hooker Chemical Corporation; Hooker Chemical Far East Corporation; Hooker Chemicals & Plastics Corp.; Hoffman-Taff Chemicals, Inc. Chemical Land Holdings, Inc.; T-H Agriculture & Nutrition Company, Inc.; Thompson Chemical Corporation; Riverdale Chemical Company; Elementis Chemicals Inc.; United States Rubber Company, Inc.; Syntex Agribusiness Inc.; Syntex Laboratories, Inc. and "ABC Chemical Companies 1-100," Defendants.
No. MDL 381, No. 04-CV-400.
United States District Court, E.D. New York.
March 10, 2005.
As Amended March 28, 2005.
*8 *9 *10 *11 *12 Constantine P. Kokkoris, Esq., by Constantine P. Kokkoris, Esq., Moore & Goodman, LLP, by Jonathan C. Moore, Esq., William H. Goodman, Esq., David Milton, Esq., New York, NY, Law Offices of Kathleen A. Melez, by Kathleen A. Melez, Esq., Los Angeles, CA, Cartee & Morris, LLC, by Jonathan W. Cartee, Esq., R. Stan Morris, Esq., Shelby Roden LLC, by Robert B. Roden, Esq., Davis & Norris, LLP, by Frank Davis, Esq., John E. Norris, Esq., Birmingham, AL, for Plaintiffs.
Rivkin Radler LLP, by Steven Brock, Esq., James V. Aiosa, Esq., Uniondale, NY, Orrick, Herrington & Sutcliffe LLP, by James L. Stengel, Esq., Laurie Strauch Weiss, Esq., Mayer Brown Rowe & Maw *13 LLP, by Andrew Frey, Esq., New York, NY, for Defendant The Dow Chemical Company.
King & Spalding LLP, by Michael M. Gordon, Esq., New York, NY, for Defendants Occidental Chemical Corporation, as successor by merger to Diamond Shamrock Chemicals Company; Maxus Energy Corporation; Tierra Solutions, Inc., formerly known as Chemical Land Holdings, Inc.; and Valero Energy Corporation, as successor by merger to Ultramar Diamond Shamrock Corporation.
Seyfarth Shaw LLP, by John C. Sabetta, Esq., New York, NY, Latham & Watkins LLP, by James E. Tyrrell, Esq., Newark, NJ, Latham & Watkins LLP, by Richard P. Bress, Esq., Sidley Austin Brown & Wood LLP, by Joseph R. Guerra, Esq., Washington, DC, for Defendants Monsanto Company and Monsanto Chemical Company.
Kelley Drye & Warren LLP, by William A. Krohley, Esq., William C. Heck, Esq., New York, NY, for Defendant Hercules Incorporated.
Myron Kalish, Esq., New York, NY, for Defendants Uniroyal, Inc.; Uniroyal Chemical Holding Company; Uniroyal Chemical Acquisition Corporation; Uniroyal Chemical Co.; and CDU Holding, Inc.
Clark, Gagliardi & Miller, P.C., by Lawrence T. D'Aloise, Esq., White Plains, NY, for Defendants T.H. Agriculture & Nutrition Co., Inc.; Thompson-Hayward Chemical Co.; and Harcros Chemicals Inc.
Debevoise & Plimpton LLP, by Anne E. Cohen, Esq., Anthea E. Roberts, Esq., New York, NY, for Defendants Hooker Chemical Corporation; Hooker Chemical Far East Corporation; and Hooker Chemicals & Plastics Corp.
McDermott Will & Emery, by Chryssa V. Valletta, Esq., New York, NY, McDermott Will & Emery, by Steven H. Hoeft, Esq., Chicago, IL, for Defendant Riverdale Chemical Company.
U.S. Department of Justice, Civil Division, by Daniel Meron, Acting Assistant Attorney General, Joseph H. Hunt, Branch Director, Vincent M. Garvey, Deputy Branch Director, Ori Lev, Esq., Washington, DC, Roslynn Mauskopf, United States Attorney, by Roslynn Mauskopf, United States Attorney, Kathleen Mahoney, Assistant United States Attorney, Brooklyn, NY, for the United States.
Center for Constitutional Rights, by Judith Brown Chomsky, Esq., Jennifer Green, Esq., Beth Stephens, Esq., New York, NY, Earthrights International, by Rick Herz, Esq., Tyler Giannini, Esq., Washington, DC, International Human Rights Law Clinic, University of Virginia School of Law, by Professor Deena Hurwitz, Esq., Charlottesville, VA, for Amici Curiae.

AMENDED MEMORANDUM, ORDER and JUDGMENT
WEINSTEIN, Senior District Judge.

 Table of Contents
 I. Introduction .....................................................................15
 A. Domestic Law Tort Claims Defeated by Government Contractor
 Defense ....................................................................15
 B. International Law Claims .....................................................17
 1. General Approach of United States Courts .................................17
 2. Government Contractor Defense Not Applicable .............................18
 3. Substantive Merit Lacking ................................................19

*14
 II. Use of Agent Orange and Other Herbicides in Vietnam War...........................19
 III. Prior Phases of Agent Orange Litigation ..........................................23
 IV. Pleadings by Vietnamese Plaintiffs and Motions by Defendants......................27
 A. Pleadings by Plaintiffs ......................................................27
 1. Jurisdiction and Venue ...................................................27
 2. Parties ..................................................................28
 3. Spraying Herbicides in Vietnam ...........................................30
 4. Herbicides Used ..........................................................30
 5. Supply of Herbicides by Defendants .......................................31
 6. Harm to Plaintiffs .......................................................32
 7. Legal Basis for Claims ...................................................35
 8. Theories .................................................................36
 a. War Crimes ...........................................................36
 b. Genocide .............................................................36
 c. Crimes Against Humanity ..............................................37
 d. Torture ..............................................................37
 e. Assault and Battery ..................................................37
 f. Intentional Infliction of Emotional Distress .........................37
 g. Negligent Infliction of Emotional Distress ...........................37
 h. Negligence ...........................................................38
 i. Wrongful Death .......................................................38
 j. Strict Products Liability ............................................38
 k. Public Nuisance ......................................................38
 l. Unjust Enrichment ....................................................38
 m. Injunctive and Declaratory Relief ....................................38
 B. Motions by Defendants ........................................................38
 1. Motions under Rule 12(b)(6) and Rule 56 ..................................38
 2. Law Applicable to Motions ................................................39
 a. Rule 56 ..............................................................39
 b. Rule 12(b)(6) ........................................................39
 3. Context ..................................................................40
 4. Different Treatment of Veteran and Vietnamese Plaintiffs .................41
 V. Position of the Government Opposing Plaintiffs' Claims ...........................43
 VI. Insufficiency of Plaintiffs' Domestic Law and Equitable Claims ...................44
 VII. Application of Sosa v. Alvarez-Machain ...........................................46
VIII. Legal Concepts ...................................................................49
 A. Standing of VAVAO ............................................................49
 B. Right to Sue Individually ....................................................51
 C. Liability of Corporations for Violation of International Law .................52
 1. Aiding and Abetting ......................................................52
 2. Corporate Culpability ....................................................54
 D. Statutes of Limitations ......................................................59
 E. Justiciability ...............................................................64
 1. Generally ................................................................64
 2. Application of Baker v. Carr to Foreign Affairs and War ..................69
 3. Judicial Power ...........................................................78
 a. Interference with Management of Foreign Affairs ......................78
 b. Incompatibility with Norm of Proportionality .........................79
 c. Preemption of State Tort Claims by Executive's Power to
 Conduct Foreign Relations ..........................................79
 F. Causation ....................................................................81
 G. Retroactivity ................................................................81

*15
 H. Choice of Law ................................................................82
 IX. Inapplicability of Government Contractor Defense .................................85
 A. Position of the Government that Defense Applies to International Law-Based
 Claims .....................................................................85
 B. Government Position Not Supported by Facts or Law ............................91
 C. Zyklon B Case ................................................................91
 D. Nuremberg Military Tribunals .................................................94
 E. Necessity Distinguished ......................................................96
 X. History of Abuse of Civilians and Land During War and Attempts to Limit
 Harm ...........................................................................99
 A. History ......................................................................99
 B. Attempts to Protect Civilians and Land by Treaties, Custom and
 Religious Edicts ..........................................................102
 XI. Insufficiency of Plaintiffs' International Law Claims............................105
 A. Position of the Government ..................................................105
 B. Statutes of the United States ...............................................110
 1. Torture .................................................................110
 2. War Crimes ..............................................................112
 3. Genocide ................................................................114
 C. Treaties and Other International Instruments ................................115
 1. 1907 Hague Convention IV ................................................115
 2. 1925 Geneva Protocol ....................................................118
 3. 1945 London Charter .....................................................121
 4. United Nations Charter ..................................................122
 5. 1949 Geneva Conventions .................................................122
 6. 1969 United Nations General Assembly Resolution .........................123
 7. Environmental Law .......................................................127
 D. Customary International Law .................................................130
 1. Generally ...............................................................130
 2. Crimes Against Humanity .................................................134
 3. Proportionality .........................................................136
 XII. 1975 Presidential and Congressional Action ......................................138
 A. President ...................................................................138
 B. Congress ....................................................................139
XIII. Conclusion ......................................................................145

I. Introduction

This case involves claims by Vietnamese nationals and an organization, The Vietnamese Association for Victims of Agent Orange/Dioxin ("VAVAO"), for harms allegedly done to them and their land by the United States' use of Agent Orange and other herbicides during the Vietnam War from 1965 to 1971 and the South Vietnamese government's subsequent use of such herbicides until 1975. They allege that the manufacturer-defendants are responsible under domestic tort law and under international law.
All claims are dismissed for the reasons stated below. Because of the comprehensive nature of the dismissal the court has not addressed individual motions by defendants claiming no connection with the use of herbicides in Vietnam.

A. Domestic Law Tort Claims Defeated by Government Contractor Defense

In Stephenson v. Dow Chemical Company (No. 99-CV-3056), Isaacson v. Dow Chemical Company (No. 98-CV-6383) and other like cases, United States veterans of *16 the Vietnam War sought damages against the defendants for exposure to Agent Orange during their service in Vietnam. Defendants moved in those cases for summary judgment based on the government contractor defense  in essence, the claim that the government told us to do it and knew at least as much as we did about the dangers. The court granted defendants' motion to dismiss those tort-based claims on the grounds that the contractor defense applied. See Isaacson v. Dow Chem. Co., 304 F.Supp.2d 404 (E.D.N.Y.2004) (granting dismissal based on government contractor defense); see also In re "Agent Orange" Prod. Liab. Litig., 818 F.2d 187 (2d Cir.1987) (holding that government contractor defense applies, plus no causation), aff'g 611 F.Supp. 1223 (E.D.N.Y.1985) (holding that government contractor defense applies, plus no causation). The government has expressed agreement with this position. See Statement of Interest of the United States, Jan. 12, 2005, at 1 n. 2 [hereinafter U.S. Statement of Interest].
Based on plaintiffs' contention that the veterans had had insufficient time for discovery, the court stayed the judgment of dismissal and granted plaintiffs six months of additional discovery. Isaacson, 304 F.Supp.2d at 442. On plaintiffs' request, further time for discovery and preparation of briefs was then afforded. The magistrate judge, the Clerk of this court, the Special Master, and the National Archives cooperated in making the material sought by plaintiffs available. After full discovery and argument on February 28, 2005, the stay was lifted and judgments of dismissal entered in the veterans' cases because the government contractor defense had been established, warranting summary judgment of dismissal in favor of all defendants. Isaacson v. Dow Chem. Co., 344 F.Supp.2d 873 (E.D.N.Y.2004). The materials submitted by the parties after November 16, 2004 furnished additional strong support for dismissal. See order and judgments for defendants issued on March 2, 2005.
The same government contractor issue was raised in defendants' motions under Rule 12(b)(6) of the Federal Rules of Civil Procedure in the instant case as a defense to all claims brought by the Vietnamese. Those claims based on domestic law  but not international law  of the United States, of any state of the United States and of Vietnam are dismissed on this ground. See infra Parts IV.B.; VI.
The alleged delicts of the manufacturer-defendants occurred with a center of gravity in the United States, where the herbicides were ordered, manufactured and delivered to the government. Whatever the substantive domestic law applicable under any conflicts of law rule, the government contractor defense applies to that law. See Sosa v. Alvarez-Machain, 542 U.S. 692, ___, 124 S.Ct. 2739, 2752, 159 L.Ed.2d 718 (2004) ("It is true that the traditional approach to choice of substantive tort law has lost favor, [Gary J.] Simson, The Choice-of-Law Revolution in the United States: Notes on Rereading Von Mehren, 36 CORNELL INT'L L.J. 125, 125 (2003) (`The traditional methodology of place of wrong ... has receded in importance, and new approaches and concepts such as governmental interest analysis, most significant relationship, and better rule of law have taken center stage' (footnotes omitted))."); In re "Agent Orange" Prod. Liab. Litig., 580 F.Supp. 1242, 1254-55 (E.D.N.Y.1984) (finding that negligence, if any, of corporate suppliers of herbicides took place in United States); In re "Agent Orange" Prod. Liab. Litig., 580 F.Supp. 690 (E.D.N.Y.1984) (finding that federal or national consensus law applies under conflicts rules); infra Part VIII.H.; cf. Sosa, 542 U.S. at ___, 124 S.Ct. at 2754 (holding *17 that the Federal Tort Claims Act's foreign country exception "bars all claims based on any injury suffered in a foreign country, regardless of where the tortious act or omission occurred").
For domestic conflicts of law purposes the government contractor defense is a federal substantive rule. Neither the rule of Erie R.R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), nor comity in recognizing the internal substantive law of another nation can trump this federal substantive rule of law. See infra Part VIII.H. For the same reasons that the veterans' claims in Stephenson, Isaacson and similar cases were dismissed, all domestic law claims of the Vietnamese are dismissed. See infra Parts IV.B.; VI.
B. International Law Claims
1. General Approach of United States Courts
In judging international human rights claims against domestic corporations or others, courts in the United States with jurisdiction act as quasi international tribunals. See, e.g., LORI FISLER DAMROSCH, LOUIS HENKIN, RICHARD CRAWFORD PUGH, OSCAR SCHACHTER & HANS SMIT, INTERNATIONAL LAW CASES AND MATERIALS 645 (4th ed. 2001) ("The international law of human rights parallels and supplements national law, superseding and supplying the deficiencies of national constitutions and laws...." (quoting THE INTERNATIONAL BILL OF RIGHTS: THE COVENANT ON CIVIL AND POLITICAL RIGHTS 7 (Louis Henkin ed., 1981))); PETER MALANCZUK, AKEHURST'S MODERN INTRODUCTION TO INTERNATIONAL LAW 112 (Routledge 7th rev. ed. 1997) ("[I]nternational law allows states to exercise universal jurisdiction over certain acts which threaten the international community as a whole and which are criminal in all countries, such as war crimes...."); Paul R. Dubinsky, Human Rights Law Meets Private Law Harmonization: The Coming Conflict, 30 YALE J. INT'L L. 211, 268-82 (2005) (discussing universal jurisdiction); Thomas H. Lee, The Supreme Court of the United States as Quasi-International Tribunal: Reclaiming the Court's Original and Exclusive Jurisdiction over Treaty-Based Suits by Foreign States Against States, 104 COLUM. L.REV. 1765 (2004). Our courts will treat foreigners relying on international law with the same due process and courtesy as they would our own nationals.
Federal common law, not Erie, governs. Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 427 n. 25, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964) (noting that constitutional and statutory provisions indicate "a desire to give matters of international significance to the jurisdiction of federal institutions"); Paul S. Ryerson, Inconsistent Consistency: A Comment on Arrested Development of the Federal Common Law of Foreign Relations, 16 FLA. J. INT'L L. (forthcoming 2005, filed and docketed); infra Part VIII.H.
International law is internalized by our courts as law of the United States. As recognized by the Restatement (Third) of the Foreign Relations Law of the United States, "the jurisprudence of the United States has considered ... rules of international law themselves (and many international agreements) to be incorporated into the law of the United States." 1 RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES § 1 cmt. a (1987); see also id. § 1 reporters' note 4 ("Courts interpret the laws and international agreements of the United States and they determine international law as law of the United States."). "From the beginning, the law of nations, later referred to as international law, was considered to be incorporated into the law of the United States without the need for any action by *18 Congress or the President...." Id. introductory note to pt. I, ch. 2, at 41. Reflecting general understanding, the Restatement's position permits individual court actions within the United States for at least some violations of international law. It declares: "A person of foreign nationality ... may pursue any remedy provided by ... the law of another state...." 2 id. § 713(2)(c); see also id. § 703 reporters' note 7 (discussing individual remedies under United States law). See also infra Part VIII.H. on choice of law.
In deciding the scope and nature of applicable substantive rules of international law, this court has followed Rule 44.1 of the Federal Rules of Civil Procedure which governs the determination of foreign law. FED.R.CIV.P. 44.1; cf. N.Y. C.P.L.R. § 4511 (McKinney 1992 & Supp.2005) (addressing judicial notice). A federal court has wide discretion to do its own research as well as to rely upon experts in the somewhat similar fields of foreign or international law. See, e.g., Arthur R. Miller, Federal Rule 44.1 and the "Fact" Approach to Determining Foreign Law: Death Knell for a Die-Hard Doctrine, 65 MICH. L.REV. 613 (1967); Comm. on Int'l Commercial Dispute Resolution, Ass'n of the Bar of the City of N.Y., Proof of Foreign Law after Four Decades with Rule 44.1 FRCP and CPLR 4511 (forthcoming 2005). The lack of judicial expertise and the complexity of sources in these two fields  foreign and international law  often make it desirable for the court to seek assistance. In this case academic experts for defendants, plaintiffs and the government, as well as counsel, have supplemented the court's own research and furnished helpful and reliable professional advice on the subject of international law. See, e.g., Burger-Fischer v. Degussa AG, 65 F.Supp.2d 248, 257 (D.N.J.1999) (relying heavily on an international law expert's submission to the court). The opinions of Professor George P. Fletcher [hereinafter Fletcher Op.] and Professor Jordan J. Paust [hereinafter Paust Op.] submitted on behalf of plaintiffs and the brief of amici were learned and compelling except for their view that military use of Agent Orange in Vietnam was a tort in violation of the law of nations. See infra Part XI. Other learned opinions submitted on behalf of defendants, relied upon and quoted in the body of this memorandum, were compelling in their conclusion that no violation of international law by defendants can be shown.
2. Government Contractor Defense Not Applicable
As indicated in more detail below in Part IX, the government contractor defense does not apply to violations of human rights, norms of international law and related theories. See, e.g., Zyklon B Case (Trial of Bruno Tesch and Two Others), 1-5 LAW REPORTS OF TRIALS OF WAR CRIMINALS 93-102 (William S. Hein & Co.1997) (U.N. War Crimes Comm'n ed., 1949); United States v. Krupp, 9 TRIALS OF WAR CRIMINALS BEFORE THE NUERNBERG MILITARY TRIBUNALS UNDER CONTROL COUNCIL LAW NO. 10, at 1327, 1437-39 (photo. reprint 1997) (1950) [hereinafter TRIALS OF WAR CRIMINALS]; United States v. Flick, 6 TRIALS OF WAR CRIMINALS 1187, 1198, 1202 (photo. reprint 1997) (1952); see also infra Part IX. Defendants' motion to dismiss the international law claims on the ground of the government contractor defense is denied. Even in light of the Supreme Court's restrictive interpretation of applicable international law in Sosa v. Alvarez-Machain, 542 U.S. 692, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004), plaintiffs' international law based causes of action under the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350 (2000), (which caselaw has also referred to as the Alien Tort Claims Act ("ATCA") or *19 Alien Tort Act ("ATA"), see Flores v. S. Peru Copper Corp., 343 F.3d 140, 143 & n. 1 (2d Cir.2003)), are not barred by the government contractor defense. See infra Part IX.
3. Substantive Merit Lacking
Detailed analysis of international law claims of the Vietnamese plaintiffs establishes that use of herbicides by or on behalf of the United States in Vietnam before 1975 was not a violation of international law. Use by the United States ended in early 1971; responsibility of defendants for that use did not extend beyond 1971 since private corporate liability in this case could arise only from the foreseeable action of a customer  the United States. Herbicide spraying by the United States violated no rights of plaintiffs under international law. See infra Part XI.

II. Use of Agent Orange and Other Herbicides in Vietnam War

There has been a great deal written on the development and use of herbicides in war. See also infra Parts IV.A.3.-4. The most recent comprehensive description is by Professor Jeanne Mager Stellman of Columbia University, New York, and her associates; it is heavily relied upon and in part copied without specific attribution in the rest of this Part. See Jeanne Mager Stellman et al., The Extent and Patterns of Usage of Agent Orange and Other Herbicides in Vietnam, 422 NATURE 681 (2003); see also Declan Butler, Flight Records Reveal Full Extent of Agent Orange Contamination, 422 NATURE 649 (2003) (stating that Stellman's study shows that herbicides were directly sprayed on hamlets containing between two and four million people); David A. Butler, Connections  The Early History of Scientific and Medical Research on "Agent Orange" (Feb. 17, 2005) (unpublished manuscript, filed and docketed). No study or technique presented to the court has demonstrated how it is now possible to connect the herbicides supplied by any defendant to exposure by any plaintiff to dioxin from that defendant's herbicide. See generally MICHAEL GOUGH, DIOXIN, AGENT ORANGE: THE FACTS (1986) (discussing scientific problems in proving causation); see also Jonathan Walter, US Cancels Agent Orange Study in Vietnam, NEW SCIENTIST, Mar. 20, 2005 (reporting that the United States National Institute of Environmental Science cancelled the research project under the 2003 United States-Vietnam agreement that would have looked at the health effects of dioxin), http://www.newscientist.com/ article.ns?id=dn7146.
Between 1961 and 1971, herbicide mixtures  nicknamed by the colored identification band painted on their 208-litre storage barrels  were used by the United States and Republic of Vietnam ("RVN") forces to defoliate forests and mangroves, to clear perimeters of military installations and to destroy "unfriendly" crops, as a tactic for decreasing enemy armed forces protective cover and food supplies. United States participation ended in 1971 but the RVN forces allegedly continued independently to use leftover barrels of herbicides until 1975.
The best-known mixture was Agent Orange. About 65% of the herbicides contained 2,4,5-trichlorophenoxyacetic acid (2,4,5-T), which was contaminated with varying levels of 2,3,7,8-tetrachlorodibenzo-p-dioxin (TCDD). Herbicide mixtures used are listed in Table I.

 Table I
 Use of military herbicides in Vietnam by United States (1961-1971)
 (Source: Stellman, supra, at 682.)

*20
------------------------------------------------------------------------------------------------------------------------
 Concentration Estimated
 Chemical active quantities
Name constituents ingredient Years used sprayed (litres)
------------------------------------------------------------------------------------------------------------------------
 Agent Pink 60%-40% n-Butyl; 961-1,081 gl -1 acid 1961; 1965 50,312 sprayed;
 isobutyl ester of equivalent 413,852 additional
 2,4,5-T on procurement
 records
------------------------------------------------------------------------------------------------------------------------
 Agent Green n-Butyl ester 2,4,5-T (Should have same (Unclear 31,026 shown on procurement
 acid equivalent as but within records
 Agent Pink) time
 frame for
 Agent
 Pink)
------------------------------------------------------------------------------------------------------------------------
 Agent Purple 50% n-Butyl ester 2,4-D; 1,033 gl -1 acid 1962-1965 1,892,773
 30% n-butyl ester equivalent
 2,4,5-T; 20% isobutyl
 ester 2,4,5-T
------------------------------------------------------------------------------------------------------------------------
 Agent 50% n-Butyl ester 2,4-D; 1,033 gl -1 acid 1965-1970 45,677,937 (may
 Orange 50% n-butyl ester equivalent include Agent
 2,4,5-T Orange II)
------------------------------------------------------------------------------------------------------------------------
 Agent 50% n-Butyl ester 2,4-D; 910 gl -1 acid After Unknown but at
 Orange II 50% isooctyl ester equivalent 1968(?) least 3,591,000
 2,4,5-T shipped
------------------------------------------------------------------------------------------------------------------------
 Agent White Acid weight basis: By acid weight: 1966-1971 20,556,525
 21.2% tri-isopropanolamine 240.2 gl -1 2,4-D
 salts of 2,4-D and 64.9 gl -1
 and 5.7% picloram picloram
------------------------------------------------------------------------------------------------------------------------
 Agent Blue Cacodylic acid (dimethylarsinic Acid: 65% active 1962-1964 25,650
 (powder) acid) and ingredient; salt:
 sodium cacodylate 70% active
 ingredient
------------------------------------------------------------------------------------------------------------------------
 Agent Blue 21% sodium cacodylate Acid weight: 360.3 1964-1971 4,715,731
 (H20 solution) + cacodylic acid to gl -1
 yield at least 26%
 total acid equivalent
 by weight
------------------------------------------------------------------------------------------------------------------------

Military herbicide operations in Vietnam became a matter of scientific controversy almost from their inception. In April 1970, 2,4,5-T was banned from most United States domestic uses on the basis of evidence of its possible teratogenicity. Long after the war, the Agent Orange Act of 1991 requested the Institute of Medicine ("IOM") to assess the strength of the evidence for association between exposure to military herbicides and disease in veterans and the feasibility of conducting further epidemiological studies.
The Department of Defense's Advanced Research Project Agency's ("ARPA") Project Agile was instrumental in the United States' development of herbicides as a military weapon, an undertaking inspired by the British use of 2,4,5-T to destroy jungle-grown crops during the insurgency in Malaya. ARPA supported tests on combinations and concentrations of herbicides; calibration studies of the spray delivery system to achieve the desired 281ha -1 (3 gallons/acre) rate; and experiments on optimal conditions to minimize spray drift. ARPA also developed the Hamlet Evaluation System ("HES") which collected the political census data used for estimating population exposures.
The first large-scale United States military defoliation took place in Camp Drum, *21 New York, in 1959, using Agent Purple (a 50-50 mixture of 2,4-D and 2,4,5-T) and a spray system which was the model for those used in Vietnam. Herbicide tests were run from August to December 1961 in the RVN using dinoxol and trinoxol. An insecticide test series was also undertaken. The first major herbicide shipment arrived in RVN in January 1962; defoliation targets were sprayed during September and October 1962 (Agent Purple); crop destruction targets were sprayed in November 1962 (Agent Blue). Systematic testing of herbicides and calibration of herbicide delivery systems continued for several years.
United States Air Force ("USAF") operations, codenamed Operation Ranch Hand, dispersed more than 95% of all herbicides used in Operation Trail Dust, the overall herbicide program. Other branches of the United States armed services and RVN forces, generally using hand sprayers, spray trucks (Buffalo turbines), helicopters and boats, sprayed much smaller quantities of herbicide. Crop destruction required White House approval until 1963, after which final approval was delegated to the United States Ambassador to the RVN.
In total about 1.9 million litres of Agent Purple were sprayed between 1962 and 1965. This timing is a particularly significant because herbicides manufactured in the early 1960s were almost certainly more heavily TCDD-contaminated than those produced later. Pre-1965 spraying was limited to a relatively small area which may be at particular risk for current TCDD contamination.
Contamination of 2,4,5-T with TCDD varied widely by production run, manufacturer, and the percentage of 2,4,5-T in the formulation. In early 1966, Agent White, which did not contain 2,4,5-T and hence was not TCDD-contaminated, began to replace Agent Orange. From a tactical perspective Agent White was less satisfactory than Agent Orange because several weeks were required for defoliation to begin. Agent White was accepted by the Department of Defense because Agent Orange was apparently no longer available in sufficient quantities. Agent Blue was the agent of choice for crop destruction by desiccation throughout the Vietnam War, but more than four million litres of the other agents, primarily containing 2,4,5-T, were also used on crops.
Procurement records show that at least 464,164 litres of Agent Pink and 31,026 litres of Agent Green, with comparatively high TCDD levels, were purchased. Identified missions dispersed about 1.9 million litres of Agent Purple.
Estimates of how much TCDD was deposited in Vietnam are based on estimates of the volume of 2,4,5-T-containing herbicide sprayed and on TCDD contamination levels. After Agent Orange spraying by the United States ended, the USAF was required to dispose of very large stockpiles of surplus herbicide that were ultimately incinerated aboard the M/T Vulcanus in 1977. TCDD concentrations ranged from 6.2 to 14.3 p.p.m., and averaged 13.25 p.p.m. in samples drawn for incineration-effluent modelling studies from 28 different barrels chosen by the USAF as representative of the seven manufacturers contributing to the stockpile. In other samples drawn from the stockpile, the TCDD range was about 0.05 to 13.3 p.p.m. (weighted average 1.77 p.p.m). Documentation also reports dioxin levels to be heterogeneous even within the same production run.
In 1971 an analysis by the National Academy of Science's comprehensive study of ecological and physiological effects of defoliation in Vietnam ("NAS-1974") found TCDD levels ranging from non-detectable *22 (

Although Agent Purple is likely to have been more highly contaminated with TCDD, it is not unlikely that mean TCDD levels in Agent Orange were higher than 3 p.p.m. for much of the herbicide used. An average value closer to 13 p.p.m. may be realistic. If 3 p.p.m., the mean associated with the "low dioxin" series, is conservatively applied, the estimate of total TCDD present in the spray grows to 221 kg. Applying 32.8 p.p.m. and 65.5 p.p.m. as the average TCDD in Agents Purple and Pink provides an additional 165 kg, or 366 kg in total (which does not take into account the herbicides sprayed by RVN forces, and possibly by United States Army and Navy forces by trucks, boats, hand sprayers and helicopters, nor the more than 400,000 litres of Agent Pink shown in procurement records but not found in any recorded missions).
A HES in which United States district advisors and Vietnamese district chiefs filled out monthly political survey and census forms was established in June 1967, and a gazetteer of place names and precise geographical locations was also created. The HES data provide a comprehensive rural census that permits estimates of the numbers of hamlets and size of the population directly sprayed.
More than 20,585 unique hamlets are represented in the corrected version of the Stellman database. Population data are not available for 18% of these hamlets and population data are not systematically reported each month for all years. Among the hamlets with some population data, 3,181 were sprayed directly and at least 2.1 million but perhaps as many as 4.8 million people would have been present during the spraying. Another 1,430 hamlets were also sprayed, but there is no estimate of the population involved. In all, at least 3,851 out of 5,958 known fixed-wing missions had flight paths directly over the hamlet coordinates given in the HES and gazetteer data. About 35% of the total herbicide sprayed was flown by these missions, although, in general, flight paths extended beyond hamlet borders.
In 1971, NAS-1974 analyzed five soil samples from an area in which large amounts of Agent Orange had been dumped in December 1968. No 2,4,5-T could be detected.
Empty barrel residues led to inadvertent defoliation of trees and gardens in Da Nang, Nha Trang, Bien Hoa, Phu Cat and Saigon civilian areas near USAF airbases that handled the herbicides when the empty barrels were transported to local merchants for commercial use. The ultimate fate of most of the empty barrels is not known. Also unknown is the extent of possible exposure of people who used the barrels for other purposes.
Large numbers of Vietnamese civilians appear to have been directly exposed to herbicidal agents, some of which were sprayed at levels at least an order of magnitude greater than for similar United States domestic purposes. Yet, according to Professor Stellman, no large-scale epidemiological study of herbicides and the health of either the Vietnamese population or war veterans has yet been carried out. The data from mortality and morbidity records, at least in the United States, should be available for causation studies, but no such study of significance has been made. Those studies supporting Veterans Administration decisions to declare some *23 diseases presumptively caused by Agent Orange as a basis for disability payments (extremely low probability required) are of almost no use in determining causation for litigation purposes (more probable than not shown by admissible proof required).
By 1970, or certainly by 1971, herbicide spraying by United States forces had ceased. David A. Butler, Connections  The Early History of Scientific and Medical Research on "Agent Orange" 8 (Feb. 17, 2005) (unpublished manuscript, filed and docketed) ("On January 7, 1971, aerial spray missions came to an end."). Plaintiffs concede that "military use of 2,4,5-T, including Agent Orange," was suspended on April 15, 1970, and other herbicides were not used after "January 1971, when the last Ranch Hand Mission took place." Mem. of Law in Opp'n To Defs.' Mot. to Dismiss All Claims for Failure to State a Claim Under the Law of Nations, Jan. 18, 2004, at 147 [hereinafter Pls.' Mem. of Law in Opp'n to Defs.' Mot.]. This is long before the 1975 termination claimed by plaintiffs. See Figure 1. The discussion below in Part XI demonstrates that international law did not outlaw the kind of use of herbicides complained of before 1975.

Figure l. Time course of herbicide sorties. At least 19,905 sorties were run between 1961-1971 (1-34 daily, with a daily average of 10.7 sorties). Source: Stellman, supra, at 685.

III. Prior Phases of Agent Orange Litigation

The extensive prior procedure in other phases of the Agent Orange litigation is assumed to be known or available to the reader. See Dow Chem. Co. v. Stephenson, 539 U.S. 111, 123 S.Ct. 2161, 156 L.Ed.2d 106 (2003) (per curiam); Stephenson v. Dow Chem. Co., 346 F.3d 19 (2d Cir.2003) (per curiam) (vacating dismissal because, inter alia, All Writs Act did not provide removal jurisdiction); Stephenson v. Dow Chem. Co., 273 F.3d 249 (2d Cir.2001) (vacating dismissal because plaintiffs were not adequately represented in prior litigation that resulted in Agent Orange settlement and thus res judicata did not bar them from pursuing their claims), aff'd *24 in part, vacated in part by 539 U.S. 111, 123 S.Ct. 2161, 156 L.Ed.2d 106 (2003); Miller v. Diamond Shamrock Co., 275 F.3d 414 (5th Cir.2001) (holding that plaintiff's claims were barred by the government contractor defense); Winters v. Diamond Shamrock Chemical Co., 149 F.3d 387 (5th Cir.1998) (holding that plaintiffs' claims were barred by the government contractor defense); Jenkins v. Agent Orange Settlement Fund, No. 97-7538, 1997 WL 774394 (2d Cir. Dec 17, 1997) (unpublished disposition); Addington v. Agent Orange Veterans Payment Program, No. 97-7071, 1997 WL 738070 (2d Cir. Nov 24, 1997) (unpublished disposition); Gough v. Agent Orange Settlement Fund, No. 96-6067, 1996 WL 636536 (2d Cir. Nov 5, 1996) (unpublished disposition); In re Agent Orange Prod. Liab. Litig., 996 F.2d 1425 (2d Cir.1993); In re Ivy, 901 F.2d 7 (2d Cir.1990) (MDL Panel had jurisdiction to transfer); In re "Agent Orange" Prod. Liab. Litig., 821 F.2d 139 (2d Cir.1987) (holding there was no abuse of discretion in unsealing documents); In re "Agent Orange" Prod. Liab. Litig., 818 F.2d 179 (2d Cir.1987) (appeal reviewing settlement plan); In re "Agent Orange" Prod. Liab. Litig., 818 F.2d 194 (2d Cir.1987) (affirming dismissal of Federal Tort Claims Act claims of servicemen);
In re "Agent Orange" Prod. Liab. Litig., 818 F.2d 204 (2d Cir.1987); In re "Agent Orange" Prod. Liab. Litig., 818 F.2d 210 (2d Cir.1987); In re "Agent Orange" Prod. Liab. Litig., 818 F.2d 216 (2d Cir.1987); In re "Agent Orange" Prod. Liab. Litig., 818 F.2d 226 (2d Cir.1987); In re "Agent Orange" Prod. Liab. Litig., 800 F.2d 14 (2d Cir.1986) (denying motion to disqualify plaintiffs' attorneys from appealing settlement); In re "Agent Orange" Prod. Liab. Litig., 804 F.2d 19 (2d Cir.1986) (denying repeal of stay on settlement funds pending appeal); In re "Agent Orange" Prod. Liab. Litig., 787 F.2d 822 (2d Cir.1986) (dismissing claims of non-class plaintiffs against defendant not named in complaints); Vietnam Ass'n for Victims of Orange/Dioxin v. Dow Chem. Co., 327 F.Supp.2d 198 (E.D.N.Y.2004) (inviting U.S. government to submit brief as amicus curiae); Isaacson v. Dow Chem. Co., 304 F.Supp.2d 404 (E.D.N.Y.2004) (holding that defendants were entitled to government contractor defense but staying decision pending discovery); Isaacson v. Dow Chem. Co., 304 F.Supp.2d 442 (E.D.N.Y.2004) (holding that defendants were entitled to remove action to federal court under federal officer removal statute); In re "Agent Orange" Prod. Liab. Litig., No. 97 CV 1976, 1999 WL 1045197 (E.D.N.Y. Jan.21, 1999); Ryan v. Dow Chem. Co., 781 F.Supp. 902 (E.D.N.Y.1991) (plaintiffs cannot collaterally attack prior settlement); In re "Agent Orange" Prod. Liab. Litig., 689 F.Supp. 1250 (E.D.N.Y.1988) (modifying class assistance program as required by 818 F.2d 179, approved settlement and granting opt-out plaintiffs opportunity to opt into class for purposes of benefitting from settlement fund); In re "Agent Orange" Prod. Liab. Litig., 603 F.Supp. 239 (E.D.N.Y.1985) (dismissing claims of veterans' wives and children against government), aff'd in part, vacated in part, 818 F.2d 201 (2d Cir.1987), cert. denied, 484 U.S. 1004, 108 S.Ct. 695, 98 L.Ed.2d 647 (1988); In re "Agent Orange" Prod. Liab. Litig., 104 F.R.D. 559 (E.D.N.Y.1985) (modifying protective orders);
In re "Agent Orange" Prod. Liab. Litig., 618 F.Supp. 625 (E.D.N.Y.1985) (approving distribution plan of Agent Orange settlement fund allocated to Australia and New Zealand); In re "Agent Orange" Prod. Liab. Litig., 618 F.Supp. 623 (E.D.N.Y.1985) (approving settlement of class action and dismissing with prejudice claims of class members) (Special Masters for Settlement Kenneth R. Feinberg and David I. *25 Shapiro); In re "Agent Orange" Prod. Liab. Litig., 611 F.Supp. 1452 (E.D.N.Y.1985) (denying motion to set aside attorney fee-sharing arrangement), rev'd in part, 818 F.2d 216 (2d Cir.1987), cert. denied, 484 U.S. 926, 108 S.Ct. 289, 98 L.Ed.2d 249 (1987); In re "Agent Orange" Prod. Liab. Litig., 611 F.Supp. 1396 (E.D.N.Y.1985) (establishing plan for disbursement of settlement fund pending appeals), aff'd in part, rev'd in part, 818 F.2d 179 (2d Cir.1987); In re "Agent Orange" Prod. Liab. Litig., 611 F.Supp. 1296 (E.D.N.Y.1985) (determining class-action plaintiffs' attorney fees and reaffirming settlement); aff'd in part, rev'd in part, 818 F.2d 226 (2d Cir.1987); In re "Agent Orange" Prod. Liab Litig., 611 F.Supp. 1290 (E.D.N.Y.1985) (dismissing claim of civilian physician for failure to demonstrate exposure to herbicides), aff'd in part, vacated in part, 818 F.2d 210 (2d Cir.1987), cert. denied, 484 U.S. 1004, 108 S.Ct. 695, 98 L.Ed.2d 648 (1988); In re "Agent Orange" Prod. Liab. Litig., 611 F.Supp. 1285 (E.D.N.Y.1985) (dismissing action brought by Hawaiian civilians), aff'd in part, vacated in part, 818 F.2d 210 (2d Cir.1987), cert. denied, 484 U.S. 1004, 108 S.Ct. 695, 98 L.Ed.2d 648 (1988); In re "Agent Orange" Prod. Liab. Litig., 611 F.Supp. 1267 (E.D.N.Y.1985) (same), aff'd, 818 F.2d 187 (2d Cir.1987), cert. denied, 487 U.S. 1234, 108 S.Ct. 2898, 101 L.Ed.2d 932 (1988); In re "Agent Orange" Prod. Liab. Litig., 611 F.Supp. 1223 (E.D.N.Y.1985) (ruling as to admissibility of opt-out plaintiffs' scientific evidence and expert testimony and granting summary judgment in favor of defendants for plaintiffs' failure to establish causation), aff'd, 818 F.2d 187 (2d Cir.1987), cert. denied, 487 U.S. 1234, 108 S.Ct. 2898, 101 L.Ed.2d 932 (1988);
In re "Agent Orange" Prod. Liab. Litig., 611 F.Supp. 1221 (E.D.N.Y.1985) (dismissing defendants' claim for indemnity from government for settlement payments to veterans' families), aff'd, 818 F.2d 204 (2d Cir.1987); In re "Agent Orange" Prod. Liab. Litig., 105 F.R.D. 577 (E.D.N.Y.1985) (affirming with modification magistrate's order that defendants in two non-settled cases produce deponents); In re "Agent Orange" Prod. Liab. Litig., 597 F.Supp. 740 (E.D.N.Y.1984) (approving settlement of class action subject to fairness hearings); In re "Agent Orange" Prod. Liab. Litig., 101 F.R.D. 97 (E.D.N.Y.1984) (ordering in camera disclosure of names of scientists deleted from government report); In re "Agent Orange" Prod. Liab. Litig., 580 F.Supp. 1242 (E.D.N.Y.1984) (reinstating third-party plaintiffs' claim for indemnity against government with respect to claims of veterans' wives and children), mandamus denied, 733 F.2d 10 (2d Cir.1984), appeal denied, 745 F.2d 161 (2d Cir.1984), cert. denied, 465 U.S. 1067, 104 S.Ct. 1417, 79 L.Ed.2d 743 (1984); In re "Agent Orange" Prod. Liab. Litig., 580 F.Supp. 690 (E.D.N.Y.1984) (finding national consensus law on issues of liability, government contractor defense and punitive damages); In re "Agent Orange" Prod. Liab. Litig., 100 F.R.D. 778 (E.D.N.Y.1984) (denying motion to implead suppliers of chemical components); In re "Agent Orange" Prod. Liab. Litig., 100 F.R.D. 718 (E.D.N.Y.1983) (certifying Rule 23(b)(3) and Rule 23(b)(1)(B) classes), appeal denied, 100 F.R.D. 735 (E.D.N.Y.1983), mandamus denied, 725 F.2d 858 (2d Cir.1984), aff'd, 818 F.2d 145 (2d Cir.1987), cert. denied, 484 U.S. 1004, 108 S.Ct. 695, 98 L.Ed.2d 648 (1988); In re "Agent Orange" Prod. Liab. Litig., 99 F.R.D. 645 (E.D.N.Y.1983) (lifting prior protective order applying to government documents obtained during discovery); In re "Agent Orange" Prod. Liab. Litig., 99 F.R.D. 338 (E.D.N.Y.1983) (approving discovery recommendations of special master); In re "Agent Orange" Prod. *26 Liab. Litig., 571 F.Supp. 481 (E.D.N.Y.1983) (granting motion of law firm to be relieved as lead counsel for plaintiffs and appointing new plaintiffs' management committee);
In re "Agent Orange" Prod. Liab. Litig., 570 F.Supp. 693 (E.D.N.Y.1983) (clarifying program for discovery); In re "Agent Orange" Prod. Liab. Litig., 98 F.R.D. 558 (E.D.N.Y.1983) (approving special master's order of additional discovery to clarify circumstances surrounding document destruction); In re "Agent Orange" Prod. Liab. Litig., 98 F.R.D. 557 (E.D.N.Y.1983) (ordering special master to review discovery decisions in light of court's decision to try causality and liability issues); In re "Agent Orange" Prod. Liab. Litig., 98 F.R.D. 554 (E.D.N.Y.1983) (denying request for reconsideration of order to unseal documents); In re "Agent Orange" Prod. Liab. Litig., 98 F.R.D. 539 (E.D.N.Y.1983) (adopting special master's order to unseal documents in connection with summary judgment motions); In re "Agent Orange" Prod. Liab. Litig., 98 F.R.D. 522 (E.D.N.Y.1983) (adopting order of special master concerning discovery of government documents); In re "Agent Orange" Prod. Liab. Litig., 565 F.Supp. 1263 (E.D.N.Y.1983) (granting summary judgment for four defendants on government contractor defense; denying summary judgment for other defendants); In re "Agent Orange" Prod. Liab. Litig., 97 F.R.D. 542 (E.D.N.Y.1983) (affirming special master's denial of discovery request); In re "Agent Orange" Prod. Liab. Litig., 97 F.R.D. 541 (E.D.N.Y.1983) (denying interlocutory appeal of decision deferring certification of class and determination of appropriate notice); In re "Agent Orange" Prod. Liab. Litig., 97 F.R.D. 427 (E.D.N.Y.1983) (adopting special master's procedures for discovery of documents possibly subject to executive privilege); In re "Agent Orange" Prod. Liab. Litig., 97 F.R.D. 424 (E.D.N.Y.1983) (adopting special master's protective order for Department of Agriculture documents); In re "Agent Orange" Prod. Liab. Litig., 97 F.R.D. 424 (E.D.N.Y.1983) (adopting protective order);
In re "Agent Orange" Prod. Liab. Litig., 96 F.R.D. 587 (E.D.N.Y.1983) (adopting with modifications special master's order regarding videotaped depositions); In re "Agent Orange" Prod. Liab. Litig., 96 F.R.D. 582 (E.D.N.Y.1983) (rejecting first amendment challenge to protective order); In re "Agent Orange" Prod. Liab. Litig., 96 F.R.D. 578 (E.D.N.Y.1983) (adopting special master's protective order for discovery of government documents); In re "Agent Orange" Prod. Liab. Litig., 95 F.R.D. 192 (E.D.N.Y.1982) (affirming special master's ruling as to location of depositions); In re "Agent Orange" Prod. Liab. Litig., 95 F.R.D. 191 (E.D.N.Y.1982) (clarifying that denial of motion to implead suppliers was without prejudice); In re "Agent Orange" Prod. Liab. Litig., 544 F.Supp. 808 (E.D.N.Y.1982) (denying motion to disqualify defense attorneys; provisionally dismissing claims against certain non-manufacturer defendants, and denying motion to implead suppliers); In re "Agent Orange" Prod. Liab. Litig., 94 F.R.D. 173 (E.D.N.Y.1982) (appointing special master to supervise discovery); In re "Agent Orange" Prod. Liab. Litig., 537 F.Supp. 977 (E.D.N.Y.1982) (provisionally dismissing claims against non-manufacturer defendant); In re "Agent Orange" Prod. Liab. Litig., 534 F.Supp. 1046 (E.D.N.Y.1982) (denying reargument on dismissal of government as third-party defendant, denying interlocutory appeal, provisionally dismissing claims against non-manufacturer defendants, denying motion to form steering committee for plaintiffs' counsel, denying motion for decertification of class, deferring decision on statute of limitations *27 issues, and establishing elements of government contractor defense); In re "Agent Orange" Prod. Liab. Litig., 93 F.R.D. 514 (E.D.N.Y.1982) (allowing defendant to proceed with scheduled destruction of documents); In re "Agent Orange" Prod. Liab. Litig., 91 F.R.D. 618 (E.D.N.Y.1981) (allowing motion to amend caption, denying motion to amend complaint, denying defendants' motion for summary judgment on government contractor defense);
In re "Agent Orange" Prod. Liab. Litig., 91 F.R.D. 616 (E.D.N.Y.1981) (establishing committee to review procedures for videotaped depositions); In re "Agent Orange" Prod. Liab. Litig., 506 F.Supp. 762 (E.D.N.Y.1980) (dismissing claims against government as third-party defendant, establishing case management plan, conditionally certifying Rule 23(b)(3) class, and denying defendants' motion for summary judgment); In re "Agent Orange" Prod. Liab. Litig., 506 F.Supp. 757 (E.D.N.Y.1980) (requiring plaintiffs to file individual notices to retain right to bring actions against federal government); In re "Agent Orange" Prod. Liab. Litig., 506 F.Supp. 756 (E.D.N.Y.1980) (establishing agenda for status conference); In re "Agent Orange" Prod. Liab. Litig., 506 F.Supp. 754 (E.D.N.Y.1980) (ordering videotaped deposition); In re "Agent Orange" Prod. Liab. Litig., 506 F.Supp. 753 (E.D.N.Y.1980) (various orders concerning modification of complaint and answers); In re "Agent Orange" Prod. Liab. Litig., 506 F.Supp. 750 (E.D.N.Y.1980) (ordering government to refrain from destruction of documents pursuant to internal procedure); In re "Agent Orange" Prod. Liab. Litig., 28 Fed. R. Serv.2d 993 (E.D.N.Y.1980) (granting motion of terminally ill plaintiff to videotape his own deposition); In re "Agent Orange" Prod. Liab. Litig., 506 F.Supp. 737 (E.D.N.Y.1979) (finding subject matter jurisdiction on basis of federal common law issues), rev'd, 635 F.2d 987 (2d Cir.1980), cert. denied, 454 U.S. 1128, 102 S.Ct. 980, 71 L.Ed.2d 116 (1981); In re "Agent Orange" Prod. Liab. Litig., 475 F.Supp. 928 (E.D.N.Y.1979) (dismissing federal constitutional and statutory claims, reserving possible federal common law claims, denying motion to limit communications to third parties); see also Ryan v. Dow Chem. Co., 781 F.Supp. 934 (E.D.N.Y.1992); Ryan v. Dow Chem. Co., Nos. 79 CIV. 747, MDL 381, 89 CIV. 3361 & 90 CIV. 3928, 1991 WL 243311 (E.D.N.Y. Nov 12, 1991); In re Agent Orange Fee Application of Yannacone, 139 F.R.D. 581 (E.D.N.Y.1991); Ryan v. Dow Chem. Co., 781 F.Supp. 902 (E.D.N.Y.1991).

IV. Pleadings by Vietnamese Plaintiffs and Motions by Defendants

Vietnamese nationals and a Vietnamese organization, VAVAO, sue corporations based in the United States for, in essence, committing violations of domestic and international law by manufacturing and supplying herbicides to the governments of the United States and South Vietnam, which were sprayed, stored and spilled in Vietnam from 1961 to 1975. Damages are sought for the deaths and injuries of the plaintiffs and the class that they seek to represent allegedly caused by exposure to the herbicides. Environmental abatement, clean-up of contaminated areas and disgorgement of profits are also sought.
A. Pleadings by Plaintiffs
1. Jurisdiction and Venue
Jurisdiction is invoked under the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350 (2000); diversity, 28 U.S.C. § 1332 (2000); regulation of commerce, 28 U.S.C. § 1337 (2000); and federal question, 28 U.S.C. § 1331 (2000). Pendent jurisdiction over state law claims is alleged. 28 U.S.C. *28 § 1367 (2000). Venue is vested in the Eastern District of New York, 28 U.S.C.A. § 1391 (1993 & Supp.2004), under control of the Judicial Panel on Multidistrict Litigation, 28 U.S.C. § 1407 (2000), for pretrial purposes only. Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach, 523 U.S. 26, 118 S.Ct. 956, 140 L.Ed.2d 62 (1998) (limiting power of multidistrict litigation transferee court to pretrial control).
2. Parties
A number of the individual plaintiffs appear to have been members of hostile military forces during the Vietnam War. They probably would have been entitled to less protection  if any  than civilians. Nevertheless, for purposes of this motion to dismiss and this memorandum, their status is not relevant. Their claims are analyzed as if they were civilians not involved in hostile acts against forces of the United States and its allies. The plaintiffs are self-described below:
VAVAO is a Vietnamese not-for-profit, non-governmental organization whose membership consists of victims of exposure to herbicides used during the Vietnam War as well as individuals and groups who volunteer to provide assistance to victims. The purpose of the organization is to represent and protect the interests of Vietnamese who allege exposure to herbicides produced by defendants, and to raise funds for their treatment and care and for mitigation of alleged harmful effects of environmental contamination. The organization is apparently run by an executive board consisting of such Vietnamese, medical and scientific researchers, as well as people from other disciplines.
Plaintiffs Phan Thi Phi Phi, Nguyen Van Quy, Vu Thi Loan, Nguyen Quang Trung, Nguyen Thi Thuy Nga, Duong Quynh Hoa, Huynh Trung Son, Ho Kan Hai, Nguyen Van Hoang, Ho Thi Le, Ho Xuan Bat, Nguyen Muoi, Nguyen Dinh Thanh, Dang Thi Hong Nhut, Nguyen Thi Thu, Nguyen Son Linh, Nguyen Son Tra, Vo Thanh Hai, Nguyen Thi Hoa, Vo Thanh Tuan Anh, Le Thi Vinh, Nguyen Thi Nham, Nguyen Minh Chau, Nguyen Thi Thoi, Nguyen Long Van, Tong Thi Tu and Nguyen Thang Loi were and are nationals and residents of Vietnam at relevant times.
Plaintiffs Nguyen Van Quy and Vu Thi Loan are the parents of plaintiffs Nguyen Quang Trung and Nguyen Thi Thuy Nga, who are under the age of 18 years. Plaintiff Duong Quynh Hoa is the administratrix of the estate of her deceased child, Huynh Trung Son. Plaintiff Ho Kan Hai is the mother of plaintiff Nguyen Van Hoang, who is under the age of 18 years. Plaintiff Ho Thi Le is the administratrix of the estate of her deceased husband, Ho Xuan Bat. Plaintiff Nguyen Thi Thu is the mother of plaintiffs Nguyen Son Linh and Nguyen Son Tra, who are under the age of 18 years.
Defendants are The Dow Chemical Company, a corporation incorporated under the laws of the State of Delaware that is registered to do business or in fact does business in the State of New York; Montsanto Chemical Company, a corporation incorporated under the laws of the State of Delaware that is registered to do business or in fact does business in the State of New York; Pharmacia Corporation, a corporation incorporated under the laws of the State of Delaware that is registered to do business or in fact does business in the State of New York; Hercules Incorporated, a corporation incorporated under the laws of the State of Delaware that is registered to do business or in fact does business in the State of New York; Occidental Chemical Corporation, a corporation incorporated under the laws of the State of New York that is registered to do business or in fact does business in the State *29 of New York; Ultramar Diamond Shamrock Corporation, a corporation incorporated under the laws of the State of Delaware that is registered to do business or in fact does business in the State of New York; Maxus Energy Corporation, a corporation incorporated under the laws of the State of Delaware that is registered to do business or in fact does business in the State of New York; Thompson Hayward Chemical Company, a corporation incorporated under the laws of the State of Missouri that is registered to do business or in fact does business in the State of New York; Harcros Chemicals Inc., a corporation incorporated under the laws of the State of Kansas that is registered to do business or in fact does business in the State of New York; Uniroyal, Inc., a corporation incorporated under the laws of the State of New Jersey that is registered to do business or in fact does business in the State of New York; Uniroyal Chemical, Inc., a corporation incorporated under the laws of the State of Delaware that is registered to do business or in fact does business in the State of New York; Uniroyal Chemical Holding Company, a corporation incorporated under the laws of the State of Delaware that is registered to do business or in fact does business in the State of New York; Uniroyal Chemical Acquisition Corporation, a corporation incorporated under the laws of the State of New Jersey that is registered to do business or in fact does business in the State of New York; C.D.U. Holding, Inc., a corporation incorporated under the laws of the State of Delaware that is registered to do business or in fact does business in the State of New York; Diamond Shamrock Agricultural Chemicals, Inc., a corporation incorporated under the laws of the State of Delaware that is registered to do business or in fact does business in the State of New York; Diamond Shamrock Chemicals, a corporation incorporated under the laws of the State of Delaware that is registered to do business or in fact does business in the State of New York; Diamond Shamrock Chemicals Company, a corporation incorporated under the laws of the State of Delaware that is registered to do business or in fact does business in the State of New York; Diamond Shamrock Corporation, a corporation incorporated under the laws of the State of Delaware that is registered to do business or in fact does business in the State of New York; Diamond Shamrock Refining and Marketing Company, a corporation incorporated under the laws of the State of Delaware that is registered to do business or in fact does business in the State of New York; Occidental Electrochemicals Corporation, a corporation incorporated under the laws of the State of Delaware that is registered to do business or in fact does business in the State of New York; Diamond Alkali Company, a corporation incorporated under the laws of the State of Delaware that is registered to do business or in fact does business in the State of New York; Ansul, Incorporated, a corporation incorporated under the laws of the State of Delaware that is registered to do business or in fact does business in the State of New York; Hooker Chemical Corporation, a corporation@ incorporated under the laws of the State of New York that is registered to do business or in fact does business in the State of New York; Hooker Chemical Far East Corporation, a corporation incorporated under the laws of the State of New York that is registered to do business or in fact does business in the State of New York; Hooker Chemicals & Plastics Corp., a corporation incorporated under the laws of the State of New York that is registered to do business or in fact does business in the State of New York; Hoffman-Taff Chemicals, Inc., a corporation incorporated under the laws of the State of Missouri that is registered to do business *30 or in fact does business in the State of New York; Chemical Land Holdings, Inc., a corporation incorporated under the laws of the State of Delaware that is registered to do business or in fact does business in the State of New York; T-H Agriculture & Nutrition Company, Inc., a corporation incorporated under the laws of the State of Delaware that is registered to do business or in fact does business in the State of New York; Thompson Chemical Corporation, a corporation incorporated under the laws of the State of Delaware that is registered to do business or in fact does business in the State of New York; Riverdale Chemical Company, a corporation incorporated under the laws of the State of Delaware that is registered to do business or in fact does business in the State of New York; Elementis Chemicals Inc., a corporation incorporated under the laws of the State of Delaware that is registered to do business or in fact does business in the State of New York; United States Rubber Company, Inc., a corporation incorporated under the laws of the State of New York that is registered to do business or in fact does business in the State of New York; Syntex Agribusiness Inc., a corporation incorporated under the laws of the State of Delaware that is registered to do business or in fact does business in the State of New York; and Syntex Laboratories, Inc., a corporation incorporated under the laws of the State of Delaware that is registered to do business or in fact does business in the State of New York. Some or all of the defendants are alleged to be successors-in-interest, parent companies, subsidiaries or otherwise associated with or related in interest with those defendants which manufactured and supplied the herbicides for use in the Vietnam War from 1961 to 1975 that allegedly caused the damage complained of.
3. Spraying Herbicides in Vietnam
It is contended that the United States in cooperation with the RVN implemented a widespread program to spray herbicides, primarily by aircraft. The stated purposes of the spraying were (1) to defoliate forests and mangroves in order to destroy the vegetative cover used by the Democratic Republic of Vietnam ("DRVN") troops and irregulars calling themselves the National Liberation Front ("NLF") for concealment, and (2) to destroy crops to deprive the DRVN and NLF of food. The spraying is alleged by plaintiffs to have lasted from 1961 until 1975.
4. Herbicides Used
The complaint indicates that various herbicides were used for defoliation and crop destruction in Vietnam. The different types of herbicides were identified by code names referring to the color of the band around the fifty-gallon steel herbicide container used to ship the materials from the manufacturer to the government which took delivery in the United States.
Herbicides included Agent Blue (cacodylic acid), Agent White (a mixture of 80% tri-isopropanol amine salt of 2,4-dichlorophenoxyacetic acid (2,4-D) and picloram), Agent Purple (a formulation of 50% n-butyl ester of 2,4-D, 30% n-butyl ester of 2,4,5-trichlorophenoxyacetic acid (2,4,5-T) and 20% isobutyl ester of 2,4-D), Agent Green (100% n-butyl ester of 2,4,5-T), Agent Pink (60% n-butyl ester of 2,4,5-T and 40% isobutyl ester of 2,4,5-T) and Agent Orange (50-50 mixture of the n-butyl esters of 2,4-D and 2,4,5-T). From 1962 to 1965, Agents Purple, Pink and Green were used. From 1965 to 1970, Agents Orange, White and Blue were used, and from 1970 to 1971, only Agents White and Blue were used. Agent Orange was the most extensively used herbicide.
*31 About two-thirds of the herbicides contained 2,4,5-T. A synthetic contaminant and by-product of the manufacture of 2,4,5-T is 2,3,7,8- tetracholorodibenzo-p-dioxin (TCDD), also known as dioxin. Dioxin is a toxic chemical. A by-product of cacodylic acid, contained in Agent Blue, is arsenic, and a contaminant of picloram, contained in Agent White, is hexachlorobenzene, both of which are toxic.
Phenoxy herbicides such as Agents Orange, Purple, White, Pink and Green are chemical growth regulators that kill certain plants by inducing malfunctions in the biological growth process. Agent Orange was an effective defoliant, used in regions containing a wide variety of woody and broadleaf herbaceous plants, causing discoloration and dropping of leaves. Agent White was especially useful in killing conifers. Agent Blue was used primarily for crop destruction.
Opposition to this herbicide program by scientists and others on the ground that it violated international law and was improper because it would cause harm to persons and land was brought to the attention of the United States beginning in early 1961. The United States officially ended its aircraft herbicide spraying campaign  also referred to as Operation Ranch Hand  in Vietnam in 1971. The complaint contends that unused United States stores of herbicides were provided to and used by the RVN up until its collapse in 1975. Am. Compl., Sept. 10, 2004, at 20.
During the course of United States' use of herbicides in Vietnam, Vietnamese combatants and civilians were directly exposed to herbicides by spraying. In addition to those who were sprayed directly with herbicides, others were exposed indirectly, by coming into contact with contaminated soil, plants, food and water. It has been estimated by plaintiffs that up to four million Vietnamese were exposed to herbicides during the period 1961-1975. Extensive environmental damage with serious ecological effects also allegedly resulted from the herbicide campaign, such as destruction of mangrove forests in southern Vietnam. Residues from herbicides transported, loaded and stored at or near United States bases in Vietnam allegedly led to continuing contamination up to the present of the soil and food chains in the surrounding areas, resulting in civilians' current exposure to herbicides.
5. Supply of Herbicides by Defendants
In the early 1960s, the United States government, pursuant to the Defense Production Act of 1950, entered into a series of fixed-price production or procurement contracts with the defendants. The contracts instructed the defendants not to label the contents of the fifty-gallon herbicide containers except by a color-coded three-inch band, in accordance with the type of herbicide (e.g., orange, purple, etc.). The government bought as much of Agent Orange as defendants were able to produce.
For the purpose of this phase of the case, it can be assumed that all defendants were aware at the time of procurement and production that the herbicides would be sprayed widely in Vietnam pursuant to chemical warfare operations in the form of defoliation and crop destruction; and that they did not object to the intended use of their product. Defendants were aware at the time of procurement and production that dioxin was a by-product and contaminant of 2,4,5-T and that dioxin was toxic to plants, some animals, and possibly humans. The defendants were also aware, it can be assumed, that the herbicides were sprayed in Vietnam in concentrations greater than those recommended for civilian use and without the precautions recommended for civilian use in the United *32 States. It is contended that the defendants were engaged in a conspiracy with the United States in violation of international law to manufacture, sell and supply these toxic herbicides to the United States government for use as chemical weapons in Vietnam during the period of 1961-1975.
6. Harm to Plaintiffs
The summary of the harms allegedly caused to plaintiffs or their progeny is set forth by plaintiffs in brief anecdotal form. The fact that diseases were experienced by some people after spraying does not suffice to prove general or specific causation, i.e., that the harm resulted to individuals because of the spraying. Post hoc ergo propter hoc remains a logical fallacy unacceptable in toxic tort law. Proof of causal connection depends primarily upon substantial epidemiological and other scientific data, particularly since some four million Vietnamese are claimed to have been adversely affected. Anecdotal evidence of the kind charged in the complaint and set out below can not suffice to prove cause and effect.
Availability of necessary scientific information from Vietnamese studies needed for epidemiological analysis has not been furnished to the court. It is not available with the richness of demographic and other data published in the United States. An agreement between the United States and Vietnam provides for some joint efforts to collect relevant data. Memorandum of Understanding, Mar. 10, 2002, between Vietnam and United States, http:// www.niehs.nih.gov/ external/usvcrp/mou31002.pdf. In view of the decision on the law in this memorandum there is no need to pursue this issue at this time. The matter is well summed up in the latest published study of Professor Stellman and her colleagues. It reads in part:
The Vietnam War ended in 1975, yet no large-scale epidemiological study of herbicides and the health of either the Vietnamese population or war veterans has been carried out....
....
Large numbers of Vietnamese civilians appear to have been directly exposed to herbicidal agents, some of which were sprayed at levels at least an order of magnitude greater than for similar U.S. domestic purposes.
Stellman, supra, at 686 (footnotes omitted); see also David Cyranoski, U.S. and Vietnam Join Forces to Count Cost of Agent Orange, 416 NATURE 262 (2002).
The harms allegedly suffered by plaintiffs are described in the complaint as follows:
From April 1966 through July 1971, plaintiff Dr. Phan Thi Phi Phi served as director of a multi-unit mobile hospital stationed at various locations in the provinces of Quang Nam and Quang Ngai in southern Vietnam, which were heavily sprayed with herbicides. She, along with the hospital staff and patients, ingested food and water from areas that were heavily sprayed with herbicides manufactured by the defendants. Allegedly as a result of her exposure to contaminated food and water, she had four pregnancies that ended in miscarriages.
From April 1972 until the end of Vietnam War in 1975, plaintiff Nguyen Van Quy served in the DRVN army repairing communication lines at various southern Vietnam locations. He ingested food and water from areas that had been sprayed with herbicides. He periodically suffered from headaches, exhaustion and skin irritation while he was stationed in southern Vietnam; the skin irritation disappeared after he left Quang Ngai province in 1973 but the headaches and exhaustion continued, *33 worsening over time. In 1983, his first wife's pregnancy ended in a stillbirth; they divorced. His spells of weakness and exhaustion worsened. His second wife, plaintiff Vu Thi Loan, gave birth to two children, plaintiffs Nguyen Quang Trung and Nguyen Thi Thuy Nga, who were born developmentally disabled. In October 2003, Nguyen Van Quy was diagnosed with stomach cancer and liver damage and found to have fluid in the lung. It is alleged that these diseases, conditions and birth defects were caused by his exposure to defendants' herbicides during the Vietnam War.
From 1964 to 1968, plaintiff Dr. Duong Quynh Hoa often traveled to the cities of Bien Hoa and Song Be, which became heavily contaminated with herbicides manufactured by the defendants. From 1968 to 1976, she resided in Tay Ninh province, where she was told several times to cover her head with plastic bags because U.S. aircraft were spraying chemicals. In 1970, she gave birth to a son, Huynh Trung Son. He was born developmentally disabled and suffered from epileptic convulsions; he died from a convulsion at the age of eight months. She had two miscarriages, in July 1971 and January 1972. She was diagnosed with diabetes in 1985 and breast cancer, for which she underwent a mastectomy, in 1998. In 1999, a test revealed relatively high levels of dioxin in her blood. She attributes all these problems to exposure to herbicides manufactured by defendants.
Since 1972, plaintiff Ho Kan Hai, a farmer, has resided in Aluoi (formerly Ashau) Valley in southern Vietnam, near the United States military base in A So where herbicides manufactured and supplied by the defendants were stored, transferred, spilled and sprayed. Her family's diet included local rice, vegetables, manioc, fish and poultry. She had four miscarriages and two of her children died at the age of 16 days and two years, respectively. She also had ovarian tumors which were surgically removed. One of her living children, Nguyen Van Hoang, was born in 1992 with severe physical and mental developmental disabilities. It is alleged that the miscarriages, ovarian tumors and developmental disabilities were caused by ingestion of food and water contaminated by herbicides manufactured by the defendants.
During the Vietnam War, plaintiff Ho Xuan Bat, now deceased, was active with the NLF in Aluoi Valley and observed the spraying of herbicides on several occasions. Herbicides were stored, transferred and spilled at several military bases in the Aluoi Valley region. In 1978, he married plaintiff Ho Thi Le and they continued to live in Aluoi Valley. They cultivated rice and vegetables for their own consumption and to sell in the local market, and consumed wild vegetables, fish and poultry. In 1980, Ho Thi Li gave birth to their first child, who died from a nose infection in 1982. She then had a miscarriage. In 1982, she gave birth to their second child, who died for unknown reasons after 16 days. Ho Xuan Bat's health began to deteriorate: he experienced fatigue, headaches, coughing with blood, chest pain, loss of appetite and weight, fever, and other symptoms. In 2003, he was diagnosed with lung cancer and died from it a year later. Ho Thi Le attributes her miscarriage, the deaths of her two children and her husband's death from lung cancer to their ingestion of food and water contaminated by herbicides manufactured by the defendants.
From 1970 through 1975, plaintiff Nguyen Dinh Thanh served in the RVN army, and was stationed in the Aluoi Valley in southern Vietnam. In 1983, his wife gave birth to their son, Nguyen Muoi, who at some point began to periodically experience *34 severe pain in his mid-section and back. In July 2003, Nguyen Muoi was diagnosed with spina bifida, which was allegedly caused by his father's exposure to herbicides and ingestion of food and water contaminated by herbicides manufactured by defendants.
In 1965, plaintiff Dang Thi Hong Nhut traveled to Cu Chi, an area heavily sprayed with herbicides, and spent approximately one month there visiting her husband. She often noticed a fog or mist and a strong odor in the air, and a white substance on plant leaves. During her time in Cui Chi, she ate wild vegetables, poultry and fish, and drank stream water; she experienced skin rashes. In 1966, she was arrested by the RVN regime and imprisoned in Bien Hoa until 1972. After her release, she lived in areas that had been heavily sprayed with herbicides. She had given birth to a healthy son in 1960 but then had three miscarriages between 1974 and 1980 and terminated a pregnancy in 1977 after an ultrasound examination showed that the fetus had spina bifida and other deformities. She had an intestinal tumor removed in 2002 and a non-functioning thyroid removed in 2003. She alleges that her miscarriages and other health problems were caused by her exposure to herbicides and her ingestion of food and water contaminated by herbicides manufactured by defendants.
From 1973 to 1975, plaintiff Nguyen Thi Thu repaired roads in Nam Dong in southern Vietnam, which was heavily sprayed with herbicides. From 1970 to 1975, her husband was stationed with the DRVN army in Quang Tri, which was heavily sprayed with herbicides. During this period, each consumed wild vegetables and fish and drank stream water. She has had five pregnancies, one resulting in a miscarriage and two resulting in the births of plaintiffs Nguyen Son Linh and Nguyen Son Tra, who were born with congenital birth defects and are paralyzed from the waist down. Her miscarriages and her sons' birth defects were allegedly caused by her and her husband's ingestion of food and water contaminated by herbicides manufactured by defendants.
From 1978 until 1993, plaintiff Vo Thanh Hai served in the Vietnamese army in Nam Dong, an area defoliated by herbicides. He and his family resided in Nam Dong and they cultivated rice and vegetables for their own consumption. His wife, plaintiff Nguyen Thi Hoa, miscarried in 1986. She gave birth to their son, plaintiff Vo Thanh Tuan Anh, in 1987. In 2001, Vo Thanh Tuan Anh began experiencing fatigue and dizzy spells; he was diagnosed with osteosarcoma and treated with surgery, radiotherapy and chemotherapy. Vo Thanh Hai was diagnosed with Hodgkins Disease. Both father and son experience chronic fatigue and have difficulty performing routine activities requiring physical exertion. Their diseases were allegedly caused by their exposure to herbicides and their ingestion of food and water contaminated by herbicides manufactured by defendants.
From 1969 to 1973, plaintiff Le Thi Vinh repaired roads in Quang Tri, which was heavily sprayed with herbicides. She often saw mist in the air, ate wild vegetables and drank stream water. After the war, she began to experience fatigue, joint pain and swollen glands and suffered two miscarriages; she had to stop working in 1986. In 2002, she was diagnosed with lung cancer, which persists even though several tumors were removed. She suffers from chest pain, breathing difficulty and fluid in the lungs. Her cancer and miscarriages were allegedly caused by her exposure to herbicides and her ingestion of food and water contaminated by herbicides manufactured by defendants.
*35 In 1989[sic], plaintiff Nguyen Thi Nham, her husband and her son, plaintiff Nguyen Minh Chau, moved to Bien Hoa in southern Vietnam. Bien Hoa was exposed to herbicides due to spraying, storage, transfer and spillage of herbicides at a United States military air base in the city. They regularly cultivated vegetables and poultry for their own consumption and regularly ate fish and rice purchased from the local market. Nguyen Thi Nham's first baby was born prematurely and died after one month, her second was born with defective intestines and died after ten days, and her third, Nguyen Minh Chau, was born in 1981[sic] and suffers from chloracne. In 1999 tests revealed abnormally high levels of dioxin in the blood of Nguyen Thi Nham and Nguyen Minh Chau. In 2003, Nguyen Thi Nham began to experience serious headaches and fatigue. She was diagnosed with diabetes. It is alleged that their diseases and the deaths of the other children were caused by their ingestion of food and water contaminated by herbicides manufactured by defendants.
In 1966, plaintiff Nguyen Thi Thoi and her husband moved to Bien Hoa, which was exposed to herbicides due to spraying, storage, transfer, and spillage at a local United States military air base. They regularly cultivated and ate local vegetables, poultry, fish and rice. In 1967, she gave birth to her first child, who died at the age of three after high fever and convulsions. She subsequently had a miscarriage. She suffers from frequent headaches, fatigue and joint pain. In 2000, a test revealed that she had an abnormally high level of dioxin in her blood. She alleges that her condition, miscarriage and the death of her child were caused by her ingestion of food and water contaminated by herbicides manufactured by defendants.
From 1961 and throughout the war, plaintiffs Dr. Nguyen Long Van and Tong Thi Tu, his wife, each served as medics with the NLF, mostly in areas which were heavily sprayed with herbicides. Dr. Nguyen Long Van was allegedly sprayed directly with herbicides on at least ten occasions. Both ate wild vegetables, rice, manioc and poultry and drank stream water exposed to herbicides. Tong Thi Tu gave birth to a healthy daughter in each of 1966 and 1974. She also gave birth in 1967 to a son who died from a lung infection after one day, in 1968 to a son with a deformed head who died after a few hours, in 1969 to a son with urinary system complications who died after one day and in 1970 to plaintiff Nguyen Thang Loi, who was born with deformed feet, is developmentally disabled and is dependent on his parents. She was diagnosed with diabetes in 1997. Dr. Nguyen Long Van was diagnosed with a prostate tumor in 2002 and diabetes in 2003. Alleged is that their diseases, their children's deaths and their sons' birth defects were caused by their exposure to herbicides manufactured by defendants.
7. Legal Basis for Claims
It is alleged that defendants' actions have violated, and plaintiffs' causes of action arise from, the following laws, treaties, conventions and resolutions, which constitute specific examples of the applicable law of nations or customary international law, as well as from domestic national and state laws:
a. Alien Tort Statute ("ATS"), 28 U.S.C. § 1350;
b. Torture Victim Protection Act ("TVPA"), 28 U.S.C. § 1350 note;
c. War Crimes Act, 18 U.S.C. § 2441;
d. 1925 Geneva Protocol for the Prohibition of the Use in War of Asphyxiating, Poisonous or Other Gases, and of Bacteriological Methods of Warfare;
*36 e. Article 23 of the Annex to the Hague Convention IV, Respecting the Laws and Customs of War on Land, signed October 18, 1907;
f. Geneva Convention relative to Protection of Civilian Persons in Time of War, signed at Geneva on August 12, 1949;
g. Agreement for the Prosecution and Punishment of the Major War Criminals of the European Axis and Charter of the International Military Tribunal at Nuremberg, signed and entered into force on August 8, 1945;
h. United Nations Charter, signed at San Francisco on June 26, 1945, and entered into force on October 24, 1945;
i. United Nations General Assembly Resolution No. 2603-A (1969);
j. Customary international law;
k. Common law of the United States of America;
l. Laws of Vietnam;
m. Common law of the State of New York, including but not limited to product liability, assault and battery, negligence, recklessness, intentional infliction of emotional distress, negligent infliction of emotional distress, civil conspiracy, unjust enrichment and public nuisance.
Class certification is sought. In view of the dismissal of all individual claims, there is no reason to consider the motion for class certification.
8. Theories
a. War Crimes
It is contended that the acts of defendants adversely affecting plaintiffs constitute violations of the laws and customs of war, also known as war crimes, which prohibit: the employment of poison or poisoned weapons or other weapons calculated to cause superfluous injury or unnecessary suffering; the wanton destruction of cities, towns, villages or the natural environment, or devastation not justified by military necessity; the use of biological or chemical agents of warfare, whether gaseous, liquid or solid, employed because of their direct toxic effects on people, animals or plants; and the poisoning of food and water supplies in the course of war. Leaders, organizers, facilitators, conspirators and accomplices participating in the formulation and execution of these acts are claimed to be responsible for all acts performed by any person in the execution of this plan. The acts described allegedly constitute war crimes in violation of the ATS, TVPA, customary international law, the common law of the United States, the common law of the State of New York, the laws of Vietnam, and international treaties, agreements, conventions and resolutions.
b. Genocide
It is contended that the acts against plaintiffs constitute genocide, in violation of customary international law which prohibits the following acts committed with intent to destroy, in whole or in part, a national, ethnic, racial or religious group, as such: killing members of the group; causing serious bodily or mental harm to members of the group; deliberately inflicting on the group conditions of life calculated to bring about its physical destruction in whole or in part; or imposing measures intended to prevent births within the group. Leaders, organizers, facilitators, conspirators and accomplices participating in the formulation and execution of these acts are claimed to be responsible for all *37 acts performed by any person in execution of such plan.
c. Crimes Against Humanity
It is contended that the acts against plaintiffs constitute crimes against humanity in violation of customary international law, which prohibits inhumane acts of a very serious nature such as willful killing and torture and other inhumane acts committed as part of a widespread or systematic attack against any civilian population or persecutions on political, racial or religious grounds. Leaders, organizers, facilitators, conspirators and accomplices participating in the formulation and execution of these acts are responsible for all acts performed by any person in execution of such plan.
d. Torture
It is contended that the acts constitute torture of the plaintiffs, in violation of the TVPA, treaties and customary international law, because they were placed in great fear for their lives, were caused to suffer severe physical and psychological pain and suffering, and were subjected to extrajudicial killing, the threat of severe physical pain and suffering and the threat of imminent death. The torture of the plaintiffs was allegedly inflicted deliberately and intentionally for purposes which included punishing the victims for acts they or third persons committed or were suspected of having committed, and intimidating or coercing the victim or third persons. The torture was also claimed to have been intentionally inflicted for discriminatory reasons. Leaders, organizers, facilitators, conspirators and accomplices participating in the formulation and execution of these acts are said to be responsible for all acts performed by any person in execution of a plan to carry out these acts.
In addition to the above theories based on international law, the following claims are based on domestic tort law of the United States, Vietnam or New York.
e. Assault and Battery
Plaintiffs were allegedly placed in great fear for their lives, causing them to suffer severe physical and psychological abuse and agony because of defendants' acts which were willful, intentional, wanton, malicious and oppressive in conjunction with the acts of the United States. This allegedly constituted assault and battery, actionable under the laws of the United States, Vietnam and New York.
f. Intentional Infliction of Emotional Distress
Defendants are alleged to have committed outrageous conduct in violation of all normal standards of decency without privilege or justification, intentionally and maliciously. This conduct allegedly constitutes the intentional infliction of emotional distress.
g. Negligent Infliction of Emotional Distress
Defendants, it is claimed, carelessly and negligently inflicted emotional distress through wanton and reckless conduct in manufacturing and supplying herbicides contaminated with dioxin for use in herbicidal warfare. As a direct result of defendants' wrongful acts, it is contended, plaintiffs and plaintiffs' immediate family members have suffered and will continue to suffer significant physical injury, pain and suffering and extreme and severe mental anguish and emotional distress. This conduct allegedly constituted the negligent infliction of emotional distress.
*38 h. Negligence
Defendants are charged with having failed to use ordinary or reasonable care in order to avoid injury to plaintiffs. Defendants' negligence was allegedly a cause of injury, damage, loss or harm to plaintiffs and their next of kin. This constituted, according to the pleadings, negligence.
i. Wrongful Death
Now deceased Huynh Trung Son, child of plaintiff Duong Quynh Hoa, and now deceased Ho Xuan Bat, husband of plaintiff Ho Thi Le, died, it is charged, as a direct result of the defendants' acts and omissions. As a result of their deaths, plaintiffs Duong Quynh Hoa and Ho Thi Le have allegedly sustained pecuniary damage from loss of society, comfort, attention, services and support of the decedents because of defendants' conduct. Plaintiffs Duong Quynh Hoa and Ho Thi Le seek relief on behalf of their deceased family members. These wrongful deaths are claimed to be actionable.
j. Strict Product Liability
The negligence of the defendants, their servants, employees and agents consisted, according to the complaint, in manufacturing and supplying the herbicides without making proper and sufficient tests to determine their dangers and contraindications, in that defendants knew, or in the exercise of reasonable diligence, should have known that the herbicides were unsafe and unfit for use by reason of the dangerous effects to human health and the environment, in negligently failing to adequately warn the public and the United States and RVN governments of the dangers and contraindications of the herbicides, in failing to properly inspect the herbicides, and in concealing the dangers and contraindications of the herbicides from the public and from the United States and RVN governments in order to profit from the manufacture and supply of the herbicides. It is contended that defendants are liable jointly and severally to the plaintiffs under the doctrine of strict product liability.
k. Public Nuisance
According to plaintiffs, defendants' acts and omissions constituted a public nuisance, and were injurious to the health and well-being of the plaintiffs, members of the plaintiffs' organization, members of the plaintiffs' families as well as neighbors and guests of plaintiffs with no adequate remedy at law, entitling them to money damages and environmental remediation for public nuisance.
l. Unjust Enrichment
As a result of what is claimed to have been defendants' unjust enrichment, plaintiffs say they have been damaged in an amount to be determined upon an accounting of the profits received by defendants for the manufacture and supply of herbicides used in the Vietnam War. Interest is sought from the date of the first procurement contract.
m. Injunctive and Declaratory Relief
Plaintiffs seek both injunctive and declaratory relief to prevent future additional harm, as by cleaning up geographic areas now contaminated by residues of the sprayed herbicides.
B. Motions by Defendants
1. Motions under Rule 12(b)(6) and Rule 56
Defendants move under Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss the complaint for failure to state a claim upon which relief can be granted. They also move under Rule 56 for partial *39 summary judgment to dismiss all claims on the ground of statute of limitations. At the hearing defendants and plaintiffs agreed that the court could consider the motion under Rule 12(b)(6) as a motion for summary judgment against all the domestic law claims, but not against the international law claims. They also agreed that the extensive record assembled by defendants and plaintiffs in the Isaacson v. Dow Chemical Company, Stephenson v. Dow Chemical Company and related cases of United States veterans could be relied upon by the court on the summary judgment motions. As already stated in Isaacson v. Dow Chemical Company, 304 F.Supp.2d 404 (E.D.N.Y.2004), Isaacson v. Dow Chemical Company, 344 F.Supp.2d 873 (E.D.N.Y.2004), and above in Part I.A., all domestic law claims by veterans were dismissed under Rule 56; the motion for dismissal under Rule 12(b)(6), expanded to Rule 56, as to the Vietnamese plaintiffs' domestic law claims is granted for the same reasons. The motion for partial summary judgment on statute of limitations grounds is denied. See infra Part VIII.D.
2. Law Applicable to Motions
a. Rule 56
Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).
The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," and identifying which materials "it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323, 106 S.Ct. 2548. The burden then shifts to the nonmoving party to "`set forth specific facts showing that there is a genuine issue for trial.'" Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting Rule 56(e) of the Federal Rules of Civil Procedure).
All inferences are to be drawn from the underlying facts in the light must favorable to the party opposing the summary judgment motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The mere existence of some peripheral factual disputes will not defeat an otherwise properly supported motion for summary judgment. Anderson, 477 U.S. at 247, 106 S.Ct. 2505. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. at 248, 106 S.Ct. 2505.
b. Rule 12(b)(6)
A defendant may move for dismissal for "failure to state a claim upon which relief can be granted." FED.R.CIV.P. 12(b)(6). The moving party has the burden of proving "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); see also King v. Simpson, 189 F.3d 284, 287 (2d Cir.1999). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). A court must accept the plaintiff's *40 factual allegations as true and draw all reasonable inferences in plaintiff's favor. King, 189 F.3d at 287.
In reviewing a Rule 12(b)(6) motion, the task of the court "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." Geisler v. Petrocelli, 616 F.2d 636, 639 (2d Cir.1980). When material outside the complaint is presented to and not excluded by the court, the motion to dismiss will usually be treated as one for summary judgment and disposed of in accordance with Rule 56 of the Federal Rules of Civil Procedure. FED.R.CIV.P. 12(b); see also Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir.2002). But see infra Part IV.B.3. "A complaint is deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are `integral' to the complaint." Sira v. Morton, 380 F.3d 57, 67 (2d Cir.2004) (citations omitted). A document is "integral" to the complaint if the complaint "relies heavily upon its terms and effect." Chambers, 282 F.3d at 153 (internal quotation marks omitted). "[A] plaintiff's reliance on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession is not enough." Id. (emphasis in original).
3. Context
In considering 12(b)(6) motions directed at the pleadings, the court should place allegations and supporting and opposing materials in context of the total dispute. It may take judicial notice of undisputed and undisputable facts revealed in its own files. See Leonard F. v. Israel Disc. Bank of New York, 199 F.3d 99, 107 (2d Cir.1999) ("In adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken.") (internal quotation marks omitted); Hirsch v. Arthur Andersen & Co., 72 F.3d 1085, 1092 (2d Cir.1995) ("We may consider all papers and exhibits appended to the complaint, as well as any matters of which judicial notice may be taken."). Much of the material considered in connection with the motion for summary judgment directed to the domestic law claims is helpful in understanding the pleadings on the international law claims. This includes the entire history of the Agent Orange litigation and such matters as the way herbicides were manufactured and used. The nature of the spraying and contents of the sprays used are based upon all available information available viewing the facts which are not disputable most favorably to plaintiffs. See discussion supra Part II.
A "herbicide" is an agent used to destroy or inhibit plant growth, while a "poison" is a substance that through its chemical action kills, injures or impairs an animal organism. A highly toxic herbicide may be poisonous and poisons may harm plants. Characterization as both, or as one or the other, depends upon design and degree. Cf., e.g., Wax v. Aventis Pasteur Inc., 240 F.Supp.2d 191 (E.D.N.Y.2002) (noting that thimerosal with mercury in a vaccine for children did not change a "vaccine" into a poison); Jones v. Lederle Labs., 785 F.Supp. 1123 (E.D.N.Y.1992) (discussing content of vaccine and granting defendant summary judgment as a matter of law); see also 21 C.F.R. § 165.110 (2005) (discussing limits on parts of arsenic and dioxin in bottled water); 29 C.F.R. § 1910.1018 (2005) (discussing *41 limits on parts of arsenic in air to which employees are exposed). Regular and sustained total exposure of employees in industrial plants containing such toxic substances as dioxin or asbestos in the air is often orders of magnitude greater than that experienced in the transient exposure of other people; where an explosion in a chemical plant involves heavy doses of dioxin the huge concentrations and exposure are not comparable to that alleged in the instant case. Cf. Mancuso v. Consol. Edison Co. of N.Y., 967 F.Supp. 1437, 1445 (S.D.N.Y.1997) (pointing out that "[a] central tenet of toxicology is that the dose makes the poison") (internal quotation marks and citation omitted); CASARETT & DOULL'S TOXICOLOGY: THE BASIC SCIENCE OF POISONS 3 (Curtis D. Klaassen et al., eds., 3d ed.1986) (noting, as Paracelsus explained in the sixteenth century, "[a]ll substances are poisons; there is none which is not a poison. The right dose differentiates a poison and a remedy." (citations omitted)). Herbicides in Vietnam were sprayed as small droplets, not as a gas.
As already indicated in Part II, the spray applied contained on average in the order of 10 parts per million (p.p.m.) of dioxin, spread at the rate of approximately 3 gallons per acre by airplanes. Dioxin is a poison. The amount of dioxin in Agent Orange and other herbicides used that actually landed on the ground was attenuated by its collection in trees, wind dispersal and deterioration in the sunlight so that in the order of less than 10 p.p.m. can be estimated as landing on people, fields and water. Once the herbicides landed at the ground level, it can be assumed for the purposes of this discussion, as plaintiffs contend, to have had a long half-life, the length of which is unclear. Given these circumstances it is concluded for 12(b)(6) purposes that the Agent Orange touched the ground or people in the order of approximately ≥999,990 herbicide or benign substance, and 10 dioxin.
Agent Orange and the other agents used, see Table I supra Part II, for the purposes of this 12(b)(6) motion, should be characterized as herbicides and not poisons. While their undesired effects may have caused some results analogous to those of poisons in their impact on people and land, such collateral consequences do not change the character of the substance for present purposes.
4. Different Treatment of Veteran and Vietnamese Plaintiffs
During the course of the argument the government suggested that it would be unfair to apply the government contractor's defense to the veteran plaintiffs' claims, but not to the Vietnamese plaintiffs' claims.
It may seem anomalous that because of the government contractor defense members of the United States armed forces may be theoretically entitled to fewer substantive rights than citizens of a foreign country  in this case, the Vietnamese allegedly affected by Agent Orange and other herbicides. Cf. U.S. Statement of Interest at 1 n.2 (stating that the analysis of the government contractor defense in Isaacson v. Dow Chem. Co., 304 F.Supp.2d 404, 424-39 (E.D.N.Y.2004), should apply to Vietnamese plaintiffs' state law claims and that "[i]t would be anomalous indeed if American veterans were precluded from bringing such state law claims, but aliens, including former soldiers in an enemy army, were permitted to assert such claims"). While citizens of the United States are themselves possessors of rights established through international law, the ATS applies only to a civil action by an alien. It reads in full: "The district courts shall have original jurisdiction of any civil *42 action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350 (2000) (emphasis added); see also infra Part VII.
The question of whether this country can cut off litigation by its own citizens on the basis of a defense not available against foreigners raises an interesting constitutional domestic and international equal protection issue. The Nuremberg case of United States v. Alstoetter (The Justice Case) held that a government and its personnel and other entities working for it, could be guilty of international law violations against its own nationals. See 3 TRIALS OF WAR CRIMINALS 954, 973 (photo. reprint 1997) (1951) ("[A]cts committed by Germans against other Germans are punishable as crimes under Law No. 10 ...." (quoting General Telford Taylor, Chief of Counsel for the prosecution, in United States v. Flick )). This question need not be decided now.
It is appropriate to point out that United States nationals who served in Vietnam in our armed forces are not being deprived of the protection of United States laws. As a practical matter, our veterans' protections are much greater than any the Vietnamese might possess: the United States has by statute arranged to compensate members of its armed forces arguably exposed to Agent Orange by providing extensive and generous administrative protections through Veterans Administration benefits. See, e.g., Agent Orange Act of 1991, Pub.L. No. 102-4, 105 Stat. 111 (codified as amended at 38 U.S.C.A. § 1116 (2002)); 38 C.F.R. § 3.309(e) (2004) (listing diseases associated with exposure to certain herbicides that are deemed to be service-related); 38 C.F.R. § 3.816 (2004) (listing diseases for which the Secretary of Veterans Affairs has established a presumption of connection with Agent Orange exposure for Vietnam veterans); McMillan v. Togus Reg'l Office, Dep't of Veteran Affairs, 294 F.Supp.2d 305 (E.D.N.Y.2003) (describing scientific studies on links between diseases and Agent Orange exposure); National Veterans Legal Services Program, Self-Help Guide on Agent Orange, Advice for Vietnam Veterans and their Families (2000 & Supp.2003).
Recall too that the United States veterans of the Vietnam War suing in Stephenson v. Dow Chemical Company, Isaacson v. Dow Chemical Company and other like cases, and their families, were entitled under the Agent Orange settlement and disbursement plan of this court to the protection of what amounted to a substantial term policy providing compensation and services to every veteran arguably exposed to herbicides in Vietnam who became ill. Had any of the present veteran plaintiffs become ill during the many years some 300 million dollars was being expended on behalf of the class, they would have received the same compensation as those who discovered their injury before the funds obtained in the original Agent Orange litigation were exhausted. A plan providing protection for the lifetimes of all Vietnam veterans would have resulted in very low individual recoveries because it would have had to cover diseases that tended to increase as peer groups age. This would have enormously increased the number of claims, and attenuated even further the probability that the later diseases were caused by Agent Orange rather than by pathogens, toxic chemicals, or other factors to which both veteran and the non-veteran populations were equally exposed. Compare In re Joint E. & S. Dists. Asbestos Litig., 878 F.Supp. 473, 498-509 (E.D.N.Y.1995) (discussing prediction of future claims against the trust, which covers asbestos injury claims up to 2049), aff'd in part, vacated in part by 78 F.3d 764 (2d Cir.1996), with Isaacson v. *43 Dow Chem. Co., 304 F.Supp.2d 404, 421 (E.D.N.Y.2004) (noting that claims were paid by the settlement fund up to June 30, 1997, with a total distribution to veterans for claimed diseases of $196,595,085, and on behalf of their families of $71,306,758).

V. Position of the Government Opposing Plaintiffs' Claims

Because this case implicated restrictions on the United States' conduct of its international relations, exercise of its military powers, and capacity to procure material for its armed forces, the court invited the government to express its views. See Vietnam Ass'n for Victims of Orange/Dioxin v. Dow Chem. Co., 327 F.Supp.2d 198 (E.D.N.Y.2004). The government responded to the court's suggestion. U.S. Statement of Interest; see also 28 U.S.C. § 517 (2000) ("The Solicitor General, or any officer of the Department of Justice, may be sent by the Attorney General to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States, or in a court of a State, or to attend to any other interest of the United States.").
The extensive "Statement of Interest of the United States," dated January 12, 2005, is summed up by the government as follows:
At bottom, this litigation seeks to challenge the means by which the United States prosecuted the Vietnam war, and ineluctably draws into issue the President's constitutional Commander in Chief authorities and invites impermissible second-guessing of the Executive's war-making decisions.
... [T]he Executive branch considered  and repeatedly rejected  the contention that the use of chemical herbicides in Vietnam constituted a violation of the laws of war. Based in part on this determination, President Kennedy himself authorized the use of herbicides, and the United States requisitioned the chemicals at issue from the defendant manufacturers. In light of this background, plaintiffs' international law claims should be dismissed for a variety of reasons.
First, adjudication of plaintiffs' international law claims would require this Court to pass upon the validity of the President's decisions regarding combat tactics and weaponry, made as Commander in Chief of the United States during a time of active combat. Such judicial review would impermissibly entrench upon the Executive's Commander in Chief authority, and run afoul of basic principles of separation of powers and the political question doctrine.
Second, plaintiffs lack a cause of action to assert the international law claims set forth in the Amended Complaint. None of the statutes or treaties relied upon by plaintiffs provide them with a cause of action. Moreover, the Amended Complaint fails to state a cognizable claim for a violation of the law of nations under the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, and the Supreme Court's recent decision in Sosa v. Alvarez-Machain, 542 U.S. 692, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004). Because the use of herbicides in war was not unlawful  let alone universally and specifically proscribed  the Court should not recognize a federal common law cause of action seeking damages for such conduct.
Third, because the Executive branch considered the very questions of customary international law now before the Court, expressly determined that the conduct at issue did not violate such law, and the President himself acted based upon that determination pursuant to his *44 constitutional authority as Commander in Chief, the President's actions displace any contrary international legal norm as a rule of decision in this case. Because these controlling executive acts preempt the application of customary international law in the domestic legal system, the Court should reject any claims based upon such law.
Fourth, were the Court to address plaintiffs' international law claims, it should give deference to the Executive's interpretation of the relevant treaties and customary international law. The Executive branch has significant expertise in the formulation and interpretation of both treaties and customary international law, which this Court should accord the substantial deference it is traditionally afforded. That interpretation has consistently been that the United States' use of chemical herbicides in Vietnam did not violate any applicable rules of international law.
Finally, even if the Court were to determine that plaintiffs have stated a cognizable claim for a violation of international law, the government contractor defense should be held applicable to those claims. All of the rationales set forth by the Supreme Court for the adoption of the defense as a matter of federal common law apply to the case at bar, and international legal principles do not foreclose its application to claims allegedly founded upon customary international law.
For all of these reasons, the Court should dismiss plaintiffs' international law claims.
U.S. Statement of Interest at 1-3. These contentions are discussed at appropriate points below.

VI. Insufficiency of Plaintiffs' Domestic Law and Equitable Claims

Claims (e) assault and battery; (f) intentional infliction of emotional distress; (g) negligent infliction of emotional distress; (h) negligence; (i) wrongful death; and (j) strict product liability, are each tort claims arising from acts by defendants within the United States. They are each subject to the government contractor defense.
The government contractor defense provides that liability for design defects in military equipment cannot be imposed on a government contractor by state law if "(1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." Boyle v. United Techs. Corp., 487 U.S. 500, 512, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988). See also infra Part IX on non-applicability of government contractor defense to international law claims.
Defendants moved for summary judgment against all plaintiffs in the instant case on domestic law claims based upon, inter alia, the government contractor defense. See Defs.' Mem. Supp. Mot. for Summ. J. Based on the Government Contractor Defense, Nov. 2, 2004, at 5 (listing Vietnam Ass'n for Victims of Agent Orange/Dioxin v. Dow Chem. Co. (No. 04-CV-400) as one of the cases moved against); Reply Mem. of Law in Supp. of Defs.' Mot. For Summ. J. Based Upon the Government Contractor Defense, Feb. 8, 2005; supra Part IV.B.1. That defense has been established for summary judgment purposes in part in the instant case and in whole in veterans' cases that were pending concurrently with this one. See Isaacson v. Dow Chem. Co., 304 F.Supp.2d 404 (E.D.N.Y.2004) (granting summary judgment to defendants based on government *45 contractor defense but staying decision pending further discovery). The Vietnamese plaintiffs, like plaintiffs from the United States, are subject to that defense; it covers all domestic state and federal substantive law claims. Claims (e) to (j) are each barred by the government contractor defense and are dismissed.
A number of claims are phrased in terms of equitable rather than legal grounds for relief. They are (k) public nuisance; (l) unjust enrichment; and (m) injunctive and declaratory relief. These claims are based on internal, domestic United States law. In their gravamen they are legal in nature even though they seek equitable relief. They are subject to the same government contractor defense as are the explicit legally based tort claims. Claims (k), (l) and (m) are dismissed.
As already noted, plaintiffs seek, among other remedies, injunctive relief compelling defendants to abate and remediate ongoing health hazards allegedly caused by the United States military's environmental contamination of the soil and food chains in vast regions of Vietnam. Such injunctive relief is wholly impracticable. Furthermore, it could compromise Vietnam's sovereignty.
Injunctive relief is granted "not as a matter of right but in the exercise of a sound judicial discretion." Morrison v. Work, 266 U.S. 481, 490, 45 S.Ct. 149, 69 L.Ed. 394 (1925). In the exercise of that discretion, district courts may properly refuse to grant injunctive relief that is impracticable or otherwise contrary to the public interest. See, e.g., Weinberger v. Romero-Barcelo, 456 U.S. 305, 312, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982) ("In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."); O'Shea v. Littleton, 414 U.S. 488, 500, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974) ("A federal court should not intervene to establish the basis for future intervention that would be ... intrusive and unworkable.").
Requests for extraterritorial injunctions often raise serious concerns for sovereignty and enforceability which compel denial. See generally Vanity Fair Mills, Inc. v. T. Eaton Co., 234 F.2d 633, 647 (2d Cir.1956). The power to enjoin activities on foreign soil "should be exercised with great reluctance when it [would] be difficult to secure compliance ... or when the exercise of such power is fraught with possibilities of discord and conflict with the authorities of another country." Id. (holding that Lanham Act did not apply to actions committed by foreign citizens acting under presumably valid trademarks in a foreign country); see also McKusick v. City of Melbourne, 96 F.3d 478, 488 (11th Cir.1996) ("'There is not an absolute right to an injunction in a case in which it would impair or affront the sovereign powers or dignity of a state or a foreign nation.'" (quoting Hoover v. Wagner, 47 F.3d 845, 850 (7th Cir.1995))).
In Bano v. Union Carbide Corp., an individual and three organizations sued Union Carbide and its former president for personal injuries and property damage allegedly caused by the corporation's pollution of groundwater with toxic chemicals and by-products that were dumped, stored or abandoned at its plant in India. The district court denied their request for an injunction to remediate soil and groundwater contamination as "[i]nfeasible and [i]nappropriate." Bano v. Union Carbide Corp., Civ. No. 99-11329, 2003 WL 1344884, at *8 (S.D.N.Y. Mar.18, 2003), aff'd in part, rev'd in part by 361 F.3d 696 (2d Cir.2004). The court noted that the former plant site is "located over 8,000 *46 miles away from the United States" and now is owned and controlled by the Indian State of Madhya Pradesh, and concluded that "[o]rdering remediation ... would be ineffectual as [defendants] have no means or authority to carry it out." Id. Moreover, although the Indian government apparently was willing to "cooperate with any measures imposed," the court stated that it did not wish "to direct a foreign government as to how that state should address its own environmental issues," and that it "would have no control over any remediation process ordered." Id.
In affirming the district court's dismissal of the remediation claim on an abuse-of-discretion standard, the Court of Appeals for the Second Circuit noted that "`[t]he practicability of drafting and enforcing an order or judgment for an injunction is one of the factors to be considered in determining the appropriateness of injunction against tort,'" Bano v. Union Carbide Corp., 361 F.3d 696, 716 (2d Cir.2004) (quoting RESTATEMENT (SECOND) OF TORTS § 943 (1979)), and that "injunctive relief may properly be refused when it would interfere with the other nation's sovereignty," id.
Ordering abatement and remediation in the present case would be far more "[i]nfeasible and [i]nappropriate" than in Bano. The remediation sought involves areas far larger and indeterminate than the discrete plant site and surrounding property in Bano. The court would be required to oversee complex environmental studies and make conclusive findings about contamination caused by chemicals used many decades ago in large regions of a foreign country. Enforcement would necessitate the administration of standards and procedures for the cleanup of lands over which the court has no jurisdiction. These difficulties make injunctive relief wholly impracticable. Injunctive relief is denied.

VII. Application of Sosa v. Alvarez-Machain

In Sosa v. Alvarez-Machain, 542 U.S. 692, ___ - ___, 124 S.Ct. 2739, 2761-62, 159 L.Ed.2d 718 (2004), the Supreme Court cautioned that "courts should require any claim [under the ATS, 28 U.S.C. § 1350,] based on the present-day law of nations to rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms [the Court has] recognized," such as violation of safe conduct, infringement of the rights of ambassadors, and piracy. Emphasizing its narrow view of the ATS, it declared "Congress intended the ATS to furnish jurisdiction for a relatively modest set of actions alleging violations of the law of nations." Id. 124 S.Ct. at 2759.
The Court stressed "judicial caution when considering the kinds of individual claims that might implement the jurisdiction conferred by" the ATS, while acknowledging "that a judge deciding in reliance on an international norm will find a substantial element of discretionary judgment in the decision." Id. at 2762. It noted that "the possible collateral consequences of making international rules privately actionable argue for judicial caution," and found "reason for a high bar to new private causes of action for violating international law" in the risk of adverse foreign policy consequences for the United States "impinging on the discretion of the Legislative and Executive Branches in managing foreign affairs." Id. at 2763. Stressing "great caution," it declared, "the judicial power should be exercised on the understanding that the door is still ajar subject to vigilant doorkeeping, and thus open to a narrow class of international norms today." Id. at 2764. It wrote: "[W]e are persuaded that federal courts should not recognize private claims under *47 federal common law for violations of any international law norm with less definite content and acceptance among civilized nations than the historical paradigms familiar when § 1350 was enacted." Id. at 2765. It added: "And the determination whether a norm is sufficiently definite to support a cause of action should (and, indeed, inevitably must) involve an element of judgment about the practical consequences of making that cause available to litigants in the federal courts." Id. (footnotes omitted).
Based on these standards, the Sosa Court categorically rejected the plaintiff's argument that a binding customary norm of international law prohibited "arbitrary" detention in a case where the plaintiff was illegally detained in Mexico for less than one day and illegally brought against his will into the United States to transfer his custody to lawful authorities for a criminal prosecution. Id. at 2768-69. Given the cautions of Sosa, plaintiffs' substantive claims must be viewed skeptically.
The government urges the court to consider Sosa's warning about practical consequences as an independent reason for dismissal. It declares:
In addition to carefully cabining the Court's discretion to recognize new federal common law causes of action based on international law, Sosa also recognized that the "determination whether a norm is sufficiently definite to support a cause of action, should (and, indeed, inevitably must) involve an element of judgment about the practical consequences of making that cause available to litigants in federal courts." 542 U.S. at ___, 124 S.Ct. at 2766. This is a paradigmatic case in which the "practical consequences" of recognizing a cause of action counsel strongly against such a result.... [P]laintiffs' claims are based upon a challenge to the President's decision, as Commander in Chief, to use chemical herbicides to advance the war in Vietnam. The practical consequences of recognizing such a cause of action are extraordinarily problematic for several reasons.
....
First, allowing plaintiffs' claims to proceed would interfere with the United States' ongoing bilateral relationship with Vietnam, particularly as it relates to the effect of chemical herbicides used in Vietnam. That relationship has been characterized by measured and specific agreement on various issues relating to the war and its aftermath. Allowing claims such as plaintiffs' to proceed would serve to undermine and upset that relationship by usurping the authority to address issues relating to the use of chemical herbicides from the Executive Branch, where such authority properly resides.
The United States and Vietnam have entered into two agreements relevant to the matters here at issue. First, in 1995, the two countries entered into an Agreement Between the Government of the United States of America and the Government of the Socialist Republic of Vietnam Concerning the Settlement of Certain Property Claims ("1995 Property Agreement"). See 34 I.L.M. 685 (1995). The 1995 Property Agreement settled claims of nationals of both parties relating to the taking or expropriation of property, and addressed the disposition of blocked Vietnamese assets in the United States. Id. Notably, the 1995 Property Agreement did not address claims for war reparations by either country.
Subsequently, in 2002, the United States, represented by the Department of Health and Human Services, entered into a Memorandum of Understanding *48 with Vietnam, represented by the Vietnamese Ministry of Science, Technology and Environment. See Memorandum of Understanding ("MOU"), March 10, 2002, available at . The MOU addresses future cooperation and collaboration between scientists in both countries with respect to research regarding the health and environmental effects of dioxin. Id. The MOU was the result of years of diplomatic negotiations with the Vietnamese regarding the use of chemical herbicides containing dioxin during the war. It reflects the full extent of the United States' willingness to engage with Vietnam on the question of chemical herbicides at this time.
Recognizing a cause of action for the international law cum federal common law claims asserted by plaintiffs here would serve to undermine the Executive's conduct of the Nation's foreign relations with Vietnam. As demonstrated by both the 1995 Property Agreement and the MOU, to date, the United States has not agreed to provide reparations to the Vietnamese for the use of chemical herbicides during the war. Allowing plaintiffs' claims here to proceed would circumvent and defeat this Executive branch determination, and allow the plaintiffs to achieve via litigation that which their government failed to achieve via diplomacy. It is precisely such "potential implications for the foreign relations of the United States" that "should make courts particularly wary" of recognizing causes of actions such as plaintiffs', which have the effect of "impinging on the discretion of the Legislative and Executive Branches in managing foreign affairs." Sosa, 542 U.S. at ___, 124 S.Ct. at 2763. Where, as here, the precise subject matter at issue has been the subject of diplomatic negotiations, Sosa's cautionary notes are particularly applicable, and no federal common law cause of action should be recognized.
....
A more general "practical consequence" also militates against recognizing a federal common law cause of action in the case at bar. Essentially, what plaintiffs seek is war reparations from the defendant chemical companies for the United States' conduct during the Vietnam war. They thus ask this Court to recognize a federal common law cause of action, by the United States' former enemies, against the United States' military contractors, for the United States' conduct during a war. The "practical consequences" of such a step are breathtaking, as it has the potential of opening federal courthouse doors to all of the Nation's past and future enemies. Such a step would likely have a chilling effect both on the President's exercise of his Commander in Chief powers, and on government contractors' willingness to provide the products necessary to ensure the defense of the Nation.... Particularly in light of the traditional rule of international law that war reparations are the subject of government-to-government negotiations, and not individual claims, recognizing such federal common law claims would be truly extraordinary.
War reparations include" `all the loss and damage to which ... Governments and their nationals have been subjected as a consequence of the war imposed upon them." Burger-Fischer v. Degussa AG, 65 F.Supp.2d 248, 275 (D.N.J.1999), quoting The Versaille[s] Treaty, art. 231. See also Black's Law Dictionary at 1325 (8th ed.2004) (defining reparations as "[c]ompensation for an injury or wrong, esp. for wartime damages or breach of an international obligation"). Claims based upon the United States' *49 use of chemical herbicides as a tool of war readily fall within the scope of war reparations claims.
Yet such war reparations claims have traditionally been, and as a matter of customary international law are, the subject of government-to-government negotiations, as opposed to private lawsuits. "Under international law claims for compensation by individuals harmed by war-related activity belong exclusively to the state of which the individual is a citizen." Burger-Fischer, 65 F.Supp.2d at 273. Thus, "[l]ike other claims for violation of an international obligation, a state's claim for a violation that caused injury to rights or interests of private persons is a claim of the state and is under the state's control.... Any reparation is, in principle, for the violation of the obligation to the state, and any payment made is to the state." Restatement (3d) Foreign Relations § 902, comment i (emphasis added); cf. Am. Ins. Ass'n v. Garamendi, 539 U.S. 396, 416, 123 S.Ct. 2374, 156 L.Ed.2d 376 (2003) ("[h]istorically, wartime claims against even nominally private entities have become issues in international diplomacy").
This latter point undermines any assertion that private claims for war reparations are as widely accepted as the eighteenth century paradigms discussed in Sosa. To the contrary, it establishes precisely the opposite  as a matter of international law war reparations claims such as plaintiffs' belong to states and not to individuals. To jettison this legal principle in order to recognize individual causes of actions for plaintiffs' claims would run counter to Sosa's admonition that the practical consequences of recognizing new causes of action "must" inform the Court's judgment in crafting federal common law. In sum, the determination of whether, when, and how to pay reparations for conduct of the United States' Armed Forces should stay where it has been for the past two-hundred-plus years by virtue of both the Constitution and principles of customary international law  with the Political Branches of government. For this reason as well, the Court should not recognize any federal common law cause of action in this case.
U.S. Statement of Interest at 39-43 (footnotes omitted).

VIII. Legal Concepts

A. Standing of VAVAO
Defendants assert that The Vietnam Association for Victims of Agent Orange/Dioxin ("VAVAO") has no standing. VAVAO claims to represent a putative class of some four million Vietnamese nationals who contend they have been exposed to, and injured by, herbicides manufactured by defendants. The size of the class and its appropriateness needs no attention now since, as already pointed out above in Part IV.A.7., there will be no certification of the class.
Defendants' argument is dubious on constitutional grounds, and is inappropriate on prudential grounds. Given the situation of those claimed to have been injured  their general relative poverty and constraints during and after the war, subjugation by a non-democratic communist government and the lack of a relatively sophisticated free and aggressive bar in Vietnam capable of prosecuting mass toxic tort actions  the most practical way to vindicate plaintiffs' rights, if there are such rights under international law, and if there is jurisdiction under the ATS, would be via some association such as VAVAO. Considering the geographic scope (much of the territory of Vietnam) of the claims, the nature of the claims (complex in law and *50 fact), the number of persons affected (millions), the difficulty of prosecution (in a foreign land with different procedures and substantive law), and the importance to this country and the world of the enforcement of international law, VAVAO's standing should be recognized. VAVAO, though apparently an ad hoc organization designed and organized primarily to prosecute Agent Orange claims, can be said to represent both itself and its members.
Under Article III of the Constitution, a court's power to redress injury extends only to parties who have suffered" `some threatened or actual injury'" resulting from an alleged illegal action. Warth v. Seldin, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) (quoting Linda R.S. v. Richard D., 410 U.S. 614, 617, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973)). As a prudential matter, such a litigant generally" `must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights and interests of third parties.'" Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc., 454 U.S. 464, 474, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982) (quoting Warth, 422 U.S. at 499, 95 S.Ct. 2197).
An association satisfies constitutional standing requirements when seeking judicial relief in its own right to redress injury to the organization itself. In limited circumstances, such as those in the instant case, an organization also may have "association standing" in a representative capacity to assert claims on behalf of its members. See Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977); Warth, 422 U.S. at 515-16, 95 S.Ct. 2197. In Hunt, the Supreme Court constructed the framework for assessing association standing. 432 U.S. at 343, 97 S.Ct. 2434. The Court explained that an association has standing in a representative capacity to bring suit on behalf of its members when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Id.
VAVAO sufficiently meets all these requirements. The fact that not all members of VAVAO, which includes persons who suffered no injury such as "medical and scientific researchers and prominent people from other disciplines," would have standing to sue in their own right, does not defeat standing of the organization. See generally N.A.A.C.P. v. Acusport Corp., 210 F.R.D. 446, 455-61 (E.D.N.Y.2002) (discussing standing with citations); cf. Beth Van Schaack, Unfulfilled Promise: The Human Rights Class Action, 2003 U. CHI. LEGAL F. 279 (discussing class action as substitute for representative actions for procedural efficiency).
The Court of Appeals for the Second Circuit analyzed these issues in Bano v. Union Carbide Corp., 361 F.3d 696 (2d Cir.2004), a case already discussed above in Part VI. In Bano, an individual and three organizations sued Union Carbide and its former president, alleging personal injuries and property damage from groundwater pollution caused by the dumping, storage and abandonment of toxic chemicals and by-products at the corporation's former plant in India. Id. at 702-05.
Addressing the organizations' claims for money damages, the Court of Appeals for the Second Circuit affirmed the district court's determination that the organizations failed to meet Hunt's "association standing" requirements for pursuing the claims of their members. Id. at 713-16. As noted above, the third prong of the *51 Hunt test for "association standing" demands that "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." 432 U.S. at 343, 97 S.Ct. 2434. The organizations' claims in Bano were that "individuals have suffered bodily harm and damage to real property they own." 361 F.3d at 714. The court reasoned that "[n]ecessarily, each of those individuals would have to be involved in the proof of his or her claims," and concluded that the organizations lacked "association standing" to pursue these claims. Id. at 714-15. Relative to the scope and nature of the claims in the instant case, those in Bano  arising from a single event in a limited geographic area  were relatively simple and arguably could be handled by consolidated individual claims or in an ordinary class action.
The Court of Appeals for the Second Circuit noted that it was aware of "no Supreme Court or federal court of appeals ruling that an association has standing to pursue damages claims on behalf of its members." Id. at 714 (emphasis added); see also, e.g., Irish Lesbian & Gay Org. v. Giuliani, 143 F.3d 638, 649 (2d Cir.1998) (confirming the district court's refusal to grant associational standing on compensatory damages claims as "obviously correct," because individualized proof of injuries was required); Am. Fed'n of R.R. Police, Inc. v. Nat'l R.R. Passenger Corp., 832 F.2d 14, 16 (2d Cir.1987) (dismissing association plaintiff's damages claim based on physical injury because any injury that occurred "would have been peculiar to the individual policeman").
In the instant case substantial equitable remedies of injunctive relief such as disgorgement of profits and toxic chemical clean-up of a huge land mass are sought in addition to individual damages. See supra Parts IV.A.8., VI. Unlike claims for money damages, an association generally has standing on behalf of its members when its claims raise a "`pure question of law,'" Bano, 361 F.3d at 714 (quoting Int'l Union, United Auto. Aerospace & Agric. Implement Workers of Am. v. Brock, 477 U.S. 274, 287, 106 S.Ct. 2523, 91 L.Ed.2d 228 (1986)), or seek solely a forward-looking remedy such as "`a declaration, injunction, or some other form of prospective relief,'" id. (quoting Warth, 422 U.S. at 515, 95 S.Ct. 2197). In such cases, the Supreme Court has held that prudential standing is possible, because" `it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured.'" Id. (quoting Warth, 422 U.S. at 515, 95 S.Ct. 2197). Thus, "where the organization seeks a purely legal ruling without requesting that the federal court award individualized relief to its members, the Hunt test may be satisfied." Id.; see also Northeastern Fla. Chapter of the Associated Gen. Contractors of Am. v. City of Jacksonville, 508 U.S. 656, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993) (allowing that an association had standing on an Equal Protection challenge to an ordinance); Brock, 477 U.S. at 284-88, 106 S.Ct. 2523 (finding union had standing to challenge a policy directive of the United States Department of Labor because it raised a "pure question of law" that could be litigated without the participation of individual claimants); Warth, 422 U.S. at 515, 95 S.Ct. 2197.
VAVAO raises a number of pure questions of law and seeks forward-looking relief in cleanups. It has standing to seek injunctive relief. The fact that injunctive relief is denied, supra Part VI, does not affect the right to seek it.
B. Right to Sue Individually
It is the government's view that plaintiffs lack a cause of action allowing them to *52 assert their international law claims because the statutes and international materials they rely upon do not provide for a private right of action, their claims do not meet the exacting rules of Sosa, and no norm prohibited the use of herbicides in war or destruction of enemy crops during this country's participation in the Vietnam War. U.S. Statement of Interest at 23-36. Insofar as the government's contention is that no right of action can exist under plaintiffs' theories, it is rejected as too broad. As to particular failures of the specific claims under the specific facts of this litigation, the position is accurate and, as indicated below in Part XI, leads to dismissal.
The right to sue under international law for violations of human rights normally devolves on states or international tribunals enforcing criminal liability. Nonetheless, international agreements or the law of the United States may permit private civil suits in a court of this country. See 2 RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES § 703(3) ("An individual victim of a violation of a human rights agreement may pursue any remedy provided by that agreement or by other applicable international agreements."); id. § 907 (discussing private remedies under the law of the United States for violations of international law); supra Part I.B.1. on treatment of foreigners in United States courts; infra Part VIII.H. on choice of law. While Sosa limits ATS litigation, it recognizes the right of a private person to sue, depending upon the applicable international substantive law.
C. Liability of Corporations for Violation of International Law
1. Aiding and Abetting
The government and defendants argue that plaintiffs' claims are essentially that defendants were aiding and abetting, and that these claims must be dismissed because Congress has not authorized aiding and abetting liability under the ATS. U.S. Statement of Interest at 36-39; see also Cent. Bank of Denver v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 181-82, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994) (explaining that although "aiding and abetting is an ancient criminal law doctrine," there is no "general presumption" that a federal statute should be read as extending aiding and abetting liability to the civil context and that the doctrine permitting civil redress "has been at best uncertain in application").
While this position is applicable to any kind of defendant, here it is particularly relevant in the corporate context. But it misstates the plaintiffs' broad contention: defendants are charged in their corporate capacity with themselves violating international law under Nuremberg theories. The argument of the government is analogous to that of the defendants  that as corporations they cannot be held liable. See infra Part VIII.C.2.; see also infra Part IX regarding the inapplicability of the government contractor defense to plaintiffs' claims.
Even under an aiding and abetting theory, civil liability may be established under international law. As the Amici Brief on behalf of plaintiffs properly analyzes the matter:
Federal courts have repeatedly confronted the question of whether the ATS encompasses the liability of private actors, including private corporations, for violations of international law. Federal courts, including those of this jurisdiction, have consistently answered the question in the affirmative. See, Kadic v. Karadzic, 70 F.3d [232,] 239 [(2d Cir.1995)] (the reach of international law is not limited to []state actors); Presbyterian *53 Church of Sudan v. Talisman Energy, Inc., 244 F.Supp.2d [289,] 321 [(S.D.N.Y.2003)] (holding that "ATCA suits [may] proceed based on theories of conspiracy and aiding and abetting"); Abdullahi v. Pfizer, Inc., 77 Fed.Appx. 48 (2d Cir.2003); Wiwa v. Royal Dutch Petroleum Co., No. 96 Civ. 8386, 2002 WL 319887 (S.D.N.Y. Feb.28, 2002) (finding that private corporations could be held liable for "joint action" with state actors); Bodner v. Banque Paribas, 114 F.Supp.2d 117, 127-28 (E.D.N.Y.2000) (holding that subject matter jurisdiction existed under the ATCA, where plaintiffs alleged a French bank had been complicit with the Nazi regime); Iwanowa [v. Ford Motor Co.], 67 F.Supp.2d [424,] 445 [(D.N.J.1999)] ("No logical reason exists for allowing private individuals and corporations to escape liability for universally condemned violations of international law merely because they were not acting under color of law."); see also Doe v. Unocal, [395 F.3d 932, 975-78] (9th Cir.2002)[,] vacated [by] 395 F.3d 978 [(9th Cir.2003)]; Burnett v. Al Bar[aka] Investment & Development Corp., 292 F.Supp.2d 9 (D.D.C.2003); Mehinovic v. Vuckovic, 198 F.Supp.2d 1322, 1355 (N.D.Ga.2002) ("United States courts have recognized that principles of accomplice liability apply under the ATCA to those who assist others in the commission of torts that violate customary international law." (citing cases)); Eastman Kodak Co. v. Kavlin, 978 F.Supp. 1078, 1090-95 (S.D.Fla.1997) (holding that subject matter jurisdiction existed in an ATCA action against a Bolivian corporation); Carmichael v. United Technologies Corp., 835 F.2d 109, 113-114 (5th Cir.1998[1988]) (assuming without deciding that ATCA confers jurisdiction over private parties who aid, abet or conspire in human rights violations)....
U.S. courts have repeatedly determined that the ATS encompasses aiding and abetting liability, in a variety of different circumstances. For example, Presbyterian Church of the Sudan, 244 F.Supp.2d at 320-24, held that allegations that a Canadian oil company aided and abetted war crimes and other gross human rights violations were actionable. Similarly, the court in Mehinovic v. Vuckovic, 198 F.Supp.2d [1322,] 1355-1356 [(N.D.Ga.2002)], found a former Serb soldier liable for aiding and abetting war crimes and other human rights violations in Bosnia-Herzegovina. In Hilao v. Estate of Marcos, 103 F.3d 767, 776 (9th Cir.1996), the Ninth Circuit affirmed a jury instruction allowing a foreign leader to be held liable upon finding that he "directed, ordered, conspired with, or aided the military in torture, summary execution, and `disappearance.'" Likewise, Burnett v. Al Baraka Investment, 274 F.Supp.2d 86, 100 (D.D.C.2003), held that allegations by victims of the September 11 attacks that various entities aided and abetted the perpetrators stated a claim. In Bowoto v. Chevron Texaco [Corp.], 312 F.Supp.2d 1229, 1247 (N.D.Cal.2004), the court held that plaintiffs could proceed on their claims against an oil company for aiding and abetting military killings in Nigeria. Similarly, Bodner v. Banque Paribas, 114 F.Supp.2d 117, 128 (E.D.N.Y.2000), held that claims that defendant banks aided and abetted the Vichy and Nazi regimes in plundering plaintiffs' assets were actionable under the ATS. There is simply no question that the ATS provides for aiding and abetting liability.
... The liability of private actors, as aiders and abettors, for violations of international law was understood at the time the ATS was enacted. In a 1795 *54 opinion issued by Attorney General Bradford specifically states that individuals would be liable under the ATS for "committing, aiding, or abetting" violations of the laws of war. Breach of Neutrality, 1 Op. Att'y Gen. 57, 59 (1795). In that opinion, the Attorney General considered an incident involving private actors, acting in concert with, but not controlling the French naval vessels. See id.
Six years after the passage of the ATS, the Supreme Court in Talbot v. Janson[Jansen], 3 U.S. (3 Dall.) 133, 156, 1 L.Ed. 540 (1795), found that Talbot, a French citizen, who had assisted Ballard, a U.S. citizen, in unlawfully capturing a Dutch ship had acted in contravention with the law of nations and was liable for the value of the captured assets. See also id. at 167-68 (Iredell, J., concurring) ("It is impossible that Ballard can be guilty of a crime, and Talbot, who associated with him, in the wilful commission of it, can be wholly innocent of it."). Justice Paterson wrote that Talbot's liability sprang from his actions in aiding Ballard to arm and outfit, in cooperating with him on the high seas, and using him as the instrument and means of capturing vessels. Id. at 157. In finding the defendant liable, Justice Paterson found that the defendant had surrendered his protection under international law when he supplied his accomplice's ship with guns and used him "as the instrument and means of capturing vessels." Id. at 156. Judge Iredell, writing in concurrence, agreed, finding Talbot to have "abetted Ballard" when he "cruised before and after, in company with him [and] put guns on board of [Ballard's] vessel." Id. at 167.... [F]ederal case law dating back more than two hundred years ... recognized liability for aiding and abetting violations of international law norms.
....
International law clearly and specifically defines aiding and abetting liability. United States courts applying such liability under the ATS have correctly held that under international law, the actus reas of aiding and abetting consists of "practical assistance, encouragement, or moral support which has a substantial effect on the perpetration of the crime," and that the mens rea required is the knowledge that these acts assist the commission of the offence; the accomplice need not share the principal's wrongful intent. Mehinovic, 198 F.Supp.2d at 1356 (quoting Prosecutor v. Furundzija, Case No. IT-95-17/1/T, judgment, ¶¶ 192-249 (ICTY Trial Chamber, Dec. 10, 1998), reprinted at 38 I.L.M. 317 (1999)); accord Presbyterian Church of the Sudan, 244 F.Supp.[2d] at 323-24. Critically, the jurisprudence of the International Criminal Tribunal for the Former Yugoslavia, upon which the Mehinovic and Talisman courts relied, was based on an exhaustive analysis of the jurisprudence of the post-World War II tribunals. See, e.g., Furundzija IT-95-17/1, ¶¶ 195-97, 200-25, 236-49. Clearly, customary international law provides a "specific, universal and obligatory" norm against aiding and abetting that was well-established long before the Vietnam War.
Br. Amici Curiae of the Center for Constitutional Rights, Earthrights International and the International Human Rights Law Clinic at the University of Virginia School of Law, Jan. 18, 2005, at 13-17 (emphasis added) (some footnotes omitted) [hereinafter Amici Brief].
2. Corporate Culpability
Defendants argue that corporations cannot be liable under international law. There is substantial support for this position. *55 See generally, e.g., STEVEN R. RATNER & JASON S. ARAMS, ACCOUNTABILITY FOR HUMAN RIGHTS ATROCITIES IN INTERNATIONAL LAW: BEYOND THE NUREMBERG LEGACY 16 (2d ed. 2001) ("It remains unclear ... whether international law generally imposes criminal responsibility on groups and organizations."); id. at 343-45 (discussing individual accountability); Albert G.D. Levy, Criminal Responsibility of Individuals and International Law, 12 U. CHI. L.REV. 313, 332 (1945) ("The element of individual responsibility is extraneous to international law."); Ernst Schneeberger, The Responsibility of the Individual under International Law, 35 GEO. L.J. 481, 489 (1947) ("In the last resort responsibility under international law can only be responsibility of an individual...."); Beth Stephens, Translating Filartiga: A Comparative and International Law Analysis of Domestic Remedies for International Human Rights Violations, 27 YALE J. INT'L L. 1, 56 (2002) ("International law permits states to allow civil claims [against individuals] for human rights violations."). But see to the contrary authorities collected in Amici Brief quoted above in Part VIII.C.1.
Defendants point out, for example, that corporate defendants cannot violate the TVPA because, by its terms, the statute imposes liability only on a human being who inflicts torture upon another human being. See infra Part XI.B.1. They suggest that even if there had been a binding prohibition on the wartime use of herbicides prior to 1971, when use by the United States ceased, it created no universally recognized prohibition on the manufacture and sale by private parties of herbicides intended for such use. They note that the general rule is that international legal norms impose obligations on states, not private actors. Decl. of Kenneth Howard Anderson, Jr., Nov. 2, 2004, ¶ 88 [hereinafter Anderson Decl.]. As a leading treatise explains:
States are the principal subjects of international law. This means that international law is primarily a law for the international conduct of States, and not of their citizens. As a rule, the subjects of the rights and duties arising from international law are states solely and exclusively, and international law does not normally impose duties or confer rights directly upon an individual human being....
Id. (quoting SIR ROBERT JENNINGS & SIR ARTHUR WATTS, 1 OPPENHEIM'S INTERNATIONAL LAW 16 (9th ed.1992)).
The defendants  all corporations  contend that plaintiffs cannot show that any international prohibition extended to corporate entities. They indicate that in the few instances in which international law imposes obligations on non-state actors, "[i]nternational law does not, in the context of international criminal law or elsewhere, impose obligations or liability on juridical actors or artificial persons such as corporations." Id. ¶ 89. It is apparently true that the international criminal tribunals beginning with Nuremberg have not provided for corporate criminal responsibility. Id. ¶¶ 91-92. In determining the jurisdiction of the newly created International Criminal Court the treaty drafters (including the United States) expressly rejected attempts to include corporate liability. Id. ¶ 92.
Throughout the TVPA the term "individual" describes both those who can violate its proscriptions against torture, as well as those who can be victims of torture. Specifically, the TVPA provides that "[a]n individual who ... subjects an individual to torture shall ... be liable for damages to that individual," Torture Victim Protection Act of 1991, Pub.L. No. 102-256, § 2(a)(1), 106 Stat. 73, 73 (1992) (emphasis *56 added), and it defines "torture" as "any act, directed against an individual... by which severe pain or suffering ... is intentionally inflicted on that individual," id. § 3(b)(1) (emphasis added). Both from context and common sense only natural persons can be the "individual" victims of acts that inflict "severe pain and suffering." See id. Because the TVPA uses the same term "individual" to identify offenders, the definition of "individual" within the statute appears to refer to a human being, suggesting that only natural persons can violate the Act. See Desert Palace, Inc. v. Costa, 539 U.S. 90, 101, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003) (noting that "[a]bsent some congressional indication to the contrary, [courts] decline to give the same term in the same Act a different meaning depending on whether the rights of the plaintiff or the defendant are at issue"); see also Beanal v. Freeport-McMoRan, Inc., 969 F.Supp. 362, 381-82 (E.D.La.1997) ("[T]he plain meaning of the term `individual' does not ordinarily include a corporation."), aff'd by 197 F.3d 161 (5th Cir.1999).
All three of the international instruments plaintiffs rely upon that address the weapons that may be used in war follow the general rule of international law by imposing obligations only on states. The Hague Convention IV expressly provides that it does "not apply except between Contracting Powers," Convention (IV) Respecting the Laws and Customs of War on Land, Oct. 18, 1907, art. 2, 36 Stat. 2277, 2290 (emphasis added), and that "[a] belligerent party which violates the provisions of the said Regulations shall, if the case demands, be liable to pay compensation," id. art. 3 (emphasis added). The 1925 Geneva Protocol likewise provides that the "High Contracting Parties ... accept" the prohibition on use of bacteriological methods of warfare "and agree to be bound as between themselves." Prohibition of the Use in War of Asphyxiating, Poisonous or Other Gases, and of Bacteriological Methods of Warfare, June 17, 1925, 26 U.S.T. 571, 575 (emphasis added). United Nations Resolution Number 2603-A, dealing with herbicides, relies upon the 1925 Geneva Protocol, which purports solely to bind States. See G.A. Res. 2603-A, U.N. GAOR, 24th Sess., 1836th plen. mtg. at 16 (1969) (claiming that "[t]he majority of States then in existence" adhered to the 1925 Geneva Protocol, that "further States have become parties" and that "other States have declared that they will abide by its principles and objectives"). Defendants argue that, because the terms of none of these documents refers to private actors, these instruments do not establish a binding international norm prohibiting private entities from making or selling herbicides for use during war prior to 1975.
Defendants argue that plaintiffs cannot rely wholly on domestic legal concepts such as conspiracy, aiding and abetting or "state actors" to expand either the type of conduct or "the type of perpetrator," that a customary international legal prohibition reaches. Instead, plaintiffs must show that a definite and universally accepted norm of international law prohibits the act of an individual working with a government to violate an international norm, and that this independent international prohibition extends to private actors. In the instances in which international law imposes obligations on non-state actors, traditionally international law does not, in the context of international criminal law or elsewhere, impose obligations or liability on juridical actors or artificial persons such as corporations. Anderson Decl. ¶¶ 91-92.
Yet, despite the strength of authority supporting defendants' position, in view of the Nuremberg and post-Nuremberg trials, *57 see infra Parts IX.C.-D., plaintiffs would have overcome this conceptual burden had international law prohibited the use of herbicides in Vietnam at the time they were used by the United States. See 1 RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES introductory note to pt. II, at 71 ("[I]ndividuals and corporations have some independent status as persons in international law...."); see also infra Part XI.
Professor Anderson writes that at the Nuremberg trials, several German businessmen and industrialists were tried as individuals (who had done their work as officers and directors of companies), but "the record contains no suggestion that corporations could themselves incur criminal liability." Anderson Decl. ¶ 91. In fact, in the Nuremberg trials, this point of lack of corporate liability appeared to have been explicitly stated. Nevertheless, in the quotation which follows, and in other proceedings regarding Krupp and other German corporate entities, the law cannot ignore the fact that it was the corporations through which the individuals acted:
We will now turn to the consideration of the individual responsibility of the defendants for the acts of spoilation [in various countries].... It is appropriate here to mention that the corporate defendant, Farben, is not before the bar of this Tribunal and cannot be subjected to criminal penalties in these proceedings. We have used the term "Farben" as descriptive of the instrumentality of cohesion in the name of which the enumerated acts of spoilation were committed. But corporations act through individuals and, under the conception of personal individual guilt to which previous reference has been made, the prosecution, to discharge the burden imposed upon it in this case, must establish by competent proof beyond a reasonable doubt that an individual defendant was either a participant in the illegal act or that, being aware thereof, he authorized or approved it. Responsibility does not automatically attach to an act proved to be criminal merely by virtue of a defendant's membership in the Vorstand. Conversely, one may not utilize the corporate structure to achieve an immunity from criminal responsibility for illegal acts which he directs, counsels, aids, orders or abets. But the evidence must establish action of the character we have already indicated, with knowledge of the essential elements of the crime. In some instances, individuals performing these acts are not before this Tribunal. In other instances, the record has large gaps as to where or when the policy was set. In some instances, a policy is set without clear indication that essential factual elements required to make it criminal were disclosed. Difficulties of establishing such proof due to the destruction of records or other causes does not relieve the prosecution of its burden in this respect.
One cannot condone the activities of Farben in the field of spoilation. If not actually marching with the Wehrmacht, Farben at least was not far behind. But translating the criminal responsibility to personal and individual criminal acts is another matter.
United States v. Krauch (I.G. Farben Case), 8 TRIALS OF WAR CRIMINALS 1081, 1152-53 (photo. reprint 1997) (1952) (emphasis added) (footnote omitted). Even accepting this quotation's suggestion of corporate immunity at its face value, limitations on criminal liability of corporations do not necessarily apply to civil liability of corporations. It is interesting to note that Telford Taylor in his masterful text, The Anatomy of the Nuremberg Trials, heads chapter 18 "The Indicted Organizations," which describes the German corporate organizations *58 that were essential to execution of widespread Nazi bestiality. See TELFORD TAYLOR, THE ANATOMY OF THE NUREMBERG TRIALS: A PERSONAL MEMOIR 501 (Little Brown & Co.1992) (emphasis added).
It is not necessary to decide whether, if the corporations had been made parties at Nuremberg  as they surely could have been under United States criminal jurisprudence  they could have been found guilty. Farben as a corporation was not a named defendant. See also United States v. Krupp, 9 TRIALS OF WAR CRIMINALS 1327-1452. The Zyklon B Case (Trial of Bruno Tesch and Two Others) involved an individual proprietorship; corporate liability was not implicated. 1-5 LAW REPORTS OF TRIALS OF WAR CRIMINALS 93-102; see also infra Part IX.C.
Limiting civil liability to individuals while exonerating the corporation directing the individual's action through its complex operations and changing personnel makes little sense in today's world. Cf. 1 RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES § 421(2)(e) (stating, generally, that a state's exercise of jurisdiction to adjudicate with respect to "a corporation or comparable judicial person" is reasonable if it "is organized pursuant to the law of the state"). Our vital private activities are conducted primarily under corporate auspices, only corporations have the wherewithal to respond to massive toxic tort suits, and changing personnel means that those individuals who acted on behalf of the corporation and for its profit are often gone or deceased before they or the corporation can be brought to justice. While the legal effects of outsourcing to private contractors is unclear, it cannot be ignored under international or United States law. See Myriam Gilles, Private Parties as Defendants in Civil Rights Litigation, 26 Cardozo L.Rev. 1, 6 & nn.21-22, 7 (2004) (discussing use of private contractors in war).
A corporation is not immune from civil legal action based on international law. The opinion on this point of Professor Paust is compelling. Paust Op. at 3 ("Companies and corporations can have duties under international law, especially with respect to laws of war and human rights. Moreover, they have never been granted immunity under any known treaty or customary law with respect to violations of treaty-based or customary international law.").
For the purposes of the present motion the court adopts the submission of the Amici Brief on the point:
The potential liability of corporations under the ATS has been widely recognized or assumed by federal courts. The Supreme Court acknowledged that corporations can be sued under the ATS. Sosa v. Alvarez-Machain, [542 U.S. at ___, n. 20], 124 S.Ct. at 2766, n. 20. The Second Circuit has considered numerous cases where plaintiffs sued a corporation under the ATCA for alleged breaches of international law. Jota v. Texaco, Inc., 157 F.3d 153 (2d Cir.1998) (vacating the district court's dismissal, on the grounds of forum non conveniens, international comity and failure to join an indispensible party, and remanding); Wiwa v. Royal Dutch Petroleum Co., 226 F.3d 88 (2d Cir.2000) (reversing dismissal on forum non conveniens grounds and finding personal jurisdiction over the defendant corporations); Bigio v. Coca-Cola Co., 239 F.3d 440 (2d Cir.2000) (affirming dismissal of the ATS claim because the defendant corporation did not "act under color of law" simply by purchasing property from the government); Aguinda v. Texaco, Inc., 303 F.3d 470 (2d Cir.2002) (dismissed based on forum non conveniens). Although none of *59 these cases explicitly addressed the liability of corporations under the ATS, the disposition of these cases is inconsistent with the assertion that no claim under the ATS can be brought against corporations. In each of these cases, the Second Circuit acknowledged that corporations are potentially liable for violations of the law of nations that ordinarily entail individual responsibility. See also Carmichael v. United Technologies Corp., 835 F.2d 109, 113-14 (5th Cir.1988) (assuming explicitly that the ATS provided subject matter jurisdiction for a claim against a corporation).
The issue of corporate liability under the ATS was decided affirmatively in numerous district court cases. In Presbyterian Church of the Sudan v. Talisman, 256[244] F.Supp.2d at 311-19, the court reviewed the various precedents in federal common law and before international tribunals, which support the view that a corporation could be held liable for a violation of an international legal norm. The Talisman court noted with approval the same conclusion analyzed by Steven R. Ratner in "Corporations and Human Rights: A Theory of Legal Responsibility," 111 Yale L.J. 443 (2001) and INTERNATIONAL COUNCIL ON HUMAN RIGHTS POLICY, BEYOND VOLUNTARISM: HUMAN RIGHTS AND THE DEVELOPING INTERNATIONAL LEGAL OBLIGATIONS OF COMPANIES (2002), available at http://www.ichrp.org/ac/ excerpts/41.pdf. In Bowoto v. Chevron Texaco Corp., 312 F.Supp.2d 1229, 1247 (N.D.Cal.2004), the court held that sufficient evidence precluded summary judgment and permitted plaintiffs to proceed against a U.S. corporate defendant on the theory that its Nigerian subsidiary was acting as defendants' agent or that the defendant corporation aided and abetted in the human rights abuses.
Defendants present no policy reason why corporations should be uniquely exempt from tort liability under the ATS, and no court has presented one either. Concluding that corporations could be subject to liability under the ATS, the Talisman court stated:
Such a result should hardly be surprising. A private corporation is a juridical person and has no per se immunity under U.S. domestic or international law. See Jordan J. Paust, Human Rights Responsibilities of Private Corporations, 35 Vand. J. Transnat'l L. 801, 803 (2002).... Given that private individuals are liable for violations of international law in certain circumstances, there is no logical reason why corporations should not be held liable, at least in cases of jus cogens violations. Indeed, while Talisman disputes the fact that corporations are capable of violating the law of nations, it provides no logical argument supporting its claim.
244 F.Supp.2d at 318.
In any event, even if it were not true that international law recognizes corporations as defendants, they still could be sued under the ATS. As noted above, the Supreme Court made clear that an ATS claim is a federal common law claim and it is a bedrock tenet of American law that corporations can be held liable for their torts.
Amici Brief at 24-26 (footnote omitted).
D. Statutes of Limitations
Defendants argue that the applicable statutes of limitations require dismissal. See Defs.' Notice of Mot. for Partial Summ. J. Based on Statutes of Limitations, Nov. 2, 2004, at 1 [hereinafter Defs.' Notice of Mot. for Partial Summ J.]. They rely on the notice given to possible claimants by the extensive publicity in Vietnam *60 about contentions that the United States was spraying herbicides to harm people both in the north and south of that country. See Exs. to Defs.' Notice of Mot. for Partial Summ. J.; see also Defs.' Mem. of Law in Supp. of Mot. for Partial Summ. J. Dismissing Personal Injury Claims of Individual Pls. Based on Statutes of Limitations, Nov. 2, 2004, at 19-27.
The ATS contains no statute of limitations. The contention of defendants is that the ten-year statute of limitations in the Torture Victim Protection Act, Pub.L. 102-256, § 2(c), 106 Stat. 73, 73 (1992), should be applied to all federal claims under the ATS. See Manliguez v. Joseph, 226 F.Supp.2d 377, 386 (E.D.N.Y.2002) ("It is well-established that the ten-year statute of limitations of the [TVPA] applies to all [ATS] claims."). They also argue that analogous and applicable shorter New York State statutes should bar the state law claims. See, e.g., N.Y. C.P.L.R. § 202 (McKinney 2003) (borrowing statute); N.Y. C.P.L.R. § 208 (McKinney 2003) (addressing disability due to infancy or insanity); N.Y. C.P.L.R. § 209(a) (McKinney 2003) (addressing cause of action accruing in a foreign country during war); N.Y. C.P.L.R. § 213(1) (McKinney 2003 & Supp.2005) (specifying six-year statute of limitations generally); N.Y. C.P.L.R. § 214(4), (5) (McKinney 2003) (specifying three-year statute of limitations for property and personal injury claims, except as otherwise provided); N.Y. C.P.L.R. § 214-c (McKinney 2003) (providing statutes of limitations based on discovery of injury, notwithstanding three-year limitations period in section 214); N.Y. C.P.L.R. § 215(3) (McKinney 2003) (providing one-year statute of limitations for, inter alia, assault and battery); N.Y. EST. POWERS & TRUSTS § 5-4.1 (McKinney 1999 & Supp.2005) (providing, inter alia, for two-year statute of limitations for wrongful death suit by personal representative). But cf. Pickett v. Brown, 462 U.S. 1, 16 n. 15, 103 S.Ct. 2199, 76 L.Ed.2d 372 (1983) ("[S]tatutes of limitations generally are tolled during a child's minority."); United States v. Kubrick, 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979) (holding that discovery of injury and its cause is the date from which to measure statute of limitations); Kronisch v. United States, 150 F.3d 112 (2d Cir.1998) (same).
If a federal substantive rights statute enacted before December 1, 1990 does not specify a statute of limitations, a court applies the statute of limitations from the forum state, unless there is a federal law which "clearly provides a closer analogy than available state statutes, and when the federal policies at stake and the practicalities of litigation make that rule a significantly more important vehicle for interstitial lawmaking." North Star Steel Co. v. Thomas, 515 U.S. 29, 35, 115 S.Ct. 1927, 132 L.Ed.2d 27 (1995) (internal quotation marks and citation omitted).
Section 1658 of title 28 of the United States Code, effective December 1, 1990, provides for time limitations on the commencement of civil actions arising under acts of Congress. It provides:
(a) Except as otherwise provided by law, a civil action arising under an Act of Congress enacted after the date of the enactment of this section may not be commenced later than 4 years after the cause of action accrues.
(b) Notwithstanding section (a), a private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws, as defined in section 3(a)(47) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(47)), may be brought not later than the earlier of 
*61 (1) 2 years after the discovery of the facts constituting the violation; or
(2) 5 years after such violation.
28 U.S.C.A. § 1658 (1994 & Supp.2004) (emphasis added); see also Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369, 124 S.Ct. 1836, 158 L.Ed.2d 645 (2004) (interpreting section 1658(a) of title 28 of the United States Code). Depending upon date of enactment, statutes such as those described below in Part XI.B. would be governed by these limitations. Treaties and other instruments of international law and non-statutory customary international law would not be. See law described infra Parts XI.C.-D.
Some courts that have considered the international law issue have held that the TVPA, which contains a ten-year statute of limitations period, provides the closest federal analogy to the ATS. See, e.g., Papa v. United States, 281 F.3d 1004, 1012-13 (9th Cir.2002) (holding that the TVPA's ten-year limitations period is applicable to ATS claims); Manliguez v. Joseph, 226 F.Supp.2d 377, 386 (E.D.N.Y.2002) (applying the TVPA's limitations period to ATS claims because "the TVPA is ... both the most analogous statute and the one that best accommodates federal policies"); Iwanowa v. Ford Motor Co., 67 F.Supp.2d 424, 462 (D.N.J.1999) (applying the TVPA's statute of limitations to ATS claims); Wiwa v. Royal Dutch Petroleum Co., No. 96 Civ. 8386, 2002 WL 319887, at *18-*19 (S.D.N.Y. Feb.28, 2002) (discussing statute of limitations for the ATS and finding that the TVPA's ten-year statute of limitations is the appropriate period of limitations for ATS claims). A court has applied limitations periods provided by state law, Forti v. Suarez-Mason, 672 F.Supp. 1531, 1548 (N.D.Cal.1987) (holding, albeit pre-TVPA, that the most analogous statute to the ATS is section 1983 of title 42 of the United States Code and that, since state statutes of limitations are applicable to section 1983 claims, the same limitations period is applicable to ATS claims); alternatively, a court may apply the limitations period of the foreign country where the act occurred or the limitations period of international law, see BETH STEPHENS & MICHAEL RATNER, INTERNATIONAL HUMAN RIGHTS LITIGATION IN U.S. COURTS 148 (1996).
No specific statute of limitations is applicable to the claims of international law violations now at issue, with the exception of the Torture Victim Protection Act. As part of federal common law (when no specific statutory limitation is applicable), federal courts may create applicable statutes of limitations and tolling provisions as well as bases for application of laches. See STEVEN R. RATNER & JASON S. ABRAMS, ACCOUNTABILITY FOR HUMAN RIGHTS ATROCITIES IN INTERNATIONAL LAW: BEYOND THE NUREMBERG LEGACY 143-44 (2d ed. 2001) ("[I]t is difficult to conclude that mandatary non-applicability of statutes of limitations has yet entered the realm of custom.... [I]nternational law at least permits states to eliminate statutes of limitations for crimes against humanity and war crimes.") (emphasis in original).
There is good reason not to create or apply general hard and fixed rules of laches or relatively short statutes of limitation, newly minted by judicial fiat, in the developing area of international law. In many instances a foreign government, group or individuals may be involved both in the violation and in threats that make it impossible for individuals harmed to complain until there is a new administration or the plaintiff can escape to freedom in another country. In the present case the lack for many years of any recognition by the United States of the Vietnam communist government as well as embargos and limits on travel arguably made it difficult for those within Vietnam to file any claims in United *62 States courts or to obtain assistance from United States counsel. There has been no proof yet of laches here. Cf. Paul R. Dubinsky, Human Rights Law Meets Private Law Harmonization: The Coming Conflict, 30 YALE J. INT'L L. 211, 286 (2005) ("Some EU member states have enacted legislation reviving causes of action.... In some instances, courts have upheld these statutes. In other instances, these revival statutes have been struck down. In still other states, statutes of limitations have been lengthened judicially, rather than legislatively, by tolling...."). But cf. Stogner v. California, 539 U.S. 607, 123 S.Ct. 2446, 156 L.Ed.2d 544 (2003) (invalidating California statute permitting prosecution of sex-related child abuse crimes even where the prior statute of limitations has expired).
The possible issues of statutes of limitations, tolling and laches requires further factual development should the case go forward on order of the Court of Appeals for the Second Circuit. In such an inquiry the courts may consider the significance of the United States Department of the Treasury's designation of North Vietnam and South Vietnam on May 5, 1964 and April 30, 1975, respectively, as foreign countries subject to the Foreign Assets Control Regulations, 31 C.F.R. § 500 (2004); apparently they did not prevent plaintiffs from filing suits in the United States. The regulations did not by their terms prohibit or restrict filing of a personal injury lawsuit. Nor did they appear to prevent retaining of attorneys in this country to prosecute their suit. There is no indication that any plaintiff applied for a waiver to the Secretary of the Treasury. See 31 C.F.R. § 500.201(a) (2004) (providing that otherwise prohibited transactions involving North Vietnam or South Vietnam, or its nationals, may be specifically authorized by the Secretary of the Treasury). There is no showing that permission to retain an attorney or commence a suit would have been denied. See Am. Airways Charters, Inc. v. Regan, 746 F.2d 865, 868 n. 3 (D.C.Cir.1984) (noting that practice may have permitted obtaining representation without a license); id. at 870 (concluding that advance government approval apparently was not needed for bare representation); id. at 867-68 (noting licenses obtained to permit payment to counsel).
In any event, tolling for infants and for Vietnamese as prospective plaintiffs in Vietnam raise questions of law and fact that are not necessarily governed by the Foreign Assets Control Regulations of the United States; the inhibitions, if any, provided by Vietnamese conditions would also need to be considered before the issue of laches and tolling  at least in part equitable doctrines  could be decided. See Hilao v. Estate of Marcos, 103 F.3d 767, 771-73 (9th Cir.1996) (including in "extraordinary conditions" that victims suffered intimidation and fear of reprisal and thus concluding that claims were tolled until the defendant left office); Johnson v. Nyack Hosp., 86 F.3d 8, 12 (2d Cir.1996) (noting that equitable tolling has been applied if plaintiff was "prevented in some extraordinary way from exercising his rights" (citation and internal quotation marks omitted)).
In developing a federal statute of limitations applicable in international law cases, account should be taken of the fact that many states of the United States provide for tolling. See Young v. United States, 535 U.S. 43, 49, 122 S.Ct. 1036, 152 L.Ed.2d 79 (2002) (noting that "limitations periods are customarily subject to equitable tolling, unless tolling would be inconsistent with the text of the relevant statute" (internal quotation marks and citations omitted)). Their terms differ. For example, the New York tolling statute on Agent Orange only covers claims of United States *63 veterans; it does not cover the claims of Vietnamese nationals. See, e.g., N.Y. C.P.L.R. § 214-b (McKinney 2003 & Supp.2005) (providing for a renewed two-year discovery statute of limitations for actions to recover damages for injury caused by phenoxy herbicides while serving as a member of the United States armed forces in Indo-China from January 1, 1962 through May 7, 1975); 2004 N.Y. Laws 68 (reviving and extending up to June 16, 2006 any cause of action for injury or death caused by phenoxy herbicides while serving as a member of the United States armed forces from December 22, 1961 through May 7, 1975 which is or would be barred prior to June 16, 1985 because the applicable statute of limitation had expired).
Adopted, for the purposes of this phase of the litigation, subject to reconsideration, is the position of Professor Paust that "[u]nder international law, there are no statutes of limitation with respect to war crimes and other violations of international law," Paust Op. at 12 (citations omitted)  excluding the TVPA. The principle of non-applicability of statutory limitations to certain violations of international law has been recognized in international instruments. The Convention on the Non-Applicability of Statutory Limitations to War Crimes and Crimes Against Humanity provides that "[n]o statutory limitations period shall apply" to war crimes and crimes against humanity, including genocide. Convention on the Non-Applicability of Statutory Limitations to War Crimes and Crimes Against Humanity, Nov. 26, 1968, art. 1, 754 U.N.T.S. 73, 75 (entered into force Nov. 11, 1970); see also Rome Statute of the International Criminal Court ("Rome Statute"), July 17, 1998, arts. 5, 29, U.N. Doc. A/Conf. 183/9 (1998) (entered into force July 1, 2002) ("The crimes within the jurisdiction of the Court [(i.e., genocide, crimes against humanity, war crimes and "the crime of aggression")] shall not be subject to any statute of limitations."), http://157. 150.195.4/LibertyIMS::/ sidRStQP3qgcXTLsn0I/ Cmd=XmlGet Request;Name =64; NoUI=1;F0=2187;F1=English; F2®D38544; F3=90;style=Xml PageViewer©xsl (last visited Mar. 6, 2005). Although the United States is not a signatory to either the United Nations Convention on the Non-Applicability of Statutory Limitations to War Crimes and Crimes Against Humanity or the Rome Statute, these instruments suggest the need to recognize a rule under customary international law that no statute of limitations should be applied to war crimes and crimes against humanity. The United States' Genocide Convention Implementation Act of 1987, 18 U.S.C.A. § 1091(e) (2000 & Supp.2004), provides that there is no statute of limitations to indict a person who commits genocide in the form of killing members of a specified group.
Apart from the difficulties of law presented by statutes of limitations and tolling, the defendants have failed to establish with the requisite probability required by Rule 56 when plaintiffs knew, or could be deemed to have known, that they were diseased because of the spraying of herbicides supplied by defendants. They rely on articles in two Vietnam newspapers alleging Agent Orange destructive effects, but there is no showing that plaintiffs read or even had access to these papers. Plaintiffs have denied that they were aware of such publications during the period when a statute might bar their claim and that they were unaware that Agent Orange might have caused the problems of which they now complain. The defendants have not *64 met the requirement of Rule 56. See supra Part IV.B.2.
E. Justiciability
Defendants' motion to dismiss on the ground that plaintiffs' claims are non-justiciable is denied. The government's argument that plaintiffs' claims raise non-justiciable political questions is not persuasive. See U.S. Statement of Interest at 13-22.
Defendants broadly construe the types of controversies whose adjudication would impermissibly interfere with the conduct of foreign relations. They unsuccessfully endeavor to include the present case among them. Their position does not square with the well-accepted principle that "[i]nternational law is part of our law, and must be ascertained and administered by the courts of justice of appropriate jurisdiction as often as questions of right depending upon it are duly presented for their determination." The Paquete Habana, 175 U.S. 677, 700, 20 S.Ct. 290, 44 L.Ed. 320 (1900); see also Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 423, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964) ("[I]t is, of course, true that United States courts apply international law as a part of our own in appropriate circumstances...."); The Nereide, 9 Cranch 388, 423, 3 L.Ed. 769 (1815) (Marshall, C.J.) ("[T]he Court is bound by the law of nations which is a part of the law of the land"); Filartiga v. Pena-Irala, 630 F.2d 876, 886 (2d Cir.1980) ("It is an ancient and a salutory feature of the Anglo-American legal tradition that the Law of Nations is a part of the law of the land to be ascertained and administered, like any other, in the appropriate case.").
That the case may call for an assessment of the President's actions during wartime is no reason for a court to abstain. Presidential powers are limited even in wartime. See, e.g., Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (holding that the executive order to seize steel plants during the Korean War exceeded the President's constitutional power); cf. Michael J. Glennon, Foreign Affairs and the Political Question Doctrine, 83 AM. J. INT'L L. 814, 814 (1989) ("The unevenness of congressional oversight, the proclivity of executive foreign affairs agencies for violating the law and the traditional responsibility of the courts as the last guardians of the Constitution  all point to the propriety of an active role for the judiciary in ensuring governmental compliance with the law."). It is not a defense that the spraying of herbicides was on orders of the President: Authorization by the head of government does not provide carte blanche for a private defendant to harm individuals in violation of international law. See infra Part IX. In the Third Reich all power of the state was centered in Hitler; yet his orders did not serve as a defense at Nuremberg. Justiciability is not eliminated because of possible interference with executive power even in wartime. Rasul v. Bush, 542 U.S. 466, ___-___, 124 S.Ct. 2686, 2698-99, 159 L.Ed.2d 548 (2004) (holding that district court had jurisdiction over claims asserted under ATS by aliens being detained by United States government at its base in Guantanamo, Cuba); Youngstown, 343 U.S. 579, 72 S.Ct. 863.
1. Generally
A well-recognized, if not altogether clear, justiciability doctrine instructs federal courts to avoid deciding "political questions." It reflects an assumption based on our separation of powers doctrine that there is a narrow class of claims best resolved by the branches of government directly responsible to the people through the vote. Federal courts, when faced with certain allegations of unconstitutional government *65 conduct, are to dismiss such claims without ruling on the merits.
Experts have observed that "[t]he political question doctrine is in a state of some confusion." LAWRENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW 96 (2d ed.1988) (quotation omitted in third edition). Others have gone further, some saying that the doctrine is useless, still others that it does not exist. See, e.g., ERWIN CHEMERINSKY, FEDERAL JURISDICTION 146 (Aspen Publishers, 4th ed.2003) (concluding that the Supreme Court criteria "seem useless in identifying what constitutes a political question"); Louis Henkin, Is There a "Political Question" Doctrine?, 85 YALE L.J. 597, 622 (1976) ("The `political question' doctrine ... is an unnecessary, deceptive packaging of several established doctrines that has misled lawyers and courts to find in it things that were never put there and make it far more than the sum of its parts."); Martin H. Redish, Judicial Review and the "Political Question," 79 NW. U.L.REV. 1031, 1031 (1984) ("The [political question] doctrine has always proven to be an enigma to commentators. Not only have they disagreed about its wisdom and validity..., but they also have differed significantly over the doctrine's scope and rationale."); Louis Michael Seidman, This Essay is Brilliant/This Essay is Stupid: Positive and Negative Self-Reference in Constitutional Practice and Theory, 46 UCLA L.REV. 501, 528-30 (1998) (arguing that a court cannot "decide whether there is a textually demonstrable commitment or judicially manageable standards without first taking a peek at the very merits it purports to be avoiding. In effect, the Court says that it must first decide the merits in order to avoid deciding the merits.... The doctrine says that courts should not decide political questions, yet the decision whether something is a political question is itself a political question that the doctrine requires the Court to decide."); Linda Sandstrom Simard, Standing Alone: Do We Still Need the Political Question Doctrine?, 100 DICK. L.REV. 303, 306 (1996) ("[D]uring the last several decades, the Court has rarely applied the political question doctrine...."); Michael E. Tigar, Judicial Power, The "Political Question Doctrine," and Foreign Relations, 17 UCLA L.REV. 1135, 1135 (1970) ("[T]here is, properly speaking, no such thing [as a `political question doctrine']. Rather, there are a cluster of disparate rules and principles any of which may, in a given case, dictate a result on the merits, lead to a dismissal for want of article three jurisdiction, prevent a party from airing an issue the favorable resolution of which might terminate the litigation in his favor, or authorize a federal court in its discretion and as a matter of prudence to decline jurisdiction to hear a case or decide an issue.").
The confusion expressed in the commentary is due in part to the Supreme Court's different, and sometimes conflicting, approaches to the political question doctrine. In Marbury v. Madison, the Supreme Court declared:
By the Constitution of the United States, the President is invested with certain important political powers, in the exercise of which he is to use his own discretion, and is accountable only to his country in his political character, and to his own conscience.... The subjects are political.... [B]eing entrusted to the executive, the decision of the executive is conclusive.... Questions, in their nature political, or which are by the constitution and laws, submitted to the executive, can never be made in this court.
5 U.S. (1 Cranch) 137, 165-66, 170, 2 L.Ed. 60 (1803). The Court's definition of political questions in Marbury was narrow, including *66 only matters in which the president had unlimited discretion; under this original formulation, a claim alleging a violation of individual rights might have afforded standing, since it would not have been deemed a political question. See HOWARD FINK & MARK V. TUSHNET, FEDERAL JURISDICTION: POLICY AND PRACTICE 214 (1st ed. 1984) ("But notice the effect of Marbury's classification: Standing is just the obverse of political questions. If a litigant claims that an individual right has been invaded, the lawsuit by definition does not involve a political question.").
As it evolved, the modern political question doctrine came to include questions incompatible with the Marbury formulation, including instances where individuals alleged the violation of specific constitutional principles and the existence of concrete injury. See, e.g., Luther v. Borden, 48 U.S. (7 How.) 1, 12 L.Ed. 581 (1849) (determining nonjusticiable a suit brought under the republican form of government clause, U.S. Const. art IV, § 4, even though the effect was to leave people in jail who were contesting the constitutionality of their conviction).
The modern governing standard in this area was articulated in the landmark one person-one vote case of Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). In Baker, the Supreme Court held that the political question doctrine did not bar the federal courts from considering an equal protection challenge to a state's voting apportionment structure. Plaintiffs from cities contended that malapportionment of the state legislature denied them equal protection because the weight of their votes would not be equal to those of voters in rural districts. Justice Brennan, writing for the Court, narrowly limited nonjusticiable political questions to a relatively few areas where the courts could not find or apply judicially enforceable standards or to areas requiring free executive or legislative control. The six areas he pointed to were the following:
Prominent on the surface of any case held to involve a political question is found [(1)] a textually demonstrable commitment of the issue to a coordinate political department; or [(2)] a lack of judicially discoverable and manageable standards for resolving it; or [(3)] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [(4)] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [(5)] an unusual need for unquestioning adherence to a political decision already made; or [(6)] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.
Id. at 217, 82 S.Ct. 691. "Unless one or more of these formulations is inextricable from the case at bar, there should be no dismissal for non-justiciability on the ground of a political question's presence." Id.
Baker warned against reliance on the political question doctrine to avoid deciding controversies over which the court is assumed to have jurisdiction:
The doctrine of which we treat is one of `political questions,' not one of `political cases.' The courts cannot reject as `no law suit' a bona fide controversy as to whether some action denominated `political' exceeds constitutional authority. The cases we have reviewed show the necessity for discriminating inquiry into the precise facts and posture of the particular case, and the impossibility of resolution by any semantic cataloguing.
Id. (emphasis added).
With respect to foreign relations, the Baker court wrote:
*67 There are sweeping statements to the effect that all questions touching foreign relations are political questions.... Yet it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance. Our cases in this field seem invariably to show a discriminating analysis of the particular question posed, in terms of the history of its management by the political branches, of its susceptibility to judicial handling in the light of its nature and posture in the specific case, and of the possible consequences of judicial action.
Id. at 211-12, 82 S.Ct. 691.
Since Baker, the Court has generally refused to hold that an individual's claims of personal injury present nonjusticiable political questions. See, e.g., U.S. Dep't of Commerce v. Montana, 503 U.S. 442, 442, 458, 112 S.Ct. 1415, 118 L.Ed.2d 87 (1992) (reversing a judgment holding unconstitutional a 1941 statute prescribing method of "equal proportions" as the method to be used for determining the number of representatives to which each State was entitled, concluding that the issue was "political" only insofar as it "raise[d] an issue of great importance to the political branches"); United States v. Munoz-Flores, 495 U.S. 385, 110 S.Ct. 1964, 109 L.Ed.2d 384 (1990) (holding that a dispute under the Origination Clause, U.S. Const. art. I, § 7, cl. 1, which mandates that all bills for raising revenue originate in the House of Representatives, did not present a nonjusticiable political question); Davis v. Bandemer, 478 U.S. 109, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1986) (applying Baker to find a legislative districting case justiciable where the political "gerrymandering" alleged involved re-drawing of state legislative districts to hamper the electoral prospects of Democratic candidates); United States v. Nixon, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974) (holding that the intra-executive nature of the dispute between President Nixon and Special Prosecutor Jaworski did not give rise to a political question); Powell v. McCormack, 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969) (concluding that the political question doctrine did not bar review of the House of Representatives' exercise of the Article I, section 5, power to judge the qualifications of its members).
Only a few times since Baker has the Supreme Court invoked the political question doctrine to hold issues nonjusticiable. In Gilligan v. Morgan, 413 U.S. 1, 93 S.Ct. 2440, 37 L.Ed.2d 407 (1973), plaintiffs sought evaluation by the federal court of the training of the Ohio National Guard under the Fourteenth Amendment of the Due Process Clause and sought injunctive relief in the event of a violation. The Supreme Court based its determination that the question was nonjusticiable on the following factors: (1) Article I, section 8 of the Constitution authorized Congress to engage in this kind of supervision; and (2) judicial review in this area would be essentially standardless. The Court reasoned that "it is difficult to conceive of an area of governmental activity in which the courts have less competence." Id. at 10, 93 S.Ct. 2440.
In Goldwater v. Carter, 444 U.S. 996, 100 S.Ct. 533, 62 L.Ed.2d 428 (1979) (per curiam), the Court summarily vacated the decision of a court of appeals holding that the President had power to terminate a treaty with Taiwan without the approval of the Senate. The plurality postulated that the President's power to abrogate a treaty presented a political question and therefore was nonjusticiable. Justice Powell concurred in the judgment on the ground that the suit was not ripe because neither the Senate nor the House had directly *68 challenged the issue. Id. at 997-98, 100 S.Ct. 533 (Powell, J., concurring). He disagreed with Justice Rehnquist's conclusion that the issue was a nonjusticiable political question, and argued to the contrary that "reliance upon the political-question doctrine is inconsistent with our precedents." Id. at 998, 100 S.Ct. 533.
In Nixon v. United States, 506 U.S. 224, 113 S.Ct. 732, 122 L.Ed.2d 1 (1993), the Court held that a challenge by Walter L. Nixon, former Chief Judge of the United States District Court for the Southern District of Mississippi, to the Senate's use of a committee to hear testimony and gather other evidence in his impeachment trial amounted to a nonjusticiable political question. The Court's analysis centered on Article I, section 3, clause 6 of the Constitution: "The Senate shall have the sole Power to try all Impeachments." The Court determined that "the use of the ... word `try' lack[ed] sufficient precision to afford any judicially manageable standard of review." 506 U.S. at 230, 113 S.Ct. 732. The Court underscored the significance of the explicit grant of "sole" authority to the legislative branch, and further observed that judicial review would pose too great a threat to the legitimacy of the process, "plac[ing] final reviewing authority with respect to impeachments in the hands of the same body that the impeachment process is meant to regulate." Id. at 235, 113 S.Ct. 732. The Court concluded that the Constitution's textually demonstrable commitment to the Senate of the conduct of impeachment trials made the issue a nonjusticiable political question.
Bush v. Gore, 531 U.S. 98, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000), is relied upon by some commentators as illustrating the lack of clarity and vitality of the political question doctrine. Commentators noted the significance of the Court's failure to even mention the doctrine. See, e.g., Robert J. Pushaw, Jr., The Presidential Election Dispute, The Political Question Doctrine, and the Fourteenth Amendment: A Reply to Professors Krent and Shane, 29 FLA. ST. U.L.REV. 603, 612 (2001) (observing that, "[i]nterestingly, no Justice in Bush cited Baker or used the term `political question doctrine'"); Mark Tushnet, Law and Prudence in the Law of Justiciability, 80 N.C. L.REV. 1203, 1229 (2002) ("What is most notable about Bush v. Gore in the present context is that no one said anything at all about justiciability questions.").
In Vieth v. Jubelirer, 541 U.S. 267, 124 S.Ct. 1769, 158 L.Ed.2d 546 (2004), Justice Scalia's plurality opinion held that a challenge to the political gerrymandering of Pennsylvania voting districts was a nonjusticiable political question because no judicially manageable standards could be applied. The plurality reasoned that "[t]he issue we have discussed is not whether severe partisan gerrymanders violate the Constitution, but whether it is for the courts to say when a violation has occurred, and to design a remedy." Id. at 1785. It then concluded that there were no constitutionally appropriate and judicially manageable standards for determining when "political gerrymandering has gone too far." Id. at 1787.
Vieth arguably demonstrated that there is still a viable political question doctrine and that, as a pre-Vieth commentator noted, "reports of [its] death ... have been greatly exaggerated." The Supreme Court, 1992 Term  Leading Cases, 107 HARV. L.REV. 254, 294 (1993); see also David J. Bederman, Deference or Deception: Treaty Rights as Political Questions, 70 U. COLO. L.REV. 1439, 1445-46 (1999) ("The [Court's] recent decisions have all but given the political question doctrine a quiet burial. With [one exception], the political question doctrine has played almost no role in Supreme Court *69 jurisprudence  and virtually none at all in the foreign affairs realm.").
Courts remain obliged to determine whether provisions may be interpreted as guarantees of enforceable rights. They must first construe the relevant text, paying close attention to whether the provision by its terms grants authority to another branch of government; if a provision recognizes such authority, the court will have to consider the possibility of conflicting conclusions, as well as whether parallel judicial and political remedies are necessary.
But ultimately, the political question inquiry turns as much on the court's conception of judicial competence as on the constitutional text. Thus the political question doctrine, like other justiciability doctrines, at bottom reflects the mix of constitutional interpretation and judicial discretion which is an inevitable by-product of the efforts of federal courts to define their own limitations.
LAWRENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW 385 (3d ed.2000). Given the importance of international law today in preventing abuse by nations and individuals, and the importation of that law into ruling federal law, the political question doctrine does not bar this suit.
2. Application of Baker v. Carr to Foreign Affairs and War
The crux of defendants' strongest argument for nonjusticiability is that the Supreme Court repeatedly has cautioned against adjudicating claims that would interfere with the conduct of foreign relations and war powers. Great emphasis is also placed on the Court of Appeals for the Second Circuit's repeated recognition of diplomatic negotiations and the conduct of foreign affairs as matters left to the President's discretion, particularly where there are hostilities.
Defendants' position is that plaintiffs' suit "challenges how the President, with the support of Congress, chose to prosecute the war in Vietnam, and seek[s] reparations that our Nation has declined to make to the people of Vietnam." Mem. of Law in Support of Defs.' Mot. to Dismiss All Claims in Pls.' Amended Class Action Compl. for Lack of Jurisdiction over the Subject Matter and for Failure to State a Claim Upon Which Relief Can Be Granted, Nov. 2, 2004, at 20 [hereinafter Defs.' Mem. of Law to Dismiss All Claims]. They contend that "virtually every one of [the Baker] factors is present," id. at 15, particularly in (1) demonstrating a lack of the respect due coordinate branches, the fourth Baker factor; (2) raising questions that uniquely demand single-voiced statements of the government's views; and (3) risking embarrassment from multifarious pronouncements, the sixth Baker factor. It is also suggested that adjudication would require this court impermissibly to second-guess the wisdom of core military and diplomatic decisions and might interfere with present sovereign-to-sovereign relations between the United States and Vietnam, positing that these conclusions do not change because plaintiffs have sued private citizens instead of the United States.
The defendants have failed to establish that any of the Baker factors are present in the instant case. As for the first Baker factor, there is no textually demonstrable commitment of the issues posed in the instant case to a coordinate political department. The judiciary is the branch of government to which claims based on international law has been committed. Kadic v. Karadzic, 70 F.3d 232, 249 (2d Cir.1995) ("[W]e have noted in a similar context... that `[t]he department to whom this issue is "constitutionally committed" is none other than our own  the *70 Judiciary.'") (quoting Klinghoffer v. S.N.C. Achille Lauro, 937 F.2d 44, 49 (2d Cir.1991)). The issues now presented require interpretation of both international law, including treaties, and domestic tort law. Article III explicitly extends judicial power to the domain of treaties. U.S. CONST. art. III, § 2. As put in Klinghoffer v. S.N.C. Achille Lauro, the instant case can be characterized as "an ordinary tort suit, alleging that the defendants breached a duty of care owed to plaintiffs or their decedents.... This factor alone, then, strongly suggests that the political question doctrine does not apply." 937 F.2d 44, 49 (2d Cir.1991).
In Sosa v. Alvarez-Machain, the Supreme Court observed in its thorough history of the ATS that "violations of the law of nations, admitting of a judicial remedy and at the same time threatening serious consequences in international affairs, [were] probably on the minds of the men who drafted the ATS with its reference to tort." 542 U.S. 692, ___, 124 S.Ct. 2739, 2755, 159 L.Ed.2d 718 (2004). It wrote:
The Framers responded [to the increasing concern that the federal government lacked judicial powers with the competency to handle cases of international dimension] by vesting the Supreme Court with original jurisdiction over "all Cases affecting Ambassadors, other public ministers and Consuls[,]" U.S. Const., Art. III, § 2, and the First Congress followed through. The Judiciary Act reinforced this Court's original jurisdiction over suits brought by diplomats, see 1 Stat. 80, ch. 20, § 13, created alienage jurisdiction, § 11 and, of course, included the ATS, § 9.
Id. at 2757.
Hybrid tort and international law actions have long been addressed by the courts. See Sosa, 542 U.S. at ___, 124 S.Ct. at 2759 (noting that "the 1795 opinion of Attorney General William Bradford ... made it clear that a federal court was open for the prosecution of a tort action growing out of [an episode where Americans took part in the French plunder of a British slave colony in Sierra Leone]" and that jurisdiction was "`expressly given to these courts in all cases where an alien sues for tort only, in violation of the laws of nations, or a treaty of the United States.'" (quoting 1 Op. Atty. Gen. 57)). The history of this practice confirms that there is no textually demonstrable commitment of the issue to a coordinate political branch.
The second Baker factor requires a court to determine whether there are judicially discoverable and manageable standards for resolving the issue. While the answers to questions of international law, like those of domestic law, may not always be clear, they are ascertainable and manageable. As the Court of Appeals for the Second Circuit recalled:
[O]ur decision in Filartiga established that universally recognized norms of international law provide judicially discoverable and manageable standards for adjudicating suits brought under the Alien Tort Act, which obviates any need to make initial policy decisions of the kind normally reserved for nonjudicial discretion. Moreover, the existence of judicially discoverable and manageable standards further undermines the claim that such suits relate to matters that are constitutionally committed to another branch.
Kadic v. Karadzic, 70 F.3d 232, 249 (2d Cir.1995). Courts in the Second Circuit have repeatedly resolved international law questions in the context of claims under the ATS. See, e.g., Filartiga v. Pena-Irala, 630 F.2d 876, 884 (2d Cir.1980) ("Having examined the sources from which customary international law is derived the usage of nations, judicial opinions and the works *71 of jurists we conclude that official torture is now prohibited by the law of nations." (footnote omitted)); see also Tachiona v. United States, 386 F.3d 205 (2d Cir.2004); Flores v. S. Peru Copper Corp., 343 F.3d 140 (2d Cir.2003); United States v. Yousef, 327 F.3d 56 (2d Cir.2003); In re S. African Apartheid Litig., 346 F.Supp.2d 538 (S.D.N.Y.2004); Weiss v. Am. Jewish Comm., 335 F.Supp.2d 469 (S.D.N.Y.2004).
The third Baker factor requires courts to evaluate whether it would be impossible to decide the case without making an initial policy determination of a kind clearly involving nonjudicial discretion. The question at issue in the instant case is whether American corporations acted in violation of international law during a war. Defendants argue that this will require an assessment of the President's conduct during a time of war, and that courts lack the authority to ever determine whether the President, as Commander-in-Chief, has exceeded his constitutional authority. This kind of determination is one of substantive international law, not policy. A categorical rule of non-justiciability because of possible interference with executive power, even in times of war, has never existed. See, e.g., Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (holding that the executive order to seize steel plants during the Korean War exceeded the President's constitutional power); see also LOUIS HENKIN, FOREIGN AFFAIRS AND THE U.S. CONSTITUTION 62 (2d ed. 1996) ("Of course the President cannot do what is forbidden to him....").
"The fourth through sixth Baker factors appear to be relevant only if judicial resolution of a question would contradict prior decisions taken by a political branch in those limited contexts where such contradiction would seriously interfere with important governmental interests." Kadic, 70 F.3d at 249. The Burger-Fischer v. Degussa AG court engaged in such analysis in addressing the political question doctrine because there the extensive post-World War II treaties and reparations were found to have been designed to deal with compensation, and thus to effectively preclude private resolution of the issues:
In effect, plaintiffs are inviting this court to try its hand at refashioning the reparations agreements which the United States and other World War II combatants (whose blood and treasure brought the war of conquest and the program of extermination to an end) forged in the crucible of a devastated post-war Europe and in the crucible of the Cold War.... [T]his is a task which the court does not have the judicial power to perform.
65 F.Supp.2d 248, 282 (D.N.J.1999). In contrast to Burger-Fischer, the instant case does not require the refashioning of agreements by coordinate branches of government. It requires only the interpretation of international law. The agreements between the present Vietnam government and the United States cited by defendants address property that was expropriated or nationalized by Vietnam and future research  they do not address any issue raised in this case.
The fourth Baker factor turns on the potential impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government. The determination that a branch of government has exceeded its constitutional authority does not express lack of respect for it. If the contrary were the case, courts would be unable to declare acts of Congress unconstitutional. See, e.g., United States v. Munoz-Flores, 495 U.S. 385, 390-91, 110 S.Ct. 1964, 109 L.Ed.2d 384 (1990) (rejecting government's claim that *72 invalidation of a bill would demonstrate disrespect for Congress's judgment, noting that "congressional consideration of constitutional questions does not foreclose subsequent judicial scrutiny of the law's constitutionality"). The President is no more above the law than is Congress or the courts. Treaties and other aspects of international law apply to, and limit, executive power  even in wartime. Because the Executive and the Legislature have not made significant political decisions in the area being trod on by the instant parties, as was the case in Burger-Fischer, there is no unusual need for unquestioning adherence to a political decision already made, the fifth Baker factor.
As for the sixth and final Baker factor  the potentiality of embarrassment from multifarious pronouncements by various departments on one question  the absence of executive and legislative action obviates concern. The judiciary, as well as the executive and the legislature, are each charged with the interpretation and application of international law. That a decision may touch on foreign relations does not decide the question.
While the Constitution grants to the political branches, and in particular to the Executive, responsibility for conducting the nation's foreign affairs, it does not follow that the judicial power is excluded from the resolution of cases merely because they may touch upon such affairs. The court must instead look at "the particular question posed" in the case. Baker v. Carr, 369 U.S. at 211, 82 S.Ct. at 707. In fact, courts are routinely deciding cases that touch upon or even have a substantial impact on foreign and defense policy.
Dellums v. Bush, 752 F.Supp. 1141, 1146 (D.D.C.Cir.1990) (citing Japan Whaling Ass'n v. American Cetacean Soc'y, 478 U.S. 221, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986); Dames & Moore v. Regan, 453 U.S. 654, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981); Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952); United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255 (1936)). This case does not raise a nonjusticiable political question. It raises issues that courts are structured and empowered to decide  the nature and applicability of substantive international law and domestic tort law.
The amici brief states the position properly when it asserts in part:
Just last term, the Supreme Court held that an ATS claim against the U.S. government challenging acts taken in prosecuting the war against al Qaeda and the Taliban regime was justiciable. Rasul v. Bush, [542 U.S.466, ___,] 124 S.Ct. [2686,] 2698[, 159 L.Ed.2d 548] [(2004)]....
The Rasul petitioners were foreign citizens captured abroad during hostilities between the United States and the Taliban, and held by the U.S. military at the U.S. naval base at Guantanamo Bay, Cuba. The petitioners challenged the legality of their detention. Some sought to assert jurisdiction under the ATS. The Court explicitly held that a district court could hear petitioners' ATS claims. It noted that the ATS:
explicitly confers the privilege of suing for an actionable "tort ... committed in violation of the law of nations or a treaty of the United States" on aliens alone. The fact that petitioners in these cases are being held in military custody is immaterial to the question of the District Court's jurisdiction over their nonhabeas statutory claims. Id. at 2699.
... The government argued in Rasul, as defendants do here, that the conduct *73 of foreign affairs is committed to the political branches, particularly with respect to the Executive's conduct of military operations abroad. Resp't Br. at 41-42, Rasul (No. 03-334), [a]vailable at http:// supreme.lp.findlaw.com/ supreme_court/briefs/ 03-334/03-334.mer.resp.pdf. The government further claimed that:
exercising jurisdiction over actions filed on behalf of the Guantanamo detainees would thrust the federal courts into the extraordinary role of reviewing the military's conduct of hostilities overseas, second-guessing the military's determination as to which captured aliens pose a threat to the United States or have strategic intelligence value, and, in practical effect, superintending the Executive's conduct of an armed conflict  even while American troops are on the ground in Afghanistan and engaged in daily combat operations. Id. at 43.
The Court rejected this position and, again, allowed the prisoners to challenge the legality of their detentions. Given that the petitioners in Rasul challenged the conduct of ongoing operations, defendants' argument that court review of conduct in Vietnam thirty years ago would "interfere" with a foreign policy stands on an even weaker foundation. The Supreme Court's holding that federal courts have authority to entertain the claims in Rasul clearly counsels against any notion that the claims at bar are inherently non-justiciable.
Similarly in Hamdi v. Rumsfeld, the plurality opinion "reject[ed] the Government's assertion that separation of powers principles mandate a heavily circumscribed role for the courts" in assessing whether a U.S. citizen captured during war was properly deemed by the Executive to be an enemy combatant. Hamdi, 124 S.Ct. at 2650. The plurality noted that while the military does have wide discretion in waging war, "it does not infringe on the core role of the military for the courts to exercise their own time-honored and constitutionally mandated roles of reviewing and resolving claims like those presented here." Id. at 2649-50, citing Sterling v. Constantin, 287 U.S. 378, 401[, 53 S.Ct. 190, 77 L.Ed. 375] (1932) ("What are the allowable limits of military discretion, and whether or not they have been overstepped in a particular case, are judicial questions").
United States courts have a long history of deciding damage claims for wrongful conduct committed by soldiers, commanders, or private persons during war. In Little v. Barreme, 6 U.S. (2 Cranch) 170[, 2 L.Ed. 243] (1804), Chief Justice Marshall spoke for a unanimous court in holding a captain in the U.S. Navy liable for damages to a ship owner for the illegal seizure of his vessel during wartime. The Court held that the President's orders authorizing the seizure of the ship did not immunize the captain from a lawsuit for civil damages where the President's instructions went beyond his statutory authority. Id. at 179. The Court held, "the [President's] instructions cannot ... legalize an act which without those instructions would have been a plain trespass [or unlawful act]." Id. at 179.
The Supreme Court has repeatedly permitted damage actions to be brought against individual soldiers and officers for wrongful or otherwise tortious conduct taken in the course of warfare. See, e.g., Mitchell v. Harmony, 54 U.S. (13 How.) 115, 14 L.Ed. 75 (1851) (U.S. soldier sued for trespass for wrongfully seizing a citizen's goods while in Mexico during the Mexican War); Ford v. Surget, 97 U.S. 594, 605-06, 24 L.Ed. 1018 *74 (1878) (reviewing soldier's civil liability for trespass and destruction of cotton and evaluating in accordance with the usages of civilized and lawful warfare); Freeland v. Williams, 131 U.S. 405, 417, 9 S.Ct. 763, 33 L.Ed. 193 (1889); see also 54 Am.Jur.2d. Military and Civil Defense § 293 (1971); W. Winthrop, Military Law & Precedents 780 n. 31, 887-89 (2d ed[.] 1920).
Amici Brief at 13-17 (footnote moved to text).
Defendants cite Japan Whaling Ass'n v. Am. Cetacean Soc'y, 478 U.S. 221, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986), in support of the argument that respect for fundamental separation of powers excludes the issues plaintiffs present from judicial review. The language of Japan Whaling excludes from review only "those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." Id. at 230, 106 S.Ct. 2860 (emphasis added). In Japan Whaling, the petitioners argued that the actions before the Court were unsuitable for judicial review because they involved foreign relations, and that in essence federal courts lacked the power to command the Secretary of Commerce, an Executive Branch official, to dishonor and repudiate an international treaty. The Court disagreed with the argument that the case raised a nonjusticiable political question, noting that, "Baker [itself] carefully pointed out that not every matter touching on politics is a political question." Id. at 229, 82 S.Ct. 691. It observed:
As Baker plainly held ... the courts have the authority to construe treaties and executive agreements, and it goes without saying that interpreting congressional legislation is a recurring and accepted task for the federal courts.... We are cognizant of the interplay between these Amendments and the conduct of this Nation's foreign relations, and we recognize the premier role which both Congress and the Executive play in this field. But under the Constitution, one of the Judiciary's characteristic roles is to interpret statutes, and we cannot shirk this responsibility merely because our decision may have significant political overtones. We conclude, therefore, that the present cases present a justiciable controversy, and turn to the merits of petitioners' arguments.
Id. at 230, 82 S.Ct. 691 (footnote omitted).
Defendants do not explain how an ATS action, or any action involving international law, could be brought in a way that would not offend their inflated understanding of the political question doctrine. It is well established that,
suits of this nature can present difficulties that implicate sensitive matters of diplomacy historically reserved to the jurisdiction of the political branches....
... Although we too recognize the potentially detrimental effects of judicial action in cases of this nature, we do not embrace the rather categorical views as to the inappropriateness of judicial action urged by [some other jurists]. Not every case "touching foreign relations" is nonjusticiable, and judges should not reflexively invoke these doctrines to avoid difficult and somewhat sensitive decisions in the context of human rights. We believe a preferable approach is to weigh carefully the relevant considerations on a case-by-case basis. This will permit the judiciary to act where appropriate in light of the express legislative mandate of the Congress in section 1350, without compromising the primacy of the political branches in foreign affairs....
*75 ... Although these cases present issues that arise in a politically charged context, that does not transform them into cases involving nonjusticiable political questions.
Kadic v. Karadzic, 70 F.3d 232, 249 (2d Cir.1995) (citations omitted). Sosa v. Alvarez-Machain did not rely upon the political question doctrine; it stated that,
[i]t would take some explaining to say now that federal courts must avert their gaze entirely from any international norm intended to protect individuals.
....
While we ... would welcome any congressional guidance in exercising jurisdiction with such obvious potential to affect foreign relations, nothing Congress has done is a reason for us to shut the door to the law of nations entirely.
124 S.Ct. at 2765.
Were the defendants' position accepted, it is difficult to imagine how the law of nations could be enforced in our courts at any time in any controversy. Yet, as Professor Louis Henkin put the matter: "Treaties are the law of the land. Cases arising under treaties are justiciable." Louis Henkin, Lexical Priority or `Political Question': A Response, 101 HARV. L.REV. 524, 531 (1987). What international law is and how it applies present questions of the meaning of substantive law, and the interpretation of these questions is a task entrusted to the courts. That judicial power can not be frustrated by the overly broad preemption doctrine espoused by defendants.
The Court of Appeals of the Second Circuit's opinions cited by defendants do not stand for the broad proposition that Congress and the Executive are entitled to unswerving deference when it comes to national defense matters and military affairs. Defendants' mention of governing Second Circuit Court of Appeals ATS caselaw is of limited utility since defendants attempt to prove that the instant case involves "reparations" by the United States. Defs.' Mem. of Law to Dismiss All Claims at 20 n.37 ("During a recent conference with the parties, this Court raised the potential applicability of Kadic v. Karadzic, 70 F.3d 232 (2d Cir.1995), to [p]laintiff's claims. Plaintiffs' claims, however, are fundamentally different from those found to be justiciable in Kadic. ... [T]he plaintiffs in Kadic did not seek reparations for the United States' conduct in war."). The argument is misconceived; this is not a case for reparations, but a tort suit between private parties.
The Kadic court cited Filartiga v. Pena-Irala, another leading ATS case supporting justiciability. See Filartiga v. Pena-Irala, 630 F.2d 876, 886 (2d Cir.1980) ("[A]s part of an articulated scheme of federal control over external affairs, Congress provided, in the first Judiciary Act, for federal jurisdiction over suits by aliens where principles of international law are in issue. The constitutional basis for the Alien Tort Statute is the law of nations, which has always been part of the federal common law." (citation omitted)). The Supreme Court also cited Filartiga in Sosa:
The position we take today has been assumed by some federal courts for 24 years, ever since the Second Circuit decided Filartiga v. Pena-Irala, 630 F.2d 876 (2d Cir.1980).... Congress, however, has not only expressed no disagreement with our view of the proper exercise of judicial power, but has responded ... by enacting legislation supplementing the judicial determination in some detail.
124 S.Ct. at 2765.
Cases of the Court of Appeals for the Second Circuit cited for the proposition *76 that the executive and the legislative branches are entitled to deference in military decisions do not rebut ATS holdings that are more clearly on point. Compare Holtzman v. Schlesinger, 484 F.2d 1307 (2d Cir.1973) (refusing to halt hostilities in Southeast Asia that had been implicitly approved by Congress), with Kadic v. Karadzic, 70 F.3d 232 (2d Cir.1995) (holding that a claim alleging violations of customary international law and the law of war for purposes of the ATS was not precluded by the political question doctrine). See also ELIZABETH HOLTZMAN & CYNTHIA COOPER, WHO SAID IT WOULD BE EASY, ONE WOMAN'S LIFE IN THE POLITICAL ARENA 70-76 (1996) (discussing the background of the Cambodian War suit); cf. John Files, U.S. Settles Suit in 1945 Looting of Jews by G.I.'s, N.Y. TIMES, Dec. 21, 2004, at A8 (discussing assets stolen by Nazis from Hungarian Jews sent to concentration camps).
Defendants frame much of their argument as though the relief sought by plaintiffs were a request for war reparations, citing various decisions involving Nazi-era claims, including Alperin v. Vatican Bank, 242 F.Supp.2d 686 (N.D.Cal.2003), Zivkovich v. Vatican Bank, 242 F.Supp.2d 659 (N.D.Cal.2002), In re Nazi Era Cases Against German Defendants Litig., 129 F.Supp.2d 370, 383-84 (D.N.J.2001), Iwanowa v. Ford Motor Co., 67 F.Supp.2d 424, 485 (D.N.J.1999), and Burger-Fischer v. Degussa AG, 65 F.Supp.2d 248 (D.N.J.1999).
Burger-Fischer, the first case decided in this line, provided the rationale for much of the analysis of the cases that followed. Class actions were brought against German corporations to recover, inter alia, compensation for slave labor under the Nazi regime as well as damages for oppressive living and working conditions. The court reasoned:
It is not accurate to characterize the present actions as simply controversies between private parties. The actions against Degussa and Siemens are but four of the many slave labor cases being brought in the courts of the United States against a host of major German corporate entities....
Viewed in their entirety these cases are hardly the typical individual against individual cases posited....
65 F.Supp.2d at 281-82. The court's opinion included a thorough history of the agreements following World War II, including a discussion of the Potsdam Conference, the Paris Agreement, the Transition Agreement, the London Debt Agreement, and the 2+4 Treaty. The court concluded:
[F]rom the outset negotiations concerning reparation claims, both with the western and eastern bloc nations, included within the term "reparations" claims of individuals both against the German state and against German nationals.... An examination of the applicable treaties establishes that the international community has subsumed [wartime claims against private corporations] and agreed that the remedies, if any, lie in German legislation and the bilateral agreements that flowed from the Transition Agreement.
...
To state the ultimate conclusion, the questions whether the reparation agreements made adequate provision for the victims of Nazi oppression and whether Germany has adequately implemented the reparation agreements are political questions which a court must decline to determine. Accepting that the court has jurisdiction over the subject matter of this case and assuming that it has jurisdiction over the parties it must nevertheless *77 refrain from adjudicating the dispute. Id. at 279, 282.
Subsequent to Burger-Fischer, one court noted a significant development: the German Parliament's July 2000 passage of a law creating the Foundation "Remembrance, Responsibility and the Future." In re Nazi Era Cases Against German Defendants Litig., 129 F.Supp.2d 370, 379 (D.N.J.2001). The Foundation was established to make payments to individual Nazi-era victims for claims against German industry. See Agreement Concerning the Foundation "Remembrance, Responsibility and the Future," July 17, 2000, U.S.-F.R.G., 39 I.L.M. 1298. The court determined that "[t]he Executive Agreement is a pronouncement by our government that claims against German Industry should not be litigated, but instead should be submitted to the Foundation." In re Nazi Era Cases Against German Defendants Litig., 129 F.Supp.2d at 383. It held that the case presented a nonjusticiable political question because, "[i]f this Court were to decline to dismiss ... it would impermissibly intrude into an area that has been exclusively managed by the Executive and Legislative branches for the last fifty-five years." Id. at 383; see also Ukrainian Nat'l Ass'n of Jewish Former Prisoners of Concentration Camps & Ghettos v. United States, 178 F.Supp.2d 312 (E.D.N.Y.2001) (granting plaintiff's motion to withdraw complaint in action by trustee of foundation seeking compensation for victims of Nazi Germany).
Burger-Fischer and the cases that followed it interpreted specific treaties and reparations agreements put in place after World War II to preclude independent private resolution. The extensive treaties and agreements analyzed in Burger-Fischer present a factual picture quite unlike this one, in which general international human rights law controls. A quotation from this line of cases is instructive:
The executive branch has always addressed claims for reparations as claims between governments. Historically, at the end of a war, there has always been a declaration of victorious nations and defeated nations. As part of that process, the victorious nations invariably discuss the reparations that the defeated nations must pay to compensate the prevailing countries and their nationals for the loss that the aggressor has caused. The nature of war is such that the governments of the victorious nations determine and negotiate the resolution of the claims of their nationals by way of agreements between the nations involved or affected by the war. This is evident from the reparations provisions in the Treaty of Versailles following World War I, and the discussion of reparations in the Yalta Conference, the Potsdam Conference and the Paris Reparations Treaty at the end of World War II. More recently, at the end of the Gulf War, the United Nations established an international claims resolution tribunal to resolve claims against Iraq. Thus, it is evident that responsibility for resolving forced labor claims arising out of a war is constitutionally committed to the political branches of government, not the judiciary.
Iwanowa v. Ford Motor Co., 67 F.Supp.2d 424, 485 (D.N.J.1999) (citations omitted).
A significant distinguishing feature of the Vietnam War is the absence of Executive and Legislative decisions regarding reparations following termination of hostilities, in stark contrast to the large number of such decisions following World War II. Because the extensive post-World War II treaties and agreements are in no way akin to the coordinate branches' relative silence following Vietnam, the potential for *78 impermissibly intruding into foreign relations posed by the former is not present in the latter.
It is also worth noting that while the Burger-Fischer court's reasoning was thoughtful, the outcome was not inevitable. The case could have gone the other way on the theory that the plaintiffs directly sued the defendants who had personally profited by, in effect, stealing their labor services and property. A major motive of many of those who conducted the Holocaust can be characterized for purposes of justiciability as common individual robbery and thuggery punishable by both tort and criminal law of most nations. See, e.g., ROBERT E. CONOT, JUSTICE AT NUREMBERG 76 (1983) ("As soon as the victorious Wehrmacht swept across Europe, Alfried [Krupp] joined with other German industrialists in the rush to acquire the spoils, consisting mostly of expropriated Jewish property. When one French entrepreneur, Robert Rothschild, was reluctant to sign over his plant and took refuge in the Italian-occupied area of France, the Krupp managers hired a bunch of thugs to kidnap him, and he wound up in the gas chamber at Auschwitz."); RICHARD BREITMAN ET AL., U.S. INTELLIGENCE AND THE NAZIS 132 (2004) (noting "a blend of official and private larceny characteristic of Nazi Germany"). Those who profited from these mass killings were operating on a massive conspiratorial scale, aided by individual opportunists, disguising their criminal greed by reference to outrageous theories of race. Their often venal purpose was to enrich themselves by stealing from Jews and others.
The Court of Appeals for the Eleventh Circuit recently found that the result in Burger-Fischer was not a foregone conclusion. Ungaro-Benages v. Dresdner Bank AG, 379 F.3d 1227 (11th Cir.2004). The Ungaro-Benages court carefully considered the cases cited by the defendants, including an analysis of the effect of the Foundation. It concluded that "federal court consideration of the present case does not reflect a lack of respect for the executive nor does it interfere with American foreign relations." Id. at 1236. As a result, it "part[ed] ways with [the] district courts that have ... considered Nazi era claims," id. at 1236 n. 12, holding that the political question doctrine did not apply to a claim against banks alleging that they stole the stock of Jewish heirs as part of the "Aryanization" process. "Every time the Court finds a nonjusticiable political question, it ends all judicial debate on that particular issue.... The political question doctrine is a powerful weapon, for it allows actions of the legislative or executive branches to escape the fundamental constitutional system of checks and balances. It should be used with great restraint...." The Supreme Court, 1992 Term  Leading Cases, 107 HARV. L.REV. 144, 303 (1993).
Defendants' argument that the instant case is merely a reparations case, and therefore raises a non-justiciable political question, is rejected. The Vietnam War did not result in formal reparations agreements and treaties as did some other American conflicts. The contention that suits by plaintiffs as individuals against defendants as individuals amount to reparations does not pass muster.
3. Judicial Power
a. Interference with Management of Foreign Affairs
Defendants essentially repeat their already refuted political question argument, supra Part VIII.E.2., when they cite Sosa for the proposition that plaintiffs' cause of action would impermissibly "imping[e] on the discretion of the Legislative and Executive Branches in managing foreign affairs." Sosa, 542 U.S. at ___, 124 *79 S.Ct. at 2744. The analysis employed to reject the claim of political question nonjusticiability applies with equal force to defendants' subpoint regarding interference with political branches' management of foreign affairs.
Their contention that the United States has already made the political decision not to provide reparations to Vietnam for the types of injury alleged in the complaint is unfounded and irrelevant. As noted above, this is not a case about reparations between nations, but rather a case about individuals suing other individuals for damages. The absence of a specific grant of reparations by Congress does not amount to a decision precluding tort actions under the ATS.
Defendants reiterate their position that creating a cause of action permitting foreign nationals injured by herbicides to recover damages would require the court to judge foreign policy and military decisions. This argument, already addressed in the political question context, is without merit. Courts do not usurp power by construing international law; it is the task of the judiciary to interpret treaties and customary international law, even when such interpretation leads to the conclusion that another branch has acted in violation of established international law principles. Sosa recognized how the root of the ATS was the Continental Congress's sense that it was "hamstrung by its inability to `cause infractions of treaties, or of the law of nations to be punished.'" Id. at 2756 (citing J. MADISON, JOURNAL OF THE CONSTITUTIONAL CONVENTION 60 (E. Scott ed., 1893)). The ATS was included in the Judiciary Act in response to this growing concern. Id.
b. Incompatibility with Norm of Proportionality
Defendants urge that several different congressional enactments embody policies that are flatly inconsistent with the recognition of a "proportionality-based" cause of action against military vendors, including Congress's decision to make the commission of a war crime a federal offense. This decision, defendants argue, reflects Congress's decision to make the international norm of proportionality enforceable only by criminal prosecutions subject to the check of prosecutorial discretion. See discussion of proportionality infra Part XI.D.3. They argue that the Federal Tort Claims Act's foreign country exception bars all claims based upon any injury suffered in a foreign country, and that permitting lawsuits to proceed against United States contractors would frustrate the purposes of this exception. Specifically, the defendants suggest that the risks associated with potential exposure to unknown foreign laws would cause contractors to shy away from federal military contracts or lead them to seek higher rates, indirectly imposing on the United States the precise type of liability the exception was designed to protect.
In short, they seek to rely on the government contractor defense. This defense is not available to them on the Vietnamese plaintiffs' international law claims. See infra Part IX.
c. Preemption of State Tort Claims by Executive's Power to Conduct Foreign Relations
Defendants contend that domestic tort law claims "that interfere with the Executive's exercise of foreign relations" are preempted by federal law. Defs.' Mem. of Law to Dismiss All Claims at 65-68. As discussed above in Part VI, plaintiffs' domestic law claims are barred by the government contractor defense.
Defendants principally rely upon American Ins. Ass'n v. Garamendi, 539 U.S. 396, 123 S.Ct. 2374, 156 L.Ed.2d 376 (2003). In *80 Garamendi, insurance companies and a trade association brought an action to enjoin the Insurance Commissioner of the State of California from enforcing a California statute requiring the disclosure of information about Holocaust-era insurance policies. The Supreme Court concluded that the Holocaust Victim Insurance Relief Act impermissibly interfered with the President's conduct of foreign affairs and was therefore preempted. Garamendi is readily distinguishable, as defendants themselves concede, because it involved a state statute that expressly conflicted with foreign policy objectives implicit in executive agreements. Much like the district courts in the post-Nazi-era cases discussed above in Part VIII.E.2., the Supreme Court in Garamendi went to great lengths to discuss the various post-war treaties and reparation agreements, including discussion of the Foundation. It concluded that "the express federal policy [encouraging European governments and companies to voluntarily set up settlement funds in preference to litigation or coercive sanctions] and the clear conflict raised by the state statute are alone enough to require state law to yield." Id. at 425, 123 S.Ct. 2374. As in other post-Nazi-era litigation, the conflict with executive agreements was determinative in Garamendi.
The second case cited by the defendants in support of its preemption argument, Zschernig v. Miller, 389 U.S. 429, 88 S.Ct. 664, 19 L.Ed.2d 683 (1968), is also inapplicable. In Zschernig, the Supreme Court held that an Oregon statute stating the conditions under which an alien not residing in the United States or its territory could inherit property constituted an impermissible intrusion by the state into the field of foreign affairs. A relevant portion of the Oregon statute required an alien not residing in the United States to establish that he or she would be able to "`receive the benefit, use or control of money or property from estates of persons dying in this state without confiscation, in whole or in part, by the governments of such foreign countries.'" Id. at 430 n. 1, 88 S.Ct. 664 (quoting Ore.Rev.Stat. § 111.070 (1957)). The Court noted that the provision became operative in 1951, and that prior to that time, the rights of aliens under the Oregon statute were defined in general terms of reciprocity which had been approved by the Court. Id. at 432, 88 S.Ct. 664. The Court's concern stemmed from the increasing practice of state probate courts which,
launched inquiries into the type of governments that obtain in particular foreign nations  whether aliens under their law have enforceable rights, whether the so-called rights are merely dispensations turning upon the whim or caprice of government officials, whether the representation of consuls, ambassadors, and other representatives of foreign nations is credible or made in good faith, whether there is in the actual administration in the particular foreign system of law any element of confiscation.
....
[W]e find that [these decisions] radiate some of the attitudes of the "cold war," where the search is for the "democracy quotient" of a foreign regime as opposed to the Marxist theory. The Oregon statute introduces the concept of "confiscation," which is of course opposed to the Just Compensation Clause of the Fifth Amendment. And this has led into minute inquiries concerning the actual administration of foreign law, into the credibility of foreign diplomatic statements, and into speculation whether the fact that some received delivery of funds should "not preclude wonderment as to how many may have been denied `the right to receive'...."
*81 Id. at 434-35, 88 S.Ct. 664 (citations omitted). The Court observed that "[a]s one reads the Oregon decisions, it seems that foreign policy attitudes, the freezing or thawing of the `cold war,' and the like are the real desiderata. Yet they of course are matters for the Federal Government." Id. at 437-38, 88 S.Ct. 664. It concluded that the statute as construed intruded deeply into foreign affairs because it "seem[ed] to make unavoidable judicial criticism of nations established on a more authoritarian basis than our own." Id. at 440, 88 S.Ct. 664. In the instant case, no similar risk is posed by the ordinary application of New York tort law, were it applicable.
These state law cases relied upon by defendants are not relevant to the problem at hand  determining what was the applicable international law during the Vietnam War. There is no conflicting state law.
F. Causation
Since there has been no discovery on general and specific causation, it would be premature to consider a motion to dismiss based on lack of causation  a motion not yet made. Should the Court of Appeals for the Second Circuit reverse dismissal on the grounds addressed in the present memorandum, the court will grant extensive discovery on the relevant general epidemiological and individual medical causation issues before addressing that problem. See supra Part II on lack of current data. Consideration of this issue is postponed as premature.
G. Retroactivity
A party is not bound by a treaty prior to the date such a treaty enters into force for it; treaties are not retroactive. Vienna Convention on the Law of Treaties, May 23, 1969, art. 28, 1155 U.N.T.S. 331, 339 (entered into force Jan. 27, 1980) ("Unless a different intention appears from the treaty or is otherwise established, its provisions do not bind a party in relation to any act or fact which took place or any situation which ceased to exist before the date of the entry into force of the treaty with respect to that party."); see also J. Mervyn Jones, The Retroactive Effect of the Ratification of Treaties, 29 AM. J. INT'L L. 51 (1935). The Vienna Convention on the Law of Treaties, albeit not ratified by the United States to date, is regarded as largely declaratory of existing law and has been recognized as such by the United States Department of State. LORI FISLER DAMROSCH, LOUIS HENKIN, RICHARD CRAWFORD PUGH, OSCAR SCHACHTER & HANS SMIT, INTERNATIONAL LAW CASES AND MATERIALS 452-54 (4th ed.2001); see also DAVID J. BEDERMAN ET AL., INTERNATIONAL LAW: A HANDBOOK FOR JUDGES 18 (Am. Soc'y of Int'l Law 2003) ("[E]ven though the United States is not a party [to the Vienna Convention on the Law of Treaties], it regards almost all of the [Convention]'s provisions as binding customary international law."). As Professor Anderson opined:
International law as a general proposition does not permit retroactive application. Akehurst's treatise refers to the "general principle that laws should not be applied retroactively." Peter Malanczuk, Akehurst's Modern Introduction to International Law 155 (7th rev. ed.1997). Two specific treaty examples... demonstrate the proposition. Article 28 of the Vienna Convention on the Law of Treaties, titled the "non-retroactivity of treaties," provides that unless a special intention is established, a treaty's provisions "do not bind a party in relation to any act or fact which took place ... before the date of the entry into force of the treaty with respect to that party." 1155 U.N.T.S. 331 (entry into force 27 January 1980). The Rome Statute of the International Criminal *82 Court ... denies retroactive application; Art. 22(1) provides that a person "shall not be criminally responsible under this Statute unless the conduct in question constitutes, at the time it takes place, a crime within the jurisdiction of the Court," while Art. 24(1) provides that "[n]o person shall be criminally responsible under this Statute for conduct prior to the entry into force of the Statute." 2187 U.N.T.S. 90 ([entered into force July 1, 2002; not ratified by the United States and the United States has filed a letter stating that it does not intend to become a party]).... International law could hardly develop if states believed that by accepting newly developed norms of international law, the result would be to hold them liable under today's norms for behavior acceptable under yesterday's. This consideration has particular importance for the international law of war  a body of law in which all acts for which individuals might be held liable are criminal... a body of law in which the acts at issue are ones involving great death, destruction and violence. States, in the interests of protecting their soldiers, would not agree to new and more restrictive rules, including criminal liability, if they believed that it would subject them and their military personnel to ex post facto liability.
Anderson Decl. ¶ 35 (footnote moved to text).
The force of arguments against retroactivity are enhanced as a barrier to a finding of liability when the principle of proportionality applies. Since proportionality in the application of force during war requires the contemporary exercise of discretion and clearly defined rules of engagement, it would be unjust to declare that new rules were in force after members of the armed forces or others acted in what they then thought was an appropriate manner under the regulations then reasonably believed to be in effect. See also infra Part XI.D.3.
H. Choice of Law
"International law is part of our law, and must be ascertained and administered by the courts of justice of appropriate jurisdiction, as often as questions of right depending upon it are duly presented for their determination." The Paquete Habana, 175 U.S. 677, 700, 20 S.Ct. 290, 44 L.Ed. 320 (1900); see supra Part I. "International law and international agreements of the United States are law of the United States and supreme over the law of the several States." 1 RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 111(1). But cf. Judicial Conference of the Second Judicial Circuit of the United States, June 15-16, 2001, 225 F.R.D. 269, 384 (2005) ("JUSTICE O'CONNOR: Well you referred to the dicta in Paquet [sic] Habana that international law is part of our law. I think that was dicta and I don't think we have authoritatively taken that position...."). As a Restatement comment puts the matter:
A rule of international law or a provision of an international agreement derives its status as law in the United States from its character as an international legal obligation of the United States. A rule of international law or an international agreement has no status as law of the United States if the United States is not in fact bound by it: for example, any rule of customary law from which the United States may have disassociated itself during the process of its formation....
Id. cmt. b. International law "is part of the law of the United States, respected by Presidents and Congresses, and by the *83 States, and given effect by the courts." Id. introductory note to pt. 1, ch. 1, at 17.
The Court of Appeals for the Second Circuit has avoided reaching the conflicts of law question of applicability of international law rather than that of the forum. See Wiwa v. Royal Dutch Petroleum Co., 226 F.3d 88, 105 n. 12 (2d Cir.2000) (noting that federal courts have never definitively resolved the choice-of-law question for ATS cases, and not reaching that question because its forum non conveniens dismissal was based on other grounds). On remand in Wiwa, the district court applied international law. No. 96 Civ. 8386, 2002 WL 319887 (S.D.N.Y. Feb.28, 2002).
While its analysis is not crystal clear, Sosa v. Alvarez-Machain, 542 U.S. 692, ___-___, 124 S.Ct. 2739, 2752-54, 159 L.Ed.2d 718 (2004), can be read generally as adopting federal choice of law rules to causes of action applying international law. See The Supreme Court  2003 Term, Leading Cases, 118 HARV. L.REV. 446, 453 (2004) ("Much of the majority's analysis is consistent with the view that ... all customary international law has been included within federal common law."); id. at 456 (stating that, in view of ambiguity, Congress should clarify scope of its grant of jurisdiction over alien tort claims). All three branches of our national government play a role in the recognition or creation of international substantive rules of law; this implies a rejection of Erie R.R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), for these claims. Sosa, 542 U.S. at ___, 124 S.Ct. at 2762. Concomitantly Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), requiring federal courts in diversity and some other cases to follow the conflicts rule of the forum state, is inapplicable. See also WILLIS L.M. REESE & MAURICE ROSENBERG, CASES AND MATERIALS ON CONFLICT OF LAWS 766 (6th ed. 1971) ("[C]onsiderations [of public questions with `international complexion'] may lead a court ... to refrain from using choice of law approaches that would be applicable if states of the Union were the only ones involved."); Paul R. Dubinsky, Human Rights Law Meets Private Law Harmonization: The Coming Conflict, 30 YALE J. INT'L L. 211, 317 (2005) ("Even if the basic choice-of-law principles applicable in this area should be those of the forum, courts of the forum should not apply those rules in a manner tha[t] subordinates or ignores established or even emerging principals of international human rights law."). The Sosa court specifically rejected state choice of law rules in denying applicability of the headquarters doctrine because "current flexibility" in choice of law methodology [of the states or foreign countries] would sometimes lead to a result inconsistent with federal policy. Sosa, 542 U.S. at ____ & n. 8, 124 S.Ct. at 2753 & n. 8, 2754.
The Court of Appeals for the Ninth Circuit's analysis of choice of law in international law cases was instructive. See Doe I v. Unocal Corp., 395 F.3d 932, 948-49 (9th Cir.2002) (finding that violations of international law is the law that applies when it is in conflict with domestic state or federal law), vacated & reh'g en banc granted by 395 F.3d 978 (9th Cir.2003). That the opinion was later vacated does not deprive its reasoning of persuasive power. It declared:
Unocal urges us to apply not international law, but the law of the state where the underlying events occurred, i.e., Myanmar. Where, as in the present case, only jus cogens violations are alleged  i.e., violations of norms of international law that are binding on nations even if they do not agree to them  it may, however, be preferable to apply international law rather than the law of any particular state, such as the state where the underlying events occurred or *84 the forum state. The reason is that, by definition, the law of any particular state is either identical to the jus cogens norms of international law, or it is invalid....
Application of international law  rather than the law of Myanmar, California state law, or our federal common law  is also favored by a consideration of the factors listed in the Restatement (Second) of Conflict of Laws § 6 (1969). First, "the needs of the ... international system[ ]" are better served by applying international rather than national law. Second, "the relevant policies of the forum" cannot be ascertained by referring ... to one out-of-circuit decision which happens to favor federal common law and ignoring other decisions which have favored other law, including international law. Third, regarding "the protection of justified expectations," the "certainty, predictability and uniformity of result," and the "ease in the determination and application of the law to be applied," we note that the standard we adopt today from an admittedly recent case nevertheless goes back at least to the Nuremberg trials and is similar to that to the Restatement (Second) of Torts. Finally, "the basic polic[y] underlying the particular field of law" is to provide tort remedies for violations of international law. This goal is furthered by the application of international law, even when the international law in question is criminal law but is similar to domestic tort law....
395 F.3d at 948-49 (citations and footnotes omitted).
The Unocal case involved allegations of forced labor, that was the equivalent of slave labor, allegedly used by an American oil corporation in Myanmar cooperating with that country's military. Neither the law of a state of this country or of Myanmar could be permitted to override international human rights law forbidding use of forced labor and the accompanying torture and rape. (The Unocal case was later settled without a concession of liability by the defendant corporation. See Bloomberg News, Unocal Settles Rights Suit in Myanmar, N.Y. TIMES, Dec. 14, 2004, at C6 (reporting that Unocal agreed to settle lawsuits alleging that it was responsible for human rights violations committed by soldiers of Myanmar who forced others to work on construction of a pipeline)).
Courts are not precluded from referring to appropriate state or national law for analogies to fill in procedural  and even substantive  gaps left in international law as it is shaped so it can be enforced in a reasonable way. See Statute of the International Court of Justice, June 26, 1945, art. 38(1)(d), 59 Stat. 1055, 1060 (entered into force Oct. 24, 1945) (providing that judicial decisions, which include decisions of national courts, may be referred to as "subsidiary means for the determination of the rules of [international law]"). They may also have to determine such local matters as whether a plaintiff is authorized by local law to sue on behalf of an estate, a minor or an association. Hilton v. Guyot, 159 U.S. 113, 163-64, 16 S.Ct. 139, 40 L.Ed. 95 (1895) (defining international comity as "the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation"); cf. Bigio v. Coca-Cola Co., No. 97 Civ. 2858, 2005 WL 287397 (S.D.N.Y. Feb.3, 2005) (dismissing, on the grounds of international comity and forum non conveniens, a suit seeking damages for conversion under New York state law arising from Egyptian government's nationalization of plaintiffs' property). But cf. Zschernig v. Miller, 389 U.S. 429, 88 S.Ct. 664, 19 L.Ed.2d 683 (1968) (holding that state statute cannot interfere with national *85 policy during Cold War by limiting estate dispositions on grounds that a communist country will actually receive proceeds); see also supra Part VIII.E.3.c. (discussing Zschernig). Defendants in the present case have raised no such issue of authority of plaintiffs to represent minors or the estates of the deceased under Vietnam's laws. Whether ownership of all land within the borders of Vietnam is claimed by the communist government, preventing occupants to individually or collectively seek a detoxification remedy, may raise issues of Vietnam law that need not now be decided.

IX. Inapplicability of Government Contractor Defense

A. Position of the Government that Defense Applies to International Law-Based Claims
It is the position of the United States that the government contractor defense should apply to all of plaintiffs' international law claims. It argues:
[P]laintiffs' international law claims, to the extent that they are recognized at all, are recognized as federal common law claims. See Sosa, 124 S.Ct. at 2754, 2765-66. As such, they should be subject to the federal common law government contractor defense. See Boyle v. United Technologies Corp., 487 U.S. 500[, 108 S.Ct. 2510] (1988). Although principles of international law suggest that a "superior orders" defense is unavailable in certain circumstances in the context of international criminal law, the rationales that led the Supreme Court to adopt the government contractor defense as a matter of federal common law in the context of state-law tort claims apply with even greater force to federal common law claims for damages based upon international law.
... The Supreme Court based its adoption of the defense in Boyle on the principles underlying the discretionary function exception to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2680(a) (which, along with the exceptions for combatant activities and claims arising abroad, would bar suit against the United States based on the conduct here at issue)....
Those "effect[s] sought to be avoided" are that "[t]he financial burden of judgments against contractors would ultimately be passed through, substantially, if not totally, to the United States itself...." Id. at 512[, 108 S.Ct. 2510]. See also id. at 507[, 108 S.Ct. 2510]. The Court thus concluded that "[i]t makes little sense to insulate the Government against financial liability for the judgment that a particular feature of military equipment is necessary when the Government produces the equipment itself, but not when it contracts for the production." Id. at 512[, 108 S.Ct. 2510].
The very same reasoning applies to the case at bar. Allowing plaintiffs' international law claims to proceed against the defendants would result in the very harms that both the discretionary function exception and Boyle were intended to prevent. Indeed, the rationale for application of the defense to claims such as plaintiffs is even stronger than was the case in Boyle, which involved claims of defective design. Here, plaintiffs' claims are based upon  and necessarily call into question  not only the Government's decision to procure the products at issue, but also the military decisions regarding the precise nature of their use. Thus, rather than simply seeking to hold the defendants liable for their own alleged negligence in the manufacture of an allegedly defective product, the plaintiffs essentially seek to hold the defendants liable for the decisions made *86 by the President regarding the manner in which to prosecute the war in Vietnam. Allowing such claims to proceed would have even further reaching implications for military procurement than the claims at issue in Boyle, for it would expose defense contractors to potential liability for possibly unforeseen uses of the goods ordered by the American Armed Forces....
Boyle was decided in the context of federal displacement of state law causes of action. Boyle, 487 U.S. at 507-08, 512[, 108 S.Ct. 2510]. Here, by contrast, the question is one of the applicability of a federal common law defense to a federal common law cause of action derived from international law norms. If anything, the argument for application of the government contractor defense is even more compelling in these circumstances, for the source of the defense is the same as the source of the cause of action  federal common law. Rather than displacing another source of law, the court would merely be applying and reconciling two federal common law concepts. If the federal interest in a government contractor defense is sufficient to pre-empt and displace state law, it is certainly applicable where the cause of action is based on federal law.
....
Sosa further supports the conclusion that the government contractor defense should apply to federal common law claims based on international law norms. As noted above, Sosa cautioned that the "determination whether a norm is sufficiently definite to support a cause of action should (and, indeed, inevitably must) involve an element of judgment about the practical consequences of making that cause available to litigants in federal courts." 124 S.Ct. at 2766 (footnote omitted). See also id. at 2763. Although that admonition was directed at the process of determining whether a particular norm has attained a level of acceptance and definition so as to make it subject to a federal common law cause of action, the principle is equally applicable to the question of whether a federal common law defense should be recognized as applicable to such causes of action. In either case, the federal courts are engaging in judicial lawmaking, and it is the "practical consequences" of such lawmaking that the Supreme Court has admonished must be considered in the process. And the "practical consequences" here clearly support adoption of the government contractor defense.
First, Boyle itself was based on practical considerations, recognizing that allowing claims such as these to proceed against government contractors would result in an end-run around sovereign immunity and ultimately harm the public fisc. Sosa's reference to "practical consequences" is thus a clear invitation to apply the principles articulated in Boyle. Second, the practical consequences of allowing claims such as plaintiffs' to proceed are even more profound than the consequences at issue in Boyle. Holding the government contractor defense inapplicable to claims such as plaintiffs', which essentially challenge military judgments made by the President, would effectively invite all of the United States' past and future enemies to sue a wide variety of military contractors based on such Presidential decisions in United States courts. See, e.g., 03/18/04 Tr. at 29-30. Such an invitation would result not only in increased costs to the United States, but would embroil the judiciary in the review and appraisal of military decisions reserved to the political branches.... It also has the potential to impede the President's *87 ability to carry out his duties as Commander in Chief, for every military decision  from the tactical to the strategic  would become the subject of potential litigation.
Moreover, reading Boyle and Sosa together strongly suggests that the government contractor defense should be deemed applicable in such circumstances. Boyle sets forth a clear rule of decision, based on principles derived from an Act of Congress, and contains no caveats or hesitations regarding the applicability of the defense there announced and applied. Sosa, by contrast, recognizes only an abstract principle, which was held inapplicable in that case, and is chock-full of references to the "caution" that must guide federal courts in this area, and the foreign policy and separation-of-powers concerns that mitigate against any broad reading of the decision. In light of the Supreme Court's clear holding in Boyle and its repeated expressions of caution in Sosa, the federal common law government contractor defense recognized in Boyle should be applicable to any federal common law causes of action derived from international law norms pursuant to Sosa.
....
Moreover, international legal principles are not inconsistent with the conclusion that the federal common law government contractor defense applies to claims based upon customary international law. As an initial matter, any such international legal principles are incorporated into U.S. law, if at all, as federal common law. And, as just discussed, federal common law has already been held to recognize the government contractor defense.
....
More importantly, as the Court has recognized, the Nuremberg and Eichmann cases  which would be the source of any alleged international law norm rendering the government contractor defense inapplicable in this case  involved criminal, as opposed to civil, liability. Id. at 22. This is an important distinction. Criminal law involves questions of individual moral culpability and punishment, while civil law is intended to be remedial. The defenses of necessity and obedience to superior orders  the closest criminal law analogues to the government contractor defense in the civil context  are intended to reflect and account for the principles of individual moral responsibility that underlie criminal law, prohibiting punishment where the individual actor is deemed not to have had a true moral choice with respect to his actions. See, e.g., International Law Commission, Principles of International Law Recognized in the Charter of the Nurnberg Tribunal and in the Judgment of the Tribunal, Principle IV. By contrast, the government contractor defense  as articulated by the Supreme Court in Boyle  is intended, ultimately, to protect the government from liability for actions that Congress has not seen fit to include within the scope of any waiver of sovereign immunity.
Recognizing that the criminal law seeks to punish individuals for acts for which they are morally culpable, and that the necessity and superior orders defenses are intended to provide a defense to those individuals who were not, in fact, morally culpable, both the Nuremberg and Eichmann cases focused on the actions and intent of the individual defendants in determining whether the defense at issue applied. See, e.g., United States v. Krupp, IX Trials of War Criminals Before the Nuernberg Military *88 Tribunals Under Control Council Law No. 10 ("Trials of War Criminals") at 1439, 1448 ("we hold that guilt must be personal"). Thus, in both the Flick and Krupp cases, the tribunal focused on the specific conduct of the individual defendants, both to ascertain the role they played in the wrongdoing and to assess the nature and extent of the willingness of their participation. In the Flick case, the tribunal found two defendants not guilty in light of the finding that they "were not desirous of employing foreign labor or prisoners of war" but "submitted to the program" under compulsion. United States v. Flick, VI Trials of War Criminals at 1197-98. Similarly, in the Krupp case, the tribunal emphasized that the defense of necessity turned on the mental state of the defendant and held that "if, in the execution of the illegal act, the will of the accused be not thereby overpowered but instead coincides with the will of those from whom the alleged compulsion emanates, there is no necessity justifying the illegal conduct." Krupp, IX Trials of War Criminals at 1439. And, underlining the individual nature of criminal responsibility, the tribunal found one of the twelve defendants in the Krupp case not guilty of the charges based upon the deportation, exploitation and abuse of slave labor, due to the absence of individual responsibility for the crimes charged. Id. at 1449. Similarly, in the Eichmann case, the court noted that the defense of "constraint" or "necessity" "goes to the question of the motive that urged the accused to carry out the criminal act," and found that Eichmann himself had "performed the order of extermination at all times con amore, that is with full zeal and devotion to the task." Attorney General of Israel v. Eichmann, 16 Piske Din 2033 (1962) (Israel Supreme Court) (Hebrew), reprinted in 36 I.L.R. 277, 318 (1968) (emphasis in original).
As the preceding discussion demonstrates, the defenses of necessity and obedience to superior orders in international criminal law have focused upon the mental state and the moral responsibility of individual criminal defendants. Indeed, in Flick and Krupp, certain individuals involved with the Flick and Krupp concerns were found not guilty based on a lack of personal moral culpability, notwithstanding the corporate culpability of the companies. These criminal law defenses, focused as they are on the mens rea of individuals, are thus not readily transferrable to the civil law context, particularly where the defendants are corporations rather than individuals.
At bottom, these criminal law defenses are grounded upon different rationales and serve different societal purposes than the civil government contractor defense. Even were the defenses of necessity and obedience to superior orders deemed inapplicable in the criminal context as a matter of international law, therefore, such a conclusion would by no means preclude application of the government contractor defense in the civil context applicable here.
....
Finally, the Nuremberg and Eichmann cases are readily distinguishable in a more fundamental way. Those cases all involved conduct so abhorrent as to be readily identifiable as violative of international legal norms and all standards of civilized human conduct. By contrast, as discussed above, there was much debate regarding the wisdom and legality of the United States' use of chemical herbicides in Vietnam. Whatever one may conclude about the 1925 Geneva Protocol's intended applicability *89 to chemical herbicides, it is beyond peradventure that the use of such herbicides constitutes conduct of a qualitatively different nature from the mass murder and slavery engaged in by the Nazis. See 03/18/04 Tr. at 22.
In addition to differentiating the heinous conduct engaged in by the Nazis and their accomplices from the conduct at issue here, this distinction is also legally relevant to the applicability of the government contractor defense. As the Israeli Supreme Court noted in Eichmann, the obedience to superior orders defense is generally "admissible where there was obedience to an order not manifestly unlawful." Eichmann, 36 I.L.R. at 314 (emphasis added). See also Rome Statute of the International Criminal Court ("Rome Statute"), art. 33(1) (superior order defense available where order "not manifestly unlawful"). Although Israeli law provided that the defense was expressly not available under the Nazi Collaborators (Punishment) Law, the Eichmann court nevertheless noted that "even if we had to decide the case on the basis of the provisions of the general criminal law [which recognizes the defense], [we] would have had to reject the defence ... because the order for physical extermination was manifestly unlawful." Id. at 314-15.
This principle was elaborated upon by the Jerusalem District Court:
The distinguishing mark of a `manifestly unlawful order' should fly like a black flag above the order given, as a warning saying "Prohibited!". Not formal unlawfulness, hidden or half-hidden, nor unlawfulness discernible only by the eyes of legal experts, is important here, but a flagrant and manifest breach of the law, definite and necessary unlawfulness appearing on the face of the order itself, the clearly criminal character of the order or of the acts ordered to be done, unlawfulness piercing the eye and revolting the heart, be the eye not blind nor the heart stony and corrupt  that is the measure of "manifest unlawfulness" required to release a soldier form the duty of obedience upon him and make him criminally responsible for his acts.
Attorney General of Israel v. Eichmann, 45 Pesakim Mehoziim 3 (Jerusalem Dist. Ct.1965), reprinted in 36 I.L.R. 18, 256 (1968), quoting Chief Military Prosecutor v. Melinki, 13 Pesakim Mehoziim 90. See also United States v. Ohlendorf (The Einsatzgruppen Case), IV Trials of War Criminals 1, 470-73, 483-86 (discussing superior orders defense; "[i]f the nature of the ordered act is manifestly beyond the scope of the superior's authority, the subordinate may not plead ignorance to the criminality of the order"); The Llandovery Castle Case, Supreme Court at Leipzig (1921), reprinted in 16 Am. J. Int'l L. 708, 721-22 (1922) (superior order defense inapplicable where "if such an order is universally known to everybody, including also the accused, to be without doubt whatever against the law").
The Zyklon B case is to the same effect. There, the tribunal found two of the three defendants guilty of supplying Zyklon B gas "for the extermination of allied nationals ... well knowing that the said gas was to be so used." The Zyklon B Case (Trial of Bruno Tesch and Two Others), reported in, 1 United Nations War Crimes Commission, Law Reports of the Trials of War Criminals 93 (1947). The case focused on the accuseds' knowledge of the uses to which the gas was to be put  "the wholesale extermination of human beings." Id. at 94. The clear implication of the focus on the accuseds' knowledge is that the horrid *90 nature of the crime was such that no defense of following orders was available. That is, in light of the "manifest illegality" of gassing millions of civilians, the only question before the tribunal was whether the defendants were aware of the uses to which the gas they provided was put.
The case at bar involves no such "manifestly illegal" conduct. To the contrary, as discussed above, no international law norm barred the use of chemical herbicides in war for purposes of defoliation or enemy crop destruction. One cannot say that use of such herbicides was "a flagrant and manifest breach of the law" or that the alleged "unlawfulness pierc[ed] the eye and revolt[ed] the heart." Rather, people of good will disagreed as to the moral and legal implications of using chemical herbicides. To the extent that international law norms governing the superior order defense inform the Court's analysis of the applicability of the government contractor defense to plaintiffs' international law claims, therefore, it is clear that international law does not preclude such a defense where, as here, the orders at issue were not manifestly illegal.
Finally in this regard, it is important to note that, to the extent that international legal norms have any role in the determination as to whether the federal common law government contractor defense is available in cases such as this, the proper inquiry is whether international law proscribes such a defense, not whether international law prescribes it. In light of the Supreme Court's ruling in Boyle recognizing the defense as a matter of federal common law, the only possible relevance of international legal norms would be if they categorically prohibited such a defense. Absent such a prohibition, the usual federal rule should be applied for the reasons discussed above.
And international law contains no such prohibition. See generally Charles Garraway, Superior Orders and the International Criminal Court: Justice Delivered or Justice Denied, [hereinafter, Garraway, Superior Orders], Int'l Review of the Red Cross, No. 836, at 785-94 (1999), available at . Although the Nuremberg Charter and Control Council Law No. 10 both provided that acting pursuant to an order of a superior does not free an individual from responsibility for a crime, those sources alone do not establish a per se rule of international law forbidding the application of a superior orders defense in all contexts. Rather, the Charter was intended to provide for the trials of the worst Nazi war criminals, whose conduct was recognized as manifestly illegal and thus not susceptible to such a defense. See id. Moreover, the concept of superior orders was in fact recognized by the Nuremberg tribunals as part of the concepts of necessity and intent, discussed above, and was thus not rejected entirely. See Garraway, Superior Orders. In addition, as noted above, the Rome Statute expressly provides for the applicability of such a defense for war crimes. Rome Statute, art. 33. At a minimum, therefore, international law does not forbid the recognition of such a defense. Accordingly, the federal common law defense recognized by the Supreme Court should be deemed applicable to the international law claims at issue here.
U.S. Statement of Interest at 50-61 (footnotes omitted).
*91 B. Government Position Not Supported by Facts or Law
The government's view is not persuasive. To establish liability, the plaintiffs would have to show that the usage was illegal under international law; the defendants knew how their product would be used; and, that with knowledge, they supplied the product, facilitating and becoming a party to the illegality. "Unfairness" to government contractors is not a convincing ground for ignoring their corporate liability under international law since it would be necessary to show that the corporation was aware of the intended illegal use when it supplied its product.
In the instant case there is little doubt that it was widely known in the industry producing herbicides for the Vietnam War how the herbicides were to be used. In view of the amounts and the close coordination between the military and industrial establishments this knowledge can be assumed on this 12(b)(6) motion. Defendants do not on their motions rely on ignorance.
The government contractor defense is one peculiar to United States law. See supra Part VI. It does not apply to violations of human rights and norms of international law. See, e.g., Boyle v. United Techs. Corp., 487 U.S. 500, 512, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988) (limiting defense to claims for design defects); see also Zyklon B Case (Trial of Bruno Tesch and Two Others), 1-5 LAW REPORTS OF TRIALS OF WAR CRIMINALS 93; United States v. Flick, 6 TRIALS OF WAR CRIMINALS 1187, 1198, 1202 (discussing necessity); United States v. Krupp, 9 TRIALS OF WAR CRIMINALS 1327, 1437-39 (same); see also infra Parts IX.C.-D. Defendants' motion to dismiss on this ground is denied. See supra Part I.B.2.
The government contractor defense is essentially based on the concept that the government told me to do it, and knew as much or more than I did about possible harms, so I can stand behind the government (which cannot be sued because of its immunity). It is designed in part to save the government money in its procurement costs because suppliers, less concerned with the risk of suits, can eliminate some difficult insurance factors from cost projections.
As shown below in a discussion of the Nuremberg and other post-World War II criminal trials, this defensive notion has been rejected. It should not be recognized, as the law now stands, by courts protecting civilians and land from depredations contrary to international law.
C. Zyklon B Case
The international law case most useful as an analogy on the point of the government contractor defense is the Zyklon B Case (Trial of Bruno Tesch and Two Others), 1-5 LAW REPORTS OF TRIALS OF WAR CRIMINALS 93-102. The statement of facts below is taken almost verbatim from the opinion in the case. No one, of course, suggests that use of herbicides in Vietnam is remotely comparable to the genocidal use of Zyklon B. See, e.g., JOSEPH E. PERSICO, NUREMBERG INFAMY ON TRIAL 316-19 (Penguin Books 1995) (discussing use at Treblinka and Auschwitz for murder).
The accused, Bruno Tesch, Joachim Drosihn and Karl Weinbacher, were charged with a war crime in that they "`at Hamburg, Germany, between 1st January, 1941, and 31st March, 1945, in violation of the laws and usages of war did supply poison gas used for the extermination of allied nationals interned in concentration camps well knowing that the said gas was to be so used.'" Id. at 93. They pleaded not guilty.
Tesch was by 1942 the sole owner of a firm known as Tesch and Stabenow, whose *92 activities were divided into three main categories: (1) it distributed certain types of gas and gassing equipment for disinfecting various public buildings, including Wehrmacht barracks and S.S. concentration camps; (2) it provided, where required, expert technicians to carry out these gassing operations; and (3) Tesch and Drosihn, the firm's senior gassing technician, carried out instruction for the Wehrmacht and the S.S. in the use of the gas which the firm supplied. The predominant importance of these gassing operations in war-time lay in their value in the extermination of lice. Id. at 94.
The chief gas involved was Zyklon B, a highly dangerous poison gas, 99 percent of which was prussic acid. It was manufactured by another firm. Tesch and Stabenow had the exclusive agency for the supply of the gas east of the River Elbe, but the Zyklon B itself went directly from the manufacturers to the customer. Id.
The Prosecution contended that from 1941 to 1945 Zyklon B was being supplied as a direct result of orders from the Third Reich accepted by the accused's firm, Tesch and Stabenow. The Zyklon B was being shipped in vast quantities to the largest concentration camps east of the Elbe. In these camps the S.S. Totenkopfverbande were, from 1942 to 1945, systematically exterminating human beings to an estimated total of six million, of whom four and a half million were exterminated by the use of Zyklon B in one camp alone, known as Auschwitz/Birkenau. Id.
In these concentration camps were a vast number of people, particularly Jews to be exterminated in the Nazis'"final solution." They came from the occupied territories of Europe, and included Czechs, Russians, Poles, French, Dutch and Belgians, from neutral countries and from the United States. The Prosecutor claimed that over a period of time the three accused became aware of the S.S.'s use of Zyklon B gas for the wholesale extermination of human beings in the eastern concentration camps, and that, having acquired this knowledge, they continued to arrange supplies of the gas to these customers in ever-increasing quantities, until in the early months of 1944, the consignment per month to the Auschwitz concentration camp was nearly two tons. Id.
When Tesch was absent, Weinbacher was fully empowered and authorized to do all acts on behalf of Tesch, his principal, which Tesch could have done. Weinbacher's position was of great importance, since Tesch would travel on the business of the firm for as many as 200 days in the year. Id.
The case for the Prosecution was that knowingly to supply a commodity to a branch of the State which was using that commodity for the mass extermination of civilian nationals was a war crime, and that the people who did it were war criminals for putting the means to commit the crime into the hands of those who actually carried it out. The accused's action was charged as being in violation of Article 46 of the Hague Regulations of 1907, to which the German government and Great Britain were both parties. Id.
In a business travel report, Tesch recorded an interview with leading members of the Wehrmacht, during which he was told that burial after the shooting of increasing numbers of Jews was proving more and more unhygienic, and that it was proposed to kill them with prussic acid. Tesch, when asked for his views, had proposed to use the same method, involving the release of prussic acid gas in an enclosed space, as was used in the extermination of vermin. He trained the S.S. men in this new method of killing human beings. Id. at 95.
*93 According to a former stenographer of the firm, Tesch, after dictating his travel report upon his return from Berlin in about June 1942, told her that Zyklon B was being used for gassing human beings, and he had appeared to be as terrified and shocked about the matter as she was. Others confirmed the extensive shipments and knowledge of the use of the gas by Tesch. He taught a class on how the gas could be used. A former high-ranking German government official stated that it was common knowledge in 1943 in Germany that gas was being used to kill people. Id. at 95-96.
Tesch testified that he had heard nothing and had known nothing about human beings being killed in concentration camps with prussic acid. He denied ever having attended any conference, or having been approached by any official or military authority on the subject, or having written in any document that human beings should be killed by prussic acid. Tesch contended that he had never been to Auschwitz himself and had had no reason to believe that the camps were incorrectly run. He did not think that deliveries to Auschwitz were very high. Id. at 97.
In his closing address Tesch's defense counsel submitted that, since the charge was not one of destroying human life but only of supplying the means of doing so, such action would be contrary to the laws and usages of war only if the means supplied were necessarily intended to kill human beings. To supply a material which also had quite legitimate purposes was not a war crime. He submitted that even in the concentration camps the gas was, at least at the beginning, used only for its legitimate purpose. Id. at 98. Regarding the large supplies of gas to Auschwitz in particular, he submitted that Tesch was too busy to be expected to know what individual customers bought, and in any case the supply of Zyklon B was not as important to the firm as were its gassing activities. Furthermore, he argued that Tesch had regarded Auschwitz as a transit camp needing therefore unusually frequent delousing. Counsel concluded that Tesch knew nothing of the gassing of human beings either in Auschwitz or Neuengamme. Id. at 99.
Weinbacher's counsel submitted that it had become clear during the trial that Weinbacher did not know that Zyklon B had been used for the killing of human beings. Id. In any case, it had been shown that the quantity of Zyklon B needed to kill human beings was much smaller than that required to kill insects. The quantities of Zyklon B needed for killing half a million or even a million human beings stood in such small proportion to the quantities needed for the killing of insects that it would not have been noticed at all. Therefore, there had been no need for Weinbacher to have grown suspicious because he knew that Auschwitz was one of the biggest camps and a sort of transit camp. Counsel did not think, therefore, that it was correct to assume that the large quantity of Zyklon B going to Auschwitz was any indication of the fact that human beings were being killed there. Id. at 100.
The prosecutor urged that the possibility that some firm other than Tesch and Stabenow could have supplied Zyklon B to Auschwitz could be ruled out because the firm had the monopoly in that area. The essential question was whether the accused knew of the purpose to which their gas was being put. The prosecutor admitted that the S.S. were under no restrictions as to the use they made of the gas, and that the direct knowledge which was available to Tesch as to that use was scanty, due to the fear and secrecy in which the S.S. worked. Id. at 100-01.
*94 It was the prosecutor's argument that it was unbelievable that Tesch did not know that anything wrong went on in the concentration camps. One key witness had said without hesitation that he saw things there which were not worthy of human dignity, and that he had said so to Tesch. It was also unbelievable that Tesch had no knowledge of the amounts of gas being supplied to the S.S., and to Auschwitz in particular, by a firm which was wholly his property. In 1942 and 1943 Auschwitz had been the firm's second largest customer. Tesch had no reason to believe that Auschwitz was a transit camp; moreover, he was too efficient to be duped by the S.S. The prosecutor completed his case against Tesch by casting doubt on his veracity, showing contradictions between his statements and those of other witnesses on certain details unrelated to the main issue. Dealing very shortly with Weinbacher's position, the prosecutor contended that all that Tesch knew must, from the nature of the inner organization of the business, have also been known by Weinbacher. He concluded that, by supplying gas, knowing that it was to be used for murder, the three accused had made themselves accessories before the fact to that murder. Id. at 101.
The Judge Advocate, in summing up the evidence, pointed out that the Court must be sure of three facts: (1) Allied nationals had been gassed by means of Zyklon B; (2) this gas had been supplied by Tesch and Stabenow; and (3) the accused knew that the gas was to be used for the purpose of killing human beings. He said: "To my mind, although it is entirely a question for you, the real strength of the Prosecution in this case rests rather upon the general proposition that, when you realize what kind of a man Tesch was, it inevitably follows that he must have known every little thing about his business." The Prosecution asks you to say that the accused and his second-in-command Weinbacher, both competent business men, were sensitive about admitting that they knew at the relevant time of the size of the deliveries of poison gas to Auschwitz. The Prosecution then asks: "Why is it that these competent business men are so sensitive about these particular deliveries? Is it because they themselves knew that such large deliveries could not possibly be going there for the purpose of delousing clothing or for the purpose of disinfecting buildings?" Id.
Tesch and Weinbacher were found guilty. They were sentenced to death. The sentences were carried out. Drosihn was acquitted. Id. at 102.
In the notes on the case, the following relevant points were made supporting the view that a private supplier of killing materials which violate international law is liable despite the fact that the government ordered it to do so.
The decision of the Military Court in the present case is a clear example of the application of the rule that the provisions of the laws and customs of war are addressed not only to combatants and to members of state and other public authorities, but to anybody who is in a position to assist in their violation.
The activities with which the accused in the present case were charged were commercial transactions conducted by civilians. The Military Court acted on the principle that any civilian who is an accessory to a violation of the laws and customs of war is himself also liable as a war criminal.
Id. at 103.
D. Nuremberg Military Tribunals
The proposition that commands from the state and higher authorities within the state can not justify a person's commission *95 of, or knowing participation in, an international crime was repeatedly made before the Nuremberg Military Tribunals. See also, e.g., TIM MAGA, JUDGMENT AT TOKYO: THE JAPANESE WAR CRIME TRIALS (2001). One example is set out below.
Except as to some of Steinbrinck's activities the defendants were not officially connected with the Nazi government but were private citizens engaged as businessmen in the heavy industry of Germany. Their counsel, and Flick in his closing unsworn statement, contended that in their persons industry itself is being persecuted. They have some shade of justification for so believing since the prosecution at the very beginning of the case made this statement 
"The defendants in this case are leading representatives of one of the two principal concentrations of power in Germany. In the final analysis, Germany's capacity for conquest derived from its heavy industry and attendant scientific techniques, and from its millions of able-bodied men, obedient, amenable to discipline, and overly susceptible to panoply and fanfare. Krupp, Flick, Thyssen, and a few others swayed the industrial group; Beck, Fritsch, Rundstedt, and other exemplars ruled the military clique. On the shoulders of these groups Hitler rode to power, and from power to conquest."
....
The question of the responsibility of individuals for such breaches of international law as constitute crimes has been widely discussed and is settled in part by the judgment of IMT. It cannot longer be successfully maintained that international law is concerned only with the actions of sovereign states and provides no punishment for individuals.
"That international law imposes duties and liabilities upon individuals as well as upon states has long been recognized." In the recent case of ex parte Quirin (1942, 317 U.S. 1, 63 S.Ct. 2, 87 L.Ed. 3), before the Supreme Court of the United States, persons were charged during the war with landing in the United States for purposes of spying and sabotage. The late Chief Justice Stone, speaking for the Court, said:
"`From the very beginning of its history this Court has applied the law of war as including that part of the law of nations which prescribed for the conduct of war, the status, rights and duties of enemy nations as well as enemy individuals' ".
... [I]t is urged that individuals holding no public offices and not representing the State, do not, and should not come within the class of persons criminally responsible for a breach of international law. It is asserted that international law is a matter wholly outside the work, interest, and knowledge of private individuals. The distinction is unsound. International law, as such, binds every citizen just as does ordinary municipal law. Acts adjudged criminal when done by an officer of the government are criminal also when done by a private individual. The guilt differs only in magnitude, not in quality. The offender in either case is charged with personal wrong and punishment falls on the offender in propria persona. The application of international law to individuals is no novelty. (See The Nuernberg Trial and Aggressive War by Sheldon Glueck, ch. V, pp. 60-67, incl., and cases there cited.) There is no justification for a limitation of responsibility to public officials. *96 United States v. Flick, 6 TRIALS OF WAR CRIMINALS 1187, 1191-92 (footnote omitted). The case involved use of slave laborers. The fact that Flick, one of the key defendants, was the head of a huge privately-operated corporate consortium responding to Nazi government requests was no defense. Id. at 1192-93, 1202.
E. Necessity Distinguished
The defense of necessity referred to in the Flick case, requiring a high degree of compulsion, is different from that of the government contractor defense. See TELFORD TAYLOR, FINAL REPORT TO THE SECRETARY OF THE ARMY ON THE NUERNBERG WAR CRIMES TRIALS UNDER CONTROL COUNCIL LAW NO. 10, at 193 (photo. reprint 1997) (1949) ("The defense of `necessity' was unqualifiedly rejected [in connection with Krupp].").
Recognizing the criminality of the Reich labor program as such, the only question remaining for our decision with respect to this count is whether the defendants are guilty of having employed conscripted foreign workers, concentration camp inmates or prisoners of war allocated to them through the slave-labor program of the Reich under the circumstances of compulsion under which such employment came about.... It is clear, however, that relation of [Albert] Speer and [Walter] Funk [who were found guilty in another IMT trial] to such [slave-labor] program differs substantially from the nature of the participation in such program by the defendants in this case. Speer and Funk were numbered among the group of top public officials responsible for the slave-labor program.
We are not unmindful of the provision of paragraph 2 of Article II of Control Council Law No. 10 which states that 
"2. Any person without regard to the nationality or the capacity in which he acted, is deemed to have committed a crime as defined in paragraph 1 of this Article, if he was (a) a principal or (b) was an accessory to the commission of any such crime or ordered or abetted the same or (c) took a consenting part therein or (d) was connected with plans or enterprises involving its commission * * *."
Nor have we overlooked the provision in paragraph 4(b) of Article II of such Control Council Law No. 10 which states 
"(b) The fact that any person acted pursuant to the order of his Government or of a superior does not free him from responsibility for a crime, but may be considered in mitigation."
In our opinion, it is not intended that these provisions are to be employed to deprive a defendant of the defense of necessity under such circumstances as obtained in this case with respect to defendants Steinbrinck, Burkart, Kaletsch, and Terberger. This Tribunal might be reproached for wreaking vengeance rather than administering justice if it were to declare as unavailable to defendants the defense of necessity here urged in their behalf. This principle has had wide acceptance in American and English courts and is recognized elsewhere.
Wharton's Criminal Law, volume I, chapter III, subdivision VII, paragraph 126 contains the following statement with respect to the defense of necessity citing cases in support thereof:
"Necessity is a defense when it is shown that the act charged was done to avoid an evil both serious and irreparable; that there was no other adequate means of escape; and that the remedy was not disproportioned to the evil."
*97 A note under paragraph 384 in chapter XIII, Wharton's Criminal Law, volume I, gives the underlying principle of the defense of necessity as follows:
"Necessity forcing a man to do an act justifies him, because no man can be guilty of a crime without the will and intent in his mind. When a man is absolutely, by natural necessity, forced, his will does not go along with the act. Lord Mansfield in Stratton's Case, 21 How. St. Tr. (Eng.) 1046-1223."
The prosecution, on final argument, contended that the defendants are barred from interposing the defense of necessity. In the course of its argument, the prosecution referred to paragraph 4(b), of Article II of Control Council Law No. 10 and stated:
"This principle has been most frequently applied and interpreted in military cases * * *."
Further on in the argument, it was said:
"The defendants in this case, as they have repeatedly and plaintively told us, were not military men or government officials. None of the acts with which they are charged under any count of the indictment were committed under `orders' of the type we have been discussing. By their own admissions, it seems to us they are in no position to claim the benefits of the doctrine of `superior orders' even by way of mitigation."
The foregoing statement was then closely followed by another, as follows:
"The defense of `coercion' or `duress' has a certain application in ordinary civilian jurisprudence. But despite the most desperate efforts, the defendants have not, we believe, succeeded in bringing themselves within the purview of these concepts."
The prosecution then asserted that this defense has no application unless the defendants acted under what is described as "clear and present danger." Reference was made to certain rules and cases in support of such position.
The evidence with respect to defendants Steinbrinck, Burkart, Kaletsch, and Terberger in our opinion, however, clearly established that there was in the instant case "clear and present danger" within the contemplation of that phrase. We have already discussed the Reich reign of terror. The defendants lived within the Reich. The Reich, through its hordes of enforcement officials and secret police, was always "present," ready to go into instant action and to mete out savage and immediate punishment against anyone doing anything that could be construed as obstructing or hindering the carrying out of governmental regulations or decrees.
United States v. Flick, 6 TRIALS OF WAR CRIMINALS 1187, 1199-1201.
A factual issue is presented with respect to whether the defendants in the instant case can support the necessity defense under Nuremberg jurisprudence even if the government contractor defense is established only for domestic torts, as it is here. See, e.g., United States v. Reimer, 356 F.3d 456, 459-63 (2d Cir.2004) (rejecting, in an action to revoke citizenship, a naturalized citizen's argument that he had not assisted the Nazis in persecution because he had done so involuntarily); International Military Tribunal (Nuremberg), Judgment and Sentences, 41 AM. J. INT'L L. 172, 221 (1947) ("[I]ndividuals have international duties which transcend the national obligations of obedience imposed by the individual state. He who violates the laws of war cannot obtain immunity while acting in pursuance of the authority of the state if the state in authorizing action *98 moves outside its competence under international law."). The legal principles are not the same. Moreover, the concerns of the United States about the terms of the Statute of the International Criminal Court, adopted in Rome on July 17, 1998, based on solicitude for soldiers who have to decide in the heat of battle whether to obey an order which may violate human rights, as suggested in the discussion of proportionality infra Part XI.D.3., is quite different from that of a corporation which can consult counsel and reflect before following an illegal order to supply products to be used to harm people in violation of international law. See, e.g., L. Doswald-Beck, The Value of the 1977 Geneva Protocols for the Protection of Civilians, in ARMED CONFLICT AND THE NEW LAW: ASPECTS OF THE 1977 GENEVA PROTOCOLS AND THE 1981 WEAPONS CONVENTION 137, 149-50 (Michael A. Meyer, ed., 1989) (discussing special problems in guerilla warfare where combatants may hide among civilians); Paola Gaeta, The Defence of Superior Orders: The Statute of the International Criminal Court Versus Customary International Law, 10 EUR. J. INT'L L. 172 (1999); Charles Garraway, Superior Orders and the International Criminal Court: Justice Delivered or Justice Denied, INT'L REV. OF THE RED CROSS, No. 836, at 785 (1999), http://www.icrc.org/Web/Eng/ siteeng0.nsf/iwpList74/ 4F89CC080CE0E792C1 256B66005DD767; Mark S. Martins, Rules of Engagement for Land Forces: A Matter of Training, Not Lawyering, 143 MIL. L.REV. 3 (1994); Mark L. Sacharoff, Problems and Paradoxes of the Laws of Warfare, 6 TEMP. INT'L & COMP. L.J. 71 (1992) (discussing increased flouting of rules of warfare); Bernard K. Shafer, The Relationship Between the International Laws of Armed Conflict and Environmental Protection: The Need to Reevaluate What Types of Conduct are Permissible During Hostilities, 19 CAL. W. INT'L L.J. 287 (1989); Nicole Barrett, Note, Holding Individual Leaders Responsible for Violations of Customary International Law: The U.S. Bombardment of Cambodia and Laos, 32 COLUM. HUM. RTS. L.REV. 429 (2001). See generally Op. of W. Michael Reisman Submitted in Support of Defendants' Motion to Dismiss, Nov. 1, 2004, at 54-59 (discussing proportionality of spraying of herbicides to protect troops against ambush) [hereinafter Reisman Op.].
Flick was found guilty of charges reflecting his commercial activities and those of his corporations on behalf of the Third Reich despite his claim of necessity. United States v. Flick, 6 TRIALS OF WAR CRIMINALS 1187, 1202, 1212, 1222-23. See also United States v. Krupp, 9 TRIALS OF WAR CRIMINALS 1327, 1327-1452. Kugler, an official in the Farben enterprises, was found guilty of supplying the gas. United States v. Krauch (I.G. Farben Case), 8 TRIALS OF WAR CRIMINALS 1081, 1167; see also id. at 1174-79 (discussing necessity defense); id. at 1179 ("[T]he defense of necessity is not available where the party seeking to invoke it was, himself, responsible for the existence or execution of such order or decree, ..., or was the result of his own initiative."); id. at 1153-66 (finding deficient proof of personal responsibility).
Defendants in the case at bar were ordered by the government to produce as much Agent Orange as they could and to promptly deliver it to the government. Such a commercial order, even in wartime, hardly constitutes "necessity" under domestic or international law.
In the first place, even where necessity under the facts would exist in criminal law, it may not provide a defense for damages in a civil action. As the Model Penal Code puts the matter, "[t]he fact that conduct is justifiable under this Article [of Affirmative *99 Defenses] does not abolish or impair any remedy for such conduct that is available in any civil action." MODEL PENAL CODE AND COMMENTARIES § 3.01(2) (1985).
Second, the choice of evils must clearly favor the harmful act by the defendant: "the harm or evil sought to be avoided by such conduct is greater than that sought to be prevented by the law defining the offense charged...." Id. § 3.02(1)(a). Execution of a legal act constituting a public duty would be a justification, see id. § 3.03(1)(d), but here, by hypothesis, the conduct is illegal under international law and cannot be an appropriate public duty. The most serious harm that could have come to defendants if they had refused to supply Agent Orange would have been loss of their manufacturing establishments and other assets through expropriation. Such possible economic harm would not have been more evil than violating international law (if it existed), leading to the alleged death and disease of many persons and destruction of much land (if there was causation).
We are a nation of free men and women habituated to standing up to government when it exceeds its authority. See, e.g., Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (holding that seizure of steel mill during a war on an order of the President "to avert a national catastrophe" in his position as Commander-in-Chief of the armed forces exceeded his constitutional power). Under the circumstances of the present case, necessity is no defense. If defendants were ordered to do an act illegal under international law they could have refused to do so, if necessary by abandoning their businesses. "The Executive and others are clearly bound by the laws of war as well as other types of international law." Paust Op. at 42-43, 43 n.29 (citing U.S. CONST., art. II, § 3; Ford v. United States, 273 U.S. 593, 606, 47 S.Ct. 531, 71 L.Ed. 793 (1927); Valentine v. Neidecker, 299 U.S. 5, 14 & n. 12, 18, 57 S.Ct. 100, 81 L.Ed. 5 (1936); Francis v. Francis, 203 U.S. 233, 240, 242, 27 S.Ct. 129, 51 L.Ed. 165 (1906); In re Neagle, 135 U.S. 1, 64, 10 S.Ct. 658, 34 L.Ed. 55 (1890); Chew Heong v. United States, 112 U.S. 536, 563, 5 S.Ct. 255, 28 L.Ed. 770 (1884); The Lessee of Pollard's Heirs v. Kibbe, 39 U.S. (14 Pet.) 353, 415, 10 L.Ed. 490 (1840); Worcester v. Georgia, 31 U.S. (6 Pet.) 515, 594, 8 L.Ed. 483 (1832); United States v. The Schooner Peggy, 5 U.S. (1 Cranch) 103, 110, 2 L.Ed. 49 (1801) (Marshall, C.J.); Ware v. Hylton, 3 U.S. (3 Dall.) 199, 272, 1 L.Ed. 568 (1796) (Iredell, J.); Taylor v. Morton, 23 F. Cas. 784, 786 (C.C.D.Mass.1855) (No. 13,799) (Curtis, J., on circuit), aff'd, 67 U.S. (2 Black) 481, 17 L.Ed. 277 (1862); United States v. Cooper, 25 F. Cas. 631, 641-42 (C.C.D.Pa.1800) (No. 14,865) (Chase, J., on circuit); 1 Op. Att'y Gen. 566, 569-71 (1822); JORDAN J. PAUST, INTERNATIONAL LAW AS LAW OF THE UNITED STATES 7-11, 169-73, 488-89, 493-94 (2d ed.2003)).

X. History of Abuse of Civilians and Land During War and Attempts to Limit Harm

Before analyzing the specific international law theories of plaintiffs, a brief summary of the history of harms to civilians and land during war, and efforts to limit or eliminate these abuses, seems useful. The historical context may be helpful in interpreting applicable law. Some examples of abuse (Table II) are followed by a brief description of some of the attempts at protection by international law and religious authorities (Table III).
A. History

*100
 Table II
 Historical Examples of Biological, Chemical and
 Other Methods of Mass Killings or Disablements
-----------------------------------------------------------------------------------------------------------------------
Date Action Source
-----------------------------------------------------------------------------------------------------------------------
1000 B.C. Chinese armies used arsenic smoke in AL MAURONI, CHEMICAL AND BIOLOGICAL
 battle. WARFARE 80 (2003).
-----------------------------------------------------------------------------------------------------------------------
600 B.C. Assyrians poisoned enemy water supplies Id.
 with rye ergot.
-----------------------------------------------------------------------------------------------------------------------
590 B.C. Solon of Athens used hellebore roots (a Jason Robey, Bioterror Through
 purgative) to poison the water in an Time, at http://dsc.discovery.com/ant
 aqueduct leading from the Pleistrus River hology/spotlight/bioterror/ history/
 to the city of Cirrha. history.html (last
 visited Nov. 5, 2004).
-----------------------------------------------------------------------------------------------------------------------
429-424 B.C. During the Peloponnesian War, Spartans MAURONI, supra, at 80.
 used toxic smoke, created by burning wax
 and sulfur, and flame against Athens and
 its allies.
-----------------------------------------------------------------------------------------------------------------------
400 B.C. Scythian archers used arrows dipped in ERIC CRODDY ET AL., CHEMICAL AND
 putrefying corpses and feces. BIOLOGICAL WARFARE: A COMPREHENSIVE
 SURVEY FOR THE CONCERNED
 CITIZEN 219 (2002).
-----------------------------------------------------------------------------------------------------------------------
187 B.C. Inhabitants of Ambracia in Epirus used MAURONI, supra, at 80.
 toxic smoke to drive off Romans from their
 walls.
-----------------------------------------------------------------------------------------------------------------------
190 B.C. During the Second Macedonian War, CRODDY, supra, at 219.
 Hannibal's forces threw poisonous snakes
 onto the ships of King Eumenes.
-----------------------------------------------------------------------------------------------------------------------
146 B.C. During the Third Punic War (149-146 Carthage (ancient city), Microsoft
 B.C.), the Romans destroyed Carthage and Encarta Online Encyclopedia 2004,
 spread salt over the ruins. http://encarta.msn.com/encyclopedia
 _761557005/Carthage
 (ancient_city).html.
-----------------------------------------------------------------------------------------------------------------------
82-72 B.C. Romans used "toxic smoke" against the United Kingdom Ministry of
 Charakitanes in Spain causing pulmonary Defense, Defending Against the
 problems and blindness. Threat of Biological and Chemical
 Weapons, http://www.mod.uk/issues/
 cbw/history.htm (last visited
 Mar. 25, 2004) (note that this site
 no longer exists) [hereinafter U.K.
 MoD].
-----------------------------------------------------------------------------------------------------------------------
1155 In the siege of Tortona, Italy, Emperor U.K. MoD, supra.
 Frederick Barbarossa conquered the town
 after poisoning the water supply.
-----------------------------------------------------------------------------------------------------------------------
1340 During the Hundred Years War, the Duke MARK WHEELIS, Biological Warfare
 of Normandy, besieging Thun l'Eveque before 1914, in BIOLOGICAL AND TOXIN
 castle, "dyd cast in deed horses, and WEAPONS: RESEARCH, DEVELOPMENT
 beestes stynking, wherby they within had AND USE FROM THE MIDDLE
 great[er] dystres thane with any other AGES TO 1945, at 8, 10-11 (Erhard
 thynge, for the ayre was hote as in the Geissler & John Ellis van Courtland
 middle of somer: the stynke and ayre was Moon, eds., 1999).
 so abomynable, that they consydred howe
 that finally they coude nat long endure."
-----------------------------------------------------------------------------------------------------------------------
1346 Mongol forces catapulted plague-infected Id. at 13-14.
 cadavers into the Genoese city of Caffa.
-----------------------------------------------------------------------------------------------------------------------

*101
-----------------------------------------------------------------------------------------------------------------------
1422 Prince Kroybut, besieging Karlstein, a fortress Id. at 16
 in Bohemia, used machines to throw
 waste and the corpses of his dead soldiers
 into the city.
-----------------------------------------------------------------------------------------------------------------------
1710 Russian troops are said to have hurled Id. at 17.
 plague casualties into Reval, Estonia.
-----------------------------------------------------------------------------------------------------------------------
1710 The Iroquois threw flayed animal skins Id. at 27.
 into a river, upstream from an English
 military encampment, to corrupt the water.
-----------------------------------------------------------------------------------------------------------------------
1763 During the Indian Wars, British colonial Id. at 22
 forces attempted to infect Indians by
 giving them smallpox-infected blankets at
 Fort Pitt, Pennsylvania.
-----------------------------------------------------------------------------------------------------------------------
1776 British forces reportedly tried to communicate Id. at 28-29
 smallpox to the Continental Army.
 One alleged method was inoculation or
 variolation, the practice of deliberately inoculating
 a susceptible person with
 matter from a smallpox pustule, with the
 idea that this person would be able to
 spread it and thereby initiate an outbreak
 of fully virulent smallpox.
-----------------------------------------------------------------------------------------------------------------------
1797 Napoleon attempted to infect the inhabitants U.K. MoD, supra.
 of the besieged city of Mantua with
 swamp fever during his Italian campaign.
-----------------------------------------------------------------------------------------------------------------------
1831 Traders, who often sustained losses from WHEEIS, supra, at 25.
 attacks by Plains Indians along the trade
 route between St. Louis and Santa Fe,
 allegedly brought smallpox-infested clothing
 and tobacco to distribute to Indians
 they met along the way. In 1832, the
 Pawnce Indians are alleged to have lost
 half their tribe due to a devastating epidemic
 of smallpox.
-----------------------------------------------------------------------------------------------------------------------
1846 Cochrance (then a British Rear Admiral) U.K Moc, supra.
 submitted a plan involving the use of shells
 containing cacodyl and cacodyl oxide mixed
 with a self-igniting liquid. The committee,
 endorsed by the Duke of Wellington, suppressed
 the plan because "it would not
 accord with the feelings and principles of
 civillised warfare."
-----------------------------------------------------------------------------------------------------------------------
1855 During the Crimean War, the British MAURONI, supra, at 80.
 military considered using projectiles
 containing caodyl cyanide. The idea was
 rejected.
-----------------------------------------------------------------------------------------------------------------------
1863 During the Civil War, Confederate troops Id. at 80-81.
 allegedly contaminated wells and ponds
 with animal carcasses during their retreat
 from Vicksburg.
-----------------------------------------------------------------------------------------------------------------------
1915-1916 The Germans used chlorine gas against Id. at 81.
 Allied Forces at Ypres. The British
 retaliated with chlorine at Loos.
-----------------------------------------------------------------------------------------------------------------------
1917 The Germans used mustard gas at Ypres Id.
 on July 12, 1917.
-----------------------------------------------------------------------------------------------------------------------
1935-1936 Italian froces used mustard gas bombs and Id. at 82.
 aerosol sprayers in Ethiopia.
-----------------------------------------------------------------------------------------------------------------------

*102
------------------------------------------------------------------------------------------------------------------------
1937-1945 Japan used gas and bacteriological DOCUMENTS ON THE LAWS OF WAR 156
 weapons in China. (Adam Roberts & Richard Guelff,
 eds., 3d ed.2004 reprint)
-----------------------------------------------------------------------------------------------------------------------
1939-1945 Genocide by Germans, Austrians and Post-War trials of Germans and
 Japanese by poison, burning, starvation, Japanese
 shooting and experiments.
-----------------------------------------------------------------------------------------------------------------------
1939-1945 World War II incineration of cities by aircraft Judicial notice.
 bombing was utilized by all sides.
-----------------------------------------------------------------------------------------------------------------------
1945 United States used atomic bombs on two Judicial notice.
 Japanese cities, Hiroshima and Nagasaki.
-----------------------------------------------------------------------------------------------------------------------
1960s British used herbicides during the insurgency PETER H. SCHUCK, AGENT ORANGE ON
 in Malaya and United States used TRIAL: MASS TOXIC DISASTERS IN THE
 them in Vietnam. COURTS 16 (enlarged ed.1987).
-----------------------------------------------------------------------------------------------------------------------
1967 Egyptian forces bombed Yemeni royalists MAURONI, supra, at 87.
 with mustard and nerve agents during
 them in Vietnam.
-----------------------------------------------------------------------------------------------------------------------
1980-1988 During the Iran-Iraq War, Iraqi forces DOCUMENTS ON THE LAWS OF WAR,
 used chemical weapons against Iranian supra, at 157; MAURONI, supra, at
 forces. Iraq also used chemical weapons 90.
 against its Kurdish minority populations, in
 particular in the town of Halabja.
-----------------------------------------------------------------------------------------------------------------------
1990-1991 Threat of possible use of biological and MAURONI, supra, at 92.
 chemical weapons by Iraq during the first
 Gulf conflict.
-----------------------------------------------------------------------------------------------------------------------
1994-1995 Sarin attacks by the Japanese Aum Id. at 93-94.
 Shinrikyo sect at Matsumoto, Japan in
 1994 and on the Tokyo subway in March
 1995.
-----------------------------------------------------------------------------------------------------------------------
1995 Iraq admitted to an extesive biological Id. at 94.
 weapons program.
-----------------------------------------------------------------------------------------------------------------------
2001 On September 11, two skyscrapers in New Judicial Notice
 York were destroyed by terrorists crashing
 commerical passenger aircraft into MAURONI, supra, at 97; Rober,
 them using aircraft fuel as an incinerating supra.
 device. In October, anonymous letters
 containing anthrax are addressed to news
 media and government officials in the
 United States.
-----------------------------------------------------------------------------------------------------------------------

B. Attempts to Protect Civilians and Land by Treaties, Custom and Religious Edicts
Part of the history of attempts to legally limit the use of poisons applied by air and otherwise is described in R.R. Baxter & Thomas Buergenthal, Legal Aspects of the Geneva Protocol of 1925, 64 AM J. INT'L L. 853 (1970).

 Table III
 Some Relevant International Agreements, Religious
 and Related Documents Designed to Protect People, Property and Land
 Against Methods Described in Table I
-----------------------------------------------------------------------------------------------------------------------
Date Description Source
-----------------------------------------------------------------------------------------------------------------------
~1500 B.C. Hindu text setting out the rules of war: Rig Veda 6-75:15 at http://
 "[D]o not poison the tip of your arrow" www.bbc.uk/religion/
 "[D]o not attack the sick or old" ethics/war/hinduism.shtml (last
 "[D]o not attact a child or a woman" visited Dec. 10, 2004).
 "[D]o not attack from behind"
 A warrior will go to hell if he breaks any of
 these rules.

*103
---------------------------------------------------------------------------------------------------------------------
~ 1000 B.C. "When you lay siege to a city for a long Deuteronomy 20:19-21
 time, fighting against it to capture it, do
 not destroy its trees by putting an ax to
 them, because you can eat their fruit. Do
 not cut they down. Are the trees of the
 field people, that you should besiege them?
 However, you may cut down trees that you
 know are not fruit trees and use them to
 build siege works until the city at war with
 you falls."
---------------------------------------------------------------------------------------------------------------------
~ 400 B.C. In wars with fellow Greeks, "the countryside THOMAS L. PANGLE & PETER J.
 is not to be laid waste." AHRENSDORF, JUSTICE AMONG
 NATIONS: ON THE MORAL BASIS OF
 POWER AND PEACE 39 (1999) (citing
 Socrates).
---------------------------------------------------------------------------------------------------------------------
~ 633 A.D. Instruction from Abu Bakr, the first Caliph Islam and the Ethics of War,
 of Islam, to an army he was sending to http//www.bbc.co.uk/religion/
 battle: ethics/war/islam.shtml (last visited
 "Neither kill a child, nor a woman, nor an Dec. 10, 2004).
 aged man."
 "Bring no harm to the trees, nor burn
 them with fire, especially those which are
 fruitful."
 "Slay not any of the enemy's flock, save for
 your food."
---------------------------------------------------------------------------------------------------------------------
1023 Excerpt of peace oath proposed by Bishop MATTHEW STRICKLAND, WAR AND
 Warin of Beauvais to the Capetian king, CHIVALRY: THE CONDUCT AND PERCEPTION
 Robert the Pious: OF WAR IN ENGLAND AND
 "I will not burn or destroy houses unless I NORMANDY, 1066-1217, at 258
 find an enemy horseman or thief .. within, (1996).
 and unless they are joined to a real
 castle. I will not cut down or uproot the
 vineyards of another, or harvest them for
 reasons of war ..., unless it is on my own
 land ... I will not destroy a mill or seize
 the grain that is in it, unless I am on a
 cavalcade or with the host ..., or it is on
 my land ... I will not attack merchants or
 pilgrims or take their possessions unless
 they commit crimes. I will not kill the
 animals for villeins except for my consumption
 and that of my men."
---------------------------------------------------------------------------------------------------------------------
August 27, 1675 French-German bilateral agreement to Strasbourgh Agreement, article 57
 prohibit the use of "perfidious and odious"
 toxic devices, including poisoned bullets.
 This was the first international agreement
 in modern history limiting the use of the chemical
 weapons.
---------------------------------------------------------------------------------------------------------------------
1862 "[T]he use of poison in any manner, be it Union Army General Order No.
 to poison wells, or food, or arms, is wholly 100. Attributed to Frances
 excluded from modern warfare." Lieber. See Fletcher Op. at 36-39,
 41. But see infra Part XI.D.
 (discussing Grant's view).
---------------------------------------------------------------------------------------------------------------------
December 11, 1868 Banning, on reciprocal basis, use in war of Saint Petersburg Declaration renouncing
 any projectile weighing less than forty the Use, in Time of War,
 grams, "which is either explosive or of Explosive Projectiles Under 400
 charged with fulminating or inflammable Grammes Weight
 substances."
---------------------------------------------------------------------------------------------------------------------
August 27, 1874 Forbidding "employment of poison or Conferences of Brussels, Article
 poisoned weapons." 13(a) (Project of an International

*104
 Declaration Concerning the Laws
 and Customs of War)
---------------------------------------------------------------------------------------------------------------------
July 29, 1899 Agreeing to obstain from using "projectiles Hague Declaration (IV, 2)
 the sole object of which is the diffusion Concerning Asphyxiating Gases
 of asphyxiating or deleterious gases."
 United States did not sign.
---------------------------------------------------------------------------------------------------------------------
October 18, 1907 "Especially" forbidding the use of poison Hague Convention IV Respecting
 or poisoned weapons. the Laws and Customs of War on
 Land and Annex to the Convention,
 Regulations Respecting the
 Laws and Customs of War on
 Land, article 23
---------------------------------------------------------------------------------------------------------------------
June 28, 1919 Prohibiting production and use of poison Treaty of versailles
 gas by Germany.
---------------------------------------------------------------------------------------------------------------------
February 6, 1922 Declaring that the prohibition in the use of Treaty of Washington Relating to
 war of "asphyxiating, poisonous or other the Use of Submarines and Noxious
 gases, and all analogous liquids, materials Gases in Warfare, article 5
 devices ... shall be universally accepted
 as a part of international law."
 Treaty did not enter into force due to
 France's failure to ratify it based on objections
 to provisions on submarine warfare.
---------------------------------------------------------------------------------------------------------------------
June 17, 1925 Recognizing prohibition of use in war of Protocol for the Prohibition of
 poison gases and prohibiting bacteriological the Use in War of Asphyxiating,
 methods of warfare. Poisonous or Other Gases, and of
 Bacteriological Methods of Warfare
 (also referred to as 1925
 Geneva Protocol)
---------------------------------------------------------------------------------------------------------------------
January 1931 The British Preferred the broader interpretation, Franco-British Interpretation of
 which stated that prohibition 1930: Memorandum by the British
 certain gases included all others gases. Delegation to the League of Nations
 The French interpreted it to apply "to al Preparatory Commission for
 gases employed with a view to toxic action the Disarmament Conference seeking
 on the human organism." clarification of the English and
 French translations of the 1925
 Geneva Protocol.
---------------------------------------------------------------------------------------------------------------------
December 16, 1969 Declaring as contrary to international law United Nations Resolution 2603-A
 under the 1925 Geneva Protocol the use of
 any chemical agents of warfare that are
 used "because of their direct toxic effects
 on man, animals or plants," including
 herbicides.
---------------------------------------------------------------------------------------------------------------------
April 10, 1972 Prohibiting production and stockpiling of Convention on the Prohibition of
(opened for biological and toxic weapons. the Development, Production and
signature) Stockpiling of Bacteriological
 (Biological) and Toxin Weapons
 and on Their Destruction ("Biological
 Weapons Convention")
---------------------------------------------------------------------------------------------------------------------
March 26, 1975 Prohibiting production and stockpiling of Biological Weapons Convention
 biological and toxic weapons. enters into force, including for the
 United States.
---------------------------------------------------------------------------------------------------------------------
April 8, 1975 Renouncing, with certain exceptions, first Exec. Order 11850 (President
 use of herbicides in war. Ford) Renunciation of Certain
 Uses of War of Chemical Herbicides
 and Riot Control Agents
---------------------------------------------------------------------------------------------------------------------
April 10, 1975 Renouncing use of noxious gases and 1925 Geneva Protocol enters into
 herbicides force for the United States.
---------------------------------------------------------------------------------------------------------------------

*105
Post-1975 Further protective developments. See, e.g., infra Part XI.C.7., and
 documents in DOCUMENTS ON THE
 LAWS OF WAR 407-719 (Adam
 Roberts & Richard Guelff, eds., 3d
 ed.2004 reprint).
---------------------------------------------------------------------------------------------------------------------

XI. Insufficiency of Plaintiffs' International Law Claims

Neither a treaty to which the United States was a party, nor a statute, nor a binding declaration of the United States, nor a rule of international or human rights law applied to limit spraying of herbicides by the United States in Vietnam during the period up to April of 1975. See also infra Part XII.
This Part discusses the international law upon which plaintiffs base their claims. Section A sets out the position of the United States on plaintiffs' international law claims. Section B discusses federal statutes of the United States reflecting treaties. Section C discusses operative treaties and other international instruments. Section D discusses customary international law.
During the period described in Sosa v. Alvarez-Machain, 542 U.S. 692, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004), at the end of the Eighteenth century when our federal government was established, uncodified customary international law may have been relatively more important than it is today. Multinational treaties  as our own early relations with France and England demonstrated  were vital but narrow in scope. In the Twentieth century, codification became the prevalent mode of establishing international law through multilateral treaties, conventions, binding declarations, and the like  often with world-encompassing reach. This development paralleled that in this country where common law waits on statute.
The current problem for United States courts  as well as other branches of the government  in interpreting and applying the vast array of common law practice, statutes, treaties with individual nations or regional associations, and written provisions embraced by almost all powers, is far different from that posited in Sosa of a few uncodified tenets. Cf. Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 428, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964) ("[T]he greater the degree of codification or consensus concerning a particular area of international law, the more appropriate it is for the judiciary to render decisions regarding it, since the courts can then focus on the application of an agreed principle to circumstances of fact rather than on the sensitive task of establishing a principle not inconsistent with the national interest or with international justice....").
A. Position of the Government
The United States has consistently taken the position that no rule of international law barred the use of chemical herbicides during the Vietnam War either to clear brush and leaves or to destroy crops, and that, in any event, the spraying focused only on crops intended to feed enemy forces. The government argues:
The primary source of the alleged prohibition on the use of chemical herbicides in combat is the 1925 Geneva Protocol for the Prohibition of the Use in War of Asphyxiating, Poisonous or Other Gases, and of Bacteriological Methods of Warfare ("1925 Geneva Protocol" or "Protocol"), 26 U.S.T. 571. See, e.g., Am. Compl., ¶¶ 75-76; Transcript of Hearing March 18, 2004 ("03/18/04 Tr.") at 28. The Protocol, however, was not ratified by the United States until 1975, *106 and thus was not binding upon the United States at the time of the Vietnam War. The Protocol was based upon the Hague Gas Declaration of 1899, the Versailles Treaty, and the 1922 Washington Treaty on Submarines and Noxious Gases. See George Bunn, Banning Poison Gas and Germ Warfare: Should the United States Agree?, 1969 Wisc. L.Rev. 375, 375-77. The United States never ratified the first two of these treaties, and the latter never entered into force. Id. Thus, until its ratification of the 1925 Geneva Protocol, the "United States [was] not a party to any treaty which expressly prohibit[ted][sic] it from engaging in gas or bacteriological warfare." Id. at 381. Because the Protocol "is evidence of the customary law norm," John Norton Moore, Ratification of the Geneva Protocol on Gas and Bacteriological Warfare: A Legal and Political Analysis, 58 Va. L.Rev. 419, 450 (1972), however, and because discussion of the issue most often revolved around interpretation of the Protocol, we focus on the disputed scope of the Protocol to demonstrate the absence of any customary international law norm prohibiting the use of chemical herbicides in combat. The scope of any customary international law prohibition is not necessarily the same as the scope of the Protocol. See Moore, 58 Va. L.Rev. at 454; R.R. Baxter and Thomas Buergenthal, Legal Aspects of the Geneva Protocol of 1925, 64 Am. J. Int'l L. 853, 855-56 (1970).
The Executive Branch has consistently taken the position that the Protocol does not apply to chemical herbicides, and that no other principle of international law prohibited their use in war. See generally Moore, 58 Va. L.Rev. at 444-47; Baxter & Buergenthal, 64 Am. J. Int'l L. at 864 & n.59 ("The United States has consistently asserted that the use of these weapons did not violate the Protocol."). Thus, as early as 1961, when the use of chemical defoliants was first being considered by President Kennedy, Secretary of State Dean Rusk informed him that "[t]he use of defoliant does not violate any rule of international law concerning chemical warfare and is an accepted tactic of war." Memorandum from Secretary of State Rusk to President Kennedy, Nov. 24, 1961 ("Rusk Memorandum"), reprinted in I Foreign Relations of the United States 1961-1963, Vietnam, 1961, at 663, available at (Item 275).
The United States consistently took this position publicly as well. In 1966, the United States Ambassador to the United Nations, James M. Nabrit, Jr., stated to the General Assembly that the 1925 Geneva Protocol does not apply to herbicides. See Moore, 58 Va. L.Rev. at 444-45, citing United States Arms Control and Disarmament Agency ("ACDA"), 1966 Documents on Disarmament ("1966 Documents on Disarmament") at 800-01. See also 1966 Documents on Disarmament at 742-43 (statement to same effect by William C. Foster, ACDA). Indeed, in that same year, notwithstanding the United States' use of herbicides in Vietnam, but consistent with the United States' position that the Protocol does not prohibit such use, the United States co-sponsored and voted for a General Assembly resolution calling for "strict observance by all States of the principles and objectives of the Geneva Protocol." G.A. Res. 2162(B) (1966), reprinted in 1966 Documents on Disarmament 798-99, quoted in Moore, 58 Va. L.Rev. at 444.
On November 25, 1969 President Nixon announced that he would resubmit *107 the Protocol to the Senate for ratification. The Protocol had previously been submitted to the Senate in 1926, but the Senate agreed to return the unratified Protocol to the Executive pursuant to the Executive's request in 1947. Chemical-Biological Warfare: U.S. Policies and International Effects: Hearings before the Subcomm. on National Security Policy and Scientific Developments, House Comm. on Foreign Affairs ("1969 House Hearings") at 180 (Statement of Thomas R. Pickering, Deputy Director, Bureau of Politico-Military Affairs, Department of State); Baxter & Buergenthal, 64 Am. J. Int'l L. at 855 n.11; 6 Unperfected Treaties of the United States of America, 1776-1976, at 473 (Christian L. Wiktor, ed.1984). In making this announcement the President again reiterated the Administration's position that the Protocol did not apply to chemical herbicides. See 1969 House Hearings at 176-77, 181-83 (Statement of Mr. Pickering). This position was reiterated again when the Protocol was officially transmitted to the Senate for ratification on August 19, 1970. See Protocol for the Prohibition of the Use in War of Asphyxiating, Poisonous, or Other Gases, and of Bacteriological Methods of Warfare: Message from the President ("President's Message"), S. Exec. J, 91st Cong., 2d Sess., at vi. In the Letter of Submittal attached to the President's Message, Secretary of State Rogers expressly stated that "[i]t is the United States' understanding of the Protocol that it did not prohibit the use in war of ... chemical herbicides." Id.
The Executive consistently reiterated this view throughout the Senate's consideration of the Protocol, and it was this very issue that delayed ratification for an additional five years. Thus, during hearings before the Senate Foreign Relations Committee in 1971, Administration officials repeatedly asserted that the Protocol does not cover chemical herbicides. See The Geneva Protocol of 1925: Hearings Before the Senate Comm. on Foreign Relations, 92nd Cong. ("1971 Senate Hearings") at 5-7, 27, 30, 37-38 (Testimony of Secretary of State Rogers), 304-05 (Testimony of G. Warren Nutter, Department of Defense) (1972). Indeed, the Secretary of State indicated that President Nixon would likely reject ratification if the Senate conditioned its advice and consent on an interpretation of the Protocol that covered herbicides. Id. at 37-38.
In response to a request from Senator Fulbright during the course of the 1971 Senate Hearings, the General Counsel of the Department of Defense set forth the Department's view that neither "the rules of customary international law," the 1925 Geneva Protocol, nor the Hague Regulations governing land warfare prohibited the use of "anti-plant chemicals for defoliation or the destruction of crops," provided that the use against crops met certain other criteria, discussed below. Letter from J. Fred Buzhardt, General Counsel for the Department of Defense to J.W. Fulbright, Chairman, Senate Comm. on Foreign Relations ("Buzhardt Letter"), April 5, 1971, reprinted in 1971 Senate Hearings at 315-17, quoted in Moore, 58 Va. L.Rev. at 444-45.
The administration reiterated its position that the 1925 Geneva Protocol does not apply to herbicides during hearings before the House of Representatives in the spring of 1974. See U.S. Chemical Warfare Policy: Hearings Before the Subcomm. on National Security Policy and Scientific Developments, House Comm. on Foreign Affairs, 93rd Cong. ("1974 House Hearings") at 150 (Statement of Amos Jordan). Moreover, the *108 testimony made clear that "the current interpretation [of the Protocol] was approved by the President" himself. Id. at 206 (Testimony of Len Sloss, Deputy Director, Politico-Military Affairs, Department of State).
Finally, in late 1974, President Ford announced that, "with a view to achieving Senate advice and consent to ratification" of the Protocol, he was prepared "in reaffirming the current U.S. understanding of the scope of the Protocol" as not covering herbicides, to renounce, as a matter of "national policy," the first use of herbicides in war, except for use in limited circumstances. See Prohibition of Chemical and Biological Weapons: Hearings Before the Senate Comm. on Foreign Relations, 93rd Cong. ("1974 Senate Hearings") at 12 (1974) (Statement of Fred C. Ickle, Director, ACDA). See also id. at 27. On December 16, 1974, the Senate unanimously voted its consent to ratification. 120 Cong. Rec. 40,067-68 (Dec. 16, 1974). On January 22, 1975, President Ford signed the instrument of ratification of the Protocol, and it was deposited with France and entered into force with respect to the United States on April 10, 1975. See 26 U.S.T. 571 (1975). Two days earlier, on April 8, 1975, President Ford issued Executive Order 11850, 1975 WL 21461 renouncing, as a matter of national policy, the first use of herbicides in war, except in certain limited circumstances. See 40 Fed.Reg. 16,187 (April 8, 1975). That action, taken as a matter of policy rather than legal obligation, has no effect on the existence or recognition of any international legal norm governing the use of herbicides in war. Flores v. Southern Peru Copper Corp., 343 F.3d 140, 154 (2d Cir.2003) ("Practices adopted for moral or political reasons, but not out of a sense of legal obligation, do not give rise to rules of customary international law.").
. . . .
Similarly, the United States had long interpreted 1907 Hague Convention Respecting the Laws and Customs of War on Land ("1907 Hague Convention" or "Convention"), 36 Stat. 2277 (1910), and international law generally, as not prohibiting the destruction of crops intended for use by enemy forces, precisely the type of crop destruction operations undertaken in Vietnam.
. . . .
As noted above, in 1945 the Judge Advocate General of the War Department provided an opinion as to the legality, under international law, of "certain crop-destroying chemicals which can be sprayed by airplane against enemy cultivations." Cramer Opinion, ¶ 1.... The Cramer Opinion concluded that "the use of chemical agents ... to destroy cultivations or retard their growth, would not violate any rule of international law prohibiting poison gas." Cramer Op., ¶ 3. The Opinion also addressed other possible international law prohibitions on the destruction of enemy crops, including the 1907 Hague Convention.... Id., ¶¶ 4-5.
This same conclusion was reached by the General Counsel of the Department of Defense a quarter-century later.... Buzhardt Letter, reprinted at 1971 Senate Hearings at 315-17.
The Army Field Manual took the same position, stating that Article 23(a) "does not prohibit measures taken to ... destroy, through chemical ... agents harmless to man, crops intended solely for consumption by the armed forces (if that fact can be determined)." Department of Army Field Manual, FM 27-10, The Law of Land Warfare (July 1956), ¶ 37, reprinted in Buzhardt Letter. *109 See also 1971 Senate Hearings at 315 (discussing Field Manual); 1969 House Hearings at 215 (same).
. . . .
The United States' use of chemical herbicides in Vietnam carefully hewed to this longstanding interpretation of international law. The initial use of chemical herbicides in Vietnam was restricted to defoliation operations. Am. Compl., ¶ 54-55; William A. Buckingham, Jr., Operation Ranch Hand: The Air Force and Herbicides in Southeast Asia 1961-1971 (Office of Air Force History 1982) ("Operation Ranch Hand") at 21, available at . After those initial defoliation operations, in 1962 President Kennedy decided to allow restricted crop destruction to proceed. Id. at 78; Am. Compl., ¶ 55. The President's decision was accompanied by instructions that "the targets should be chosen so as to cause the least damage possible to non-Viet Cong farmers." Buckingham, Operation Ranch Hand at 79.
The crop destruction program was thus focused on "crops intended for the use of Vietcong or North Vietnamese forces" in Vietcong-held territory. 1969 House Hearings at 215 (Testimony of Mr. Pickering). See also id. at 197 (crop destruction undertaken only after "very thorough review" and "very thorough conclusions" about crops before destruction operations) (Testimony of Mr. Pickering), 229 ("friendly crops" excluded from target areas and all crop destruction projects approved by Ambassador) (Statement of Adm. Lemos); Buckingham, Operation Ranch Hand at 83....
This same policy of focusing crop destruction on enemy crops continued throughout the war. As explained by Rear Admiral Lemos in 1969:
[W]e are really talking about very isolated crops in areas of known Vietcong and North Vietnamese army units, and which are clearly a part of that complex and being used, or being grown by them, or by people forced by them to grow for them.
1969 House Hearings at 250 (Testimony of Adm. Lemos). See also id. at 251 ("crop destruction program is associated with enemy camp areas and not the villages and hamlets"). Thus, before crop destruction could be approved, there "ha[d] to be substantial evidence that the crops are being grown specifically for the use of Vietcong troops and North Vietnamese troops." Id. See also 1971 Senate Hearings at 315 (Testimony of Mr. Nutter). As a result, the crop destruction program was only a small part of the overall use of herbicides in Vietnam. 1969 House Hearings at 250.
In early December 1970, the decision was made to completely phase out the crop destruction program. Buckingham, Operation Ranch Hand at 172; 1971 Senate Hearings at 3 ("immediate termination of all use of chemical herbicides in Vietnam for crop destruction purposes") (Statement of Secretary of State Rogers). On January 16, 1971, the Deputy Secretary of Defense ordered the immediate termination of all crop destruction operations by U.S. forces. Buckingham, Operation Ranch Hand at 175.
U.S. Statement of Interest at 4-13 (some footnotes omitted; some moved in whole or in part to text).
As indicated below, history supports the government's view of the law pre-1975. See also infra Part XII.
Not persuasive, however, is the government's further argument that the President's *110 decision to use herbicides during the Vietnam War constituted a "controlling executive act" foreclosing customary international law claims. U.S. Statement of Interest at 44-47. The President of the United States has no power to violate international law or to authorize others to do so. The Nuremberg decisions made it clear that a head of state and those responding to his orders are bound by international law. See supra Part IX. The fact that a head of state may not be sued for official activities does not provide authorization for others to act illegally under the cloak of his immunization. See Lafontant v. Aristide, 844 F.Supp. 128 (E.D.N.Y.1994) (addressing head of state immunity).
There was, in any event, no formal act of Congress authorizing a violation of international law during the Vietnam hostilities or covering specifically the area of herbicide use. Had Congress, or perhaps even the President by formal proclamation, occupied this area, the government's contention "that customary international law is only incorporated into the law of the United States absent a `controlling executive or legislative act,' The Paquete Habana, 175 U.S. 677, 700, 20 S.Ct. 290, 44 L.Ed. 320 (1900)," U.S. Statement of Interest at 45, might have some weight. But there was never a public formal legislative act or presidential proclamation permitting spraying of the kind used in Vietnam.
The government's further contention that the courts should defer to the executive's interpretation of international law, id. at 47-49, insofar as it suggests that the executive's statement of the law is controlling, is rejected, even though the courts will often be influenced by the executive's interpretation since its expertise in international law is substantial. See Kolovrat v. Oregon, 366 U.S. 187, 194, 81 S.Ct. 922, 6 L.Ed.2d 218 (1961) (stating, with respect to meaning of treaties, that the government's view is given great weight). Courts cannot abandon their own duty under Article III of the Constitution to decide the law applicable to a case properly before them.
B. Statutes of the United States
Statutes of the United States, based on treaties or other forms of international law, provide a particularly useful source of international law for United States courts. They instance situations where the legislative and executive branches of government agree on what that international law is and agree that we are bound by it. They also obviate the issue of whether a treaty is self-executing. See 1 RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 111 cmts. h, i (discussing the issue of self-executing treaties, i.e., "whether existing law is adequate to enable the United States to carry out its obligations, or whether further legislation is required": "Whether an agreement is to be given effect without further legislation is an issue that a court must decide when a party seeks to invoke the agreement as law."). Rules against torture, war crimes and genocide are, apart from treaties and statutes, arguably jus cogens, i.e., a peremptory norm. While in particular cases a statute may create a problem by adopting broader or narrower definitions than those reflected in treaties or customary international law, that is not an issue in the instant case.
1. Torture
Plaintiffs rely upon the Torture Victim Protection Act of 1991 ("TVPA"), Pub.L. No. 102-256, 106 Stat. 73 (1992). It is a federal statute that arguably codifies international law prohibitions against torture and extrajudicial killing. See id., 106 Stat. at 73 (stating, in preamble, that the Act carries out "obligations of the *111 United States under the United Nations Charter and other international agreements pertaining to the protection of human rights by establishing a civil action for recovery of damages from an individual who engages in torture or extrajudicial killing"); see also Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("Convention Against Torture"), Dec. 10, 1984, 1465 U.N.T.S. 112 (entered into force June 26, 1987).
The TVPA provides:
An individual who, under actual or apparent authority, or color of law, of any foreign nation 
(1) subjects an individual to torture shall, in a civil action, be liable for damages to that individual; or
(2) subjects an individual to extrajudicial killing shall, in a civil action, be liable for damages to the individual's legal representative, or to any person who may be a claimant in an action for wrongful death.
TVPA, Pub.L. No. 102-256, § 2(a), 106 Stat. at 73 (emphasis added). The TVPA also requires exhaustion of "adequate and available remedies in the place in which the conduct giving rise to the claim occurred," id. § 2(b), and provides for a ten-year statute of limitations, id. § 2(c) ("[W]ithin 10 years after the cause of action arose.").
Section 3 of the TVPA defines extrajudicial killing and torture as follows:
(a) Extrajudicial killing  For the purposes of this Act, the term `extrajudicial killing' means a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples. Such term, however, does not, include any such killing that, under international law, is lawfully carried out under the authority of a foreign nation.
(b) Torture  For the purposes of this Act 
(1) the term `torture' means any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind; and
(2) mental pain or suffering refers to prolonged mental harm caused by or resulting from 
(A) the intentional infliction or threatened infliction of severe physical pain or suffering;
(B) the administration or application, or threatened administration or application, of mind altering substances or other procedures calculated to disrupt profoundly the senses or the personality;
(C) the threat of imminent death; or
(D) the threat that another individual will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind altering substances or other procedures calculated to disrupt profoundly the senses or personality.
Id. § 3, 106 Stat. at 73-74 (emphasis added).
The TVPA by its terms only applies to those acting under the authority of a foreign *112 nation and thus is inapplicable here since plaintiffs allege that the defendants acted in concert with, and by authority of, the United States government.
Plaintiffs also allege that the defendants acted in concert with the South Vietnamese government, but this is a makeweight. Defendants' contracts were with the United States, and until 1971 the United States was calling the tune on the herbicide application of which plaintiffs complain.
The use of herbicides in Vietnam does not fit within the definition of either torture or extrajudicial killing. Plaintiffs were not within the defendants' custody or physical control, nor that of the United States, when herbicides were used. Nor were herbicides used to intentionally inflict pain and suffering. They were used to kill plants.
Another obstacle plaintiffs face is the TVPA's ten-year statute of limitations, which bars any claim under the TVPA that arose prior to January 30, 1994, ten years prior to the date the complaint was filed. See id. § 2(c), 106 Stat. at 73; supra Part VIII.D.
In addition, the TVPA did not become effective until 1992, long after the activities of which plaintiffs complain took place. Assuming arguendo that plaintiffs rely upon the customary international law prohibition of torture as jus cogens, see Filartiga v. Pena-Irala, 630 F.2d 876, 880 (2d Cir.1980) (recognizing under the ATS, prior to the Convention Against Torture entering into force for the United States and prior to the TVPA's enactment, a cause of action for "an act of torture committed by a state official agent against one held in detention [which] violates established norms of the international law of human rights, and hence the law of nations"), plaintiffs still fail to allege facts that would constitute torture. The TVPA and its counterpart, the Convention Against Torture, has no application in the instant case.
2. War Crimes
Plaintiffs rely on the War Crimes Act of 1996, 18 U.S.C. § 2441 (2000). It provides:
Whoever, whether inside or outside the United States, commits a war crime, in any of the circumstances described in subsection (b), shall be fined under this title or imprisoned for life or any term of years, or both, and if death results to the victim, shall also be subject to the penalty of death.
18 U.S.C. § 2441(a). Subsection (b) provides that the circumstances are that "the person committing such war crime or the victim of such war crime is a member of the Armed Forces of the United States or a national of the United States." 18 U.S.C. § 2441(b). A "war crime" is defined as follows:
As used in this section the term `war crime' means any conduct 
(1) defined as a grave breach in any of the international conventions signed at Geneva 12 August 1949, or any protocol to such convention to which the United States is a party;
(2) prohibited by Article 23, 25, 27, or 28 of the Annex to the Hague Convention IV, Respecting the Laws and Customs of War on Land, signed 18 October 1907;
(3) which constitutes a violation of common Article 3 of the international conventions signed at Geneva, 12 August 1949, or any protocol to such convention to which the United States is a party and which deals with non-international armed conflict; or
(4) of a person who, in relation to an armed conflict and contrary to the provisions of the Protocol on Prohibitions or Restrictions on the Use of Mines, Booby-Traps and Other Devices as amended *113 at Geneva on 3 May 1996 (Protocol II as amended on 3 May 1996), when the United States is a party to such Protocol, willfully kills or causes serious injury to civilians.
18 U.S.C. § 2441(c).
Defendants argue that the War Crimes Act creates no private cause of action for civil liability because it is a criminal statute. In Kadic v. Karadzic, 70 F.3d 232, 242-43 (2d Cir.1995), the Court of Appeals for the Second Circuit held that the district court had jurisdiction under the ATS over plaintiffs' claims of war crimes and other violations of international humanitarian law. Although Kadic predates Sosa, the former's reasoning for recognizing civil liability for war crimes under the ATS remains sound. The war crimes alleged in Kadic  "acts of murder, rape, torture, and arbitrary detention of civilians, committed in the course of hostilities"  "have long been recognized in international law as violations of the law of war." Id. at 242. The defect in plaintiffs' complaint is that the herbicide spraying complained of did not constitute a war crime pre-1975.
With respect to section 2441(c)(1) of title 18 of the United States Code, plaintiffs only rely upon the Geneva Convention Relative to the Protection of Civilian Persons in Time of War, Aug. 12, 1949, 6 U.S.T. 3516, 75 U.N.T.S. 287; see also infra Part XI.C.5. It defines "grave breaches" in relevant part as follows:
[W]ilful killing, torture or inhuman treatment, including biological experiments, wilfully causing great suffering or serious injury to body or health, ..., and extensive destruction and appropriation of property, not justified by military necessity and carried out unlawfully and wantonly.
Id. art. 147, 6 U.S.T. at 3618, 75 U.N.T.S. at 388. Herbicide spraying by the United States did not constitute "willful killing" or "wilfully causing great suffering or serious injury to body or health" since the United States lacked the requisite criminal intent. Nor did the spraying constitute "torture," see supra Part XI.B.1, or "inhuman treatment," see OSCAR M. UHLER ET AL., GENEVA CONVENTION RELATIVE TO THE PROTECTION OF CIVILIAN PERSONS IN TIME OF WAR: COMMENTARY 598 (Jean S. Pictet ed., Ronald Griffin & C.W. Dumbleton trans., 1958) (noting that the notion of inhuman treatment is not easily definable, but concluding that it refers to "treatment constituting an attack on physical integrity or health" and treatment that injures the victim's human dignity, bringing him "down to the level of [an] animal[]"). As for property damage, any such damage was justified by military necessity and was carried out lawfully. See infra Part XI.D.3.
Under section 2441(c)(2), article 23 of the Annex to Hague Convention IV is the only article in that convention that plaintiffs rely upon. Contrary to plaintiffs' claim, herbicide spraying by the United States in Vietnam was not a violation of article 23. See infra Part XI.C.1.
In reference to section 2441(c)(3), the United States' spraying of herbicides in Vietnam did not constitute a violation of common article 3 to the 1949 Geneva Conventions. See infra Part XI.C.5. Nor was the United States a party to any protocol to the 1949 Geneva Conventions during the relevant period.
As for section 2441(c)(4), it is inapplicable because the United States was not a party to the Protocol on Prohibitions or Restrictions on the Use of Mines, Booby-Traps and Other Devices during the relevant period; this protocol did not enter into force for the United States until May 24, 1999.
Even if the War Crimes Act is a reflection of customary international law either *114 pre-1975 or today, see infra Part XI.D.1., the herbicide spraying complained of did not constitute a war crime prior to 1975.
3. Genocide
Plaintiffs argue that defendants' acts constituted genocide but do not specifically rely upon the Genocide Convention Implementation Act of 1987, 18 U.S.C.A. § 1091 (2000 & Supp.2004). The Act "incorporated" the Convention on the Prevention and Punishment of the Crime of Genocide ("Genocide Convention"), Dec. 9, 1948, 78 U.N.T.S. 277 (entered into force Jan. 12, 1951), into federal law. The Genocide Convention Implementation Act reads in relevant part:
Whoever, whether in time of peace or in time of war, in a circumstance described in subsection (d) and with the specific intent to destroy, in whole or in substantial part, a national, ethnic, racial or religious group as such 
(1) kills members of that group;
(2) causes serious bodily injury to members of that group;
(3) causes the permanent impairment of the mental faculties of members of the group through drugs, torture, or similar techniques;
(4) subjects the group to conditions of life that are intended to cause the physical destruction of the group in whole or in part;
(5) imposes measures intended to prevent births within the group; or
(6) transfers by force children of the group to another group; or attempts to do so, shall be punished as provided in subsection (b).
18 U.S.C.A. § 1091(a). Subsection (d) requires either the commission of the offense within the United States or that the alleged offender be a national of the United States. 18 U.S.C.A. § 1091(d). Subsection (b) specifies punishment, such as imprisonment or a possible fine of up to one million dollars. See 18 U.S.C.A. § 1091(b). The Act also provides that there is no statute of limitations for an offense under subsection (a)(1). 18 U.S.C.A. § 1091(e).
Similarly, "genocide" is defined in the Genocide Convention as follows:
In the present Convention, genocide means any of the following acts committed with intent to destroy, in whole or in part, a national, ethnical, racial or religious group, as such:
(a) Killing members of the group;
(b) Causing serious bodily or mental harm to members of the group;
(c) Deliberately inflicting on the group conditions of life calculated to bring about its physical destruction in whole or in part;
(d) Imposing measures intended to prevent births within the group;
(e) Forcibly transferring children of the group to another group.
Genocide Convention, art. 2, 78 U.N.T.S. at 280 (emphasis added).
The United States did not become a party to the Genocide Convention until November 25, 1988. It attached the following understandings, among others:
(1) That the term `intent to destroy, in whole or in part, a national, ethnical, racial, or religious group as such' appearing in article II means the specific intent to destroy, in whole or in substantial part, a national, ethnical, racial or religious group as such by the acts specified in article II.
. . .
(4) That acts in the course of armed conflicts committed without the specific intent required by article II are not sufficient to constitute genocide as defined by this Convention.
*115 Multilateral Treaties Deposited with the Secretary General (emphasis added), http://untreaty.un.org/ ENGLISH/bible/englishinternetbible/ partI/chapterIV/treaty1.asp# N26 (last visited Feb. 16, 2005).
Laws against genocide have been expanded  unfortunately with limited effect  in the latter part of the twentieth century. See generally HOWARD BALL, PROSECUTING WAR CRIMES AND GENOCIDE: THE TWENTIETH-CENTURY EXPERIENCE (1999); LAWRENCE J. LEBLANC, THE UNITED STATES AND THE GENOCIDE CONVENTION (1991); SAMANTHA POWER, "A PROBLEM FROM HELL": AMERICA AND THE AGE OF GENOCIDE (Perennial 2003); STEVEN R. RATNER & JASON S. ABRAMS, ACCOUNTABILITY FOR HUMAN RIGHTS ATROCITIES IN INTERNATIONAL LAW: BEYOND THE NUREMBERG LEGACY (2d ed.2001); GEOFFREY ROBERTSON, CRIMES AGAINST HUMANITY: THE STRUGGLE FOR GLOBAL JUSTICE (New Press 2000); II DREXEL A. SPRECHER, INSIDE THE NUREMBERG TRIAL: A PROSECUTOR'S COMPREHENSIVE ACCOUNT 1447-48 (1999) (discussing Genocide Convention as a legacy of Nuremberg).
The use of herbicides in Vietnam did not constitute genocide as defined by either the Genocide Convention Implementation Act or the Genocide Convention, particularly with the United States' understanding regarding specific intent. The United States did not use herbicides in Vietnam with the specific intent to destroy any group. Nor were those herbicides designed to harm individuals or to starve a whole population into submission or death. The herbicides were primarily applied to plants in order to protect troops against ambush, not to destroy a people.
C. Treaties and Other International Instruments
1. 1907 Hague Convention IV
Plaintiffs rely upon article 23 of the Regulations Respecting the Laws and Customs of War on Land, the Annex to the 1907 Hague Convention IV Respecting the Laws and Customs of War on Land ("Hague Convention IV"). The United States signed the Hague Convention IV on October 18, 1907, and the Senate ratified it on March 10, 1908. Article 23 reads as follows:
In addition to the prohibitions provided by special Conventions, it is especially forbidden:
(a) To employ poison or poisoned weapons;
(b) To kill or wound treacherously individuals belonging to the hostile nation or army;
(c) To kill or wound an enemy who, having laid down his arms, or having no longer means of defence, has surrendered at discretion;
(d) To declare that no quarter will be given;
(e) To employ arms, projectiles, or material calculated to cause unnecessary suffering;
(f) To make improper use of a flag of truce, of the national flag, or of the military insignia and uniform of the enemy, as well as the distinctive badges of the Geneva Convention;
(g) To destroy or seize the enemy's property, unless such destruction or seizure be imperatively demanded by the necessities of war;
(h) To declare abolished, suspended, or inadmissible in a court of law the rights and actions of the nationals of the hostile party.
A belligerent is likewise forbidden to compel the nationals of the hostile party to take part in the operations of war directed against their own country, even if they were in the belligerent's service before the commencement of the war. *116 Convention (IV) Respecting the Laws and Customs of War on Land, Oct. 18, 1907, art. 23, 36 Stat. 2277, 2301-02 (emphasis added) [hereinafter Hague Convention IV]. The only provisions that may be construed as relevant are clauses (a) and (e).
The poisons referenced in clause (a) encompass those applied to specific instruments of warfare such as bullets or bayonets. They do not cover, and have never been interpreted as including, gases or spraying from the air. During World War I both the Germans and the French used poison gas on the assumption that the Hague Convention IV did not apply. The United States was also prepared at the time to use poison gas, but the Armistice made that unnecessary.
Hague Convention IV does not define the phrase "poison or poisoned weapons." The International Court of Justice ("ICJ") has noted that "different interpretations exist" as to what this undefined phrase means. See Advisory Opinion No. 95, Legality of the Threat or Use of Nuclear Weapons, 1996 I.C.J. 226, at 248 (July 8). State practice under the treaty indicates that the proscriptions of "poison or poisoned weapons" did not apply even to chemical gas weapons designed and intended to be lethal, such as shells containing chlorine or mustard gas. See Anderson Decl. ¶ 39 (explaining that the Germans, British and French extensively employed such weapons in the years immediately following adoption of Hague Convention IV); Reisman Op. at 30 ("State practice suggests that the 1907 Hague Convention was not intended to apply to poisonous gases.").
The belligerents in World War I, all of whom had ratified Hague Convention IV, thought it necessary later to negotiate a special treaty, the 1925 Geneva Protocol, to outlaw lethal chemical gas weapons. Anderson Decl. ¶ 39; Reisman Op. at 32. In 1960 a classic treatise on the international law of war and a leading writer on the subject convincingly concluded that Article 23's 1907 prohibition of poison and poisoned weapons did not apply to poisonous gases. See Joseph Burns Kelly, Gas Warfare in International Law, 9 MIL. L.REV. 1, 44 (1960); Reisman Op. at 29-30 (citing MYRES S. MCDOUGAL & FLORENTINO P. FELICIANO, LAW AND MINIMUM WORLD PUBLIC ORDER 619 (1960, repr.1994)).
The United States Army field manual in force throughout the Vietnam War concluded that specific weapons, including chemical weapons, were to be addressed by specific treaties and not by general prohibitions such as Article 23. Anderson Decl. ¶ 38. Inasmuch as Hague Convention IV's ban on "poison or poisoned weapons" does not apply to chemical gas weapons designed and intended to kill humans, a fortiori it does not prohibit military use of herbicides designed and intended as defoliants. See also supra Part X for traditional abhorrence of poison tipped or impregnated munitions used in war, and supra Part IV.B.3. for definition of poison.
Even if the terms "poison or poisoned weapons" could be construed more broadly to encompass poisonous gases, this broader definition still would not reach herbicides, regardless of whether they have collateral harmful consequences for humans. Rather, this proscription would reach only those materials that were intentionally designed "to inflict poisoning as a means of combat." STEFAN OETER, Methods and Means of Combat, in THE HANDBOOK OF HUMANITARIAN LAW IN ARMED CONFLICTS 105, 149 (Dieter Fleck ed., 1995). "If the asphyxiating or poisoning effect is merely a side-effect of a physical mechanism intended principally to cause totally different results ..., then the relevant munition does not constitute a `poisonous gas.'" Id. Thus, chemicals designed and used as herbicides *117 to kill plants, as defendants' products were designed and used during the Vietnam War, are not outlawed as "poison or poisonous weapons" under even the broadest interpretation of that phrase.
Under Sosa, the imprecise scope of the Hague Convention IV's prohibition on the use of "poison or poisoned weapons," and the uncertainty as to whether that prohibition even applies to lethal chemical weapons designed to kill human beings, is fatal to any claim that the Convention sets forth a sufficiently definite prohibition on military use of herbicides that could be enforced in United States courts. By contrast, the "18th-century paradigms" the Court identified in Sosa, 124 S.Ct. at 2755-57, 2761-62, were offenses specified in great detail by the treatise writers of the day. Blackstone, whose treatise the Court cites, id. at 2756, defined piracy as, among other things: "any commander ... betraying his trust, and running away with any ship, boat, ordnance, ammunition, or goods; or yielding them up voluntarily to a pirate; ... or any person confining the commander of a vessel, to hinder him from fighting in the defense of his ship, or to cause a revolt on board;" or "trading with known pirates, or furnishing them with stores or ammunition, or fitting out any vessel for that purpose." 4 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 72 (1769). Unlike the "18th century paradigms," Hague Convention IV's proscription of "poison or poisoned weapons" does not establish a specific and definite prohibition on military use of herbicides, and thus they cannot be the source of an actionable norm prohibiting such use.
Plaintiffs argue that herbicides are per se proscribed materials that are "calculated to cause unnecessary suffering." See Hague Convention IV, art. 23(e), 36 Stat. at 2302. The prohibition has long been understood to apply to weapons that cause unnecessary or superfluous injury to an already incapacitated combatant. Anderson Decl. ¶ 47 (citing, as an example, bullets treated with an agent that inflames a wound). It does not apply to lethal weapons that collaterally cause injury or suffering in order to achieve an appropriate (in war) military objective of incapacitating enemy troops, let alone to herbicides that may cause harm to humans beings as the side-effect of an application intended to destroy plants. As a leading treatise explains, Article 23's prohibition of weapons "calculated to cause unnecessary suffering" is:
too vague to produce by itself a great many practical results. Apart from cases in which states expressly agree to forbid employment of a specified weapon ..., states have not been known to lightly decide unilaterally to discard a weapon, once introduced into their arsenals, because it is considered to cause unnecessary suffering.
FRITS KALSHOVEN & LIESBETH ZEGVELD, CONSTRAINTS ON THE WAGING OF WAR: AN INTRODUCTION TO INTERNATIONAL HUMANITARIAN LAW 41-42 (3d ed.2001), http:// www.icrc.org/Web/Eng/ siteeng0.nsf/htmlall/p0793/$File/ ICRC_002_0793.PDF!Open. This norm is too indeterminate to be actionable under Sosa.
Clause (e) is not applicable because the herbicides were not "calculated to cause unnecessary suffering." The herbicide spraying was in the course of armed activities deemed necessary by the United States to protect American armed forces and those of its allies. It was not designed to harm people or land independently as a punishment or to inflict hurt viciously and consciously.
The Reisman opinion submitted in support of defendants' motion to dismiss is sound. He wrote:
*118 Some scholars, such as [Wil D.] Verewey, [RIOT CONTROL AGENTS AND HERBICIDES IN WAR[;] THEIR HUMANITARIAN, TOXICOLOGICAL, ECOLOGICAL, MILITARY, POLEMOLOGICAL, AND LEGAL ASPECTS (1977),] and the collective authors of the Stockholm International Peace Research Institute, [THE PROBLEM OF CHEMICAL AND BIOLOGICAL WARFARE, VOL. III: CBW AND THE LAW OF WAR (1973),], have labored mightily to establish that Article 23(a) of the Hague Conventions related to herbicides. On all the evidence, this is, in my opinion, incorrect. Herbicides were unknown at the time of the drafting of the provisions under discussion and, for that reason, could not have been an explicit target of the provision.
Reisman Op. at 29; see also R.R. Baxter & Thomas Buergenthal, Legal Aspects of the Geneva Protocol of 1925, 64 AM. J. INT'L L. 853, 853-54 (1970) (speaking in 1969 of ratification of the 1925 Geneva Protocol, that "[i]t is less clear to what extent [the customary international law prohibition of the use in war of lethal chemical and biological weapons]... outlaws the use of ... herbicides").
Hague Convention IV does not provide a basis for recognizing a common law cause of action against defendants for manufacturing and selling herbicides for military use during the Vietnam War. The Convention did not outlaw the use of herbicides in Vietnam.
2. 1925 Geneva Protocol
Plaintiffs rely upon the Prohibition of the Use in War of Asphyxiating, Poisonous or Other Gases, and of Bacteriological Methods of Warfare, June 17, 1925, 26 U.S.T. 571 ("1925 Geneva Protocol"). The 1925 Geneva Protocol entered into force for the United States on April 10, 1975. See also infra Part XII discussing events concurrent with ratification of the 1925 Geneva Protocol. The ratification document reads as follows:

BY THE PRESIDENT OF THE UNITED STATES OF AMERICA

A PROCLAMATION
CONSIDERING THAT:
The Protocol for the Prohibition of the Use in War of Asphyxiating, Poisonous or Other Gases, and of Bacteriological Methods of Warfare was signed at Geneva on June 17, 1925, the certified text of which, in the English and French languages, is hereto annexed;
The Senate of the United States of America by its resolution of December 16, 1974, two-thirds of the Senators present concurring therein, gave its advice and consent to ratification of the Protocol subject to a reservation as follows:
"That the said Protocol shall cease to be binding on the Government of the United States with respect to the use in war of asphyxiating, poisonous or other gases, and of all analogous liquids, materials, or devices, in regard to an enemy State if such State or any of its allies fails to respect the prohibitions laid down in the Protocol.";
The President of the United States of America on January 22, 1975, ratified the Protocol, subject to the aforesaid reservation, in pursuance of the advice and consent of the Senate, and the United States of America deposited its instrument of ratification with the Government of the French Republic on April 10, 1975;
Pursuant to the provisions of the Protocol, the Protocol entered into force for the United States of America on April 10, 1975;
*119 NOW, THEREFORE, I, Gerald R. Ford, President of the United States of America, proclaim and make public the Protocol, to the end that it shall be observed and fulfilled with good faith on and after April 10, 1975, by the United States of America and by the citizens of the United States of America and all other persons subject to the jurisdiction thereof.
IN TESTIMONY WHEREOF, I have signed this proclamation and caused the Seal of the United States of America to be affixed.
DONE at the city of Washington this twenty-ninth day of April in the year of our Lord one thousand nine hundred seventy-five and of the independence of the United States of America the one hundred ninety-ninth.
. . . .

PROTOCOL

for the Prohibition of the Use in War of Asphyxiating, Poisonous or Other

Gases, and of Bacteriological Methods of Warfare
THE UNDERSIGNED PLENIPOTENTIARIES, in the name of their respective Governments:
WHEREAS the use in war of asphyxiating, poisonous or other gases, and of all analogous liquids, materials or devices, has been justly condemned by the general opinion of the civilized world; and
WHEREAS the prohibition of such use has been declared in Treaties to which the majority of Powers of the world are Parties; and
TO THE END that this prohibition shall be universally accepted as a part of International Law, binding alike the conscience and the practice of nations;
DECLARE:
That the High Contracting Parties, so far as they are not already Parties to Treaties prohibiting such use, accept this prohibition, agree to extend this prohibition to the use of bacteriological methods of warfare and agree to be bound as between themselves according to the terms of this declaration.
Prohibition of the Use in War of Asphyxiating, Poisonous or Other Gases, and of Bacteriological Methods of Warfare, June 17, 1925, 26 U.S.T. 571, 571-75 (emphasis added). Neither the ratification document nor the protocol references herbicides even though President Ford by separate almost simultaneous executive order included herbicide limitations. See infra Part XII.A.
The 1925 Geneva Protocol prohibits "the use in war of asphyxiating, poisonous or other gases, and of all analogous liquids, material or devices." 26 U.S.T. at 575. This proscription  whether based on the protocol or the customary international law that hypothetically could have developed from it  did not prohibit military use of herbicides at the time of the Vietnam War. See supra Part VIII.G. on non-retroactivity. Even if it arguably had, the proscription would not be sufficiently "definite" and "universal" to be among the limited set of temporally operative international legal norms that are actionable under Sosa.
As leading scholars have pointed out, the 1925 Geneva Protocol's prohibition on use of "asphyxiating, poisonous or other gases" and "analogous liquids, materials or devices" leaves "considerable room for divergent interpretations." DOCUMENTS ON THE LAWS OF WAR 155 (Adam Roberts & Richard Guelff, eds., 3d ed.2004 reprint). See generally Jill M. Sheldon, Note, Nuclear Weapons and the Laws of War: Does Customary International Law Prohibit the Use of Nuclear Weapons in All *120 Circumstances?, 20 FORDHAM INT'L L.J. 181, 220-21 (1996) (stating that the 1925 Geneva Protocol "provoked controversy because the drafters did not specify the chemical, biological, or other poisonous gases subject to the protocol's prohibitions. Based on the language banning `other' gases, some states claimed that it was unclear whether the Geneva Gas Protocol prohibited tear gas, other non-lethal gases, or herbicides." (footnote omitted) (emphasis added)).
The 1925 Geneva Protocol has given rise to a customary international legal prohibition on first use of lethal gas weapons, such as those used during World War I. Anderson Decl. ¶ 39. At the time of the Vietnam War, however, this prohibition was, for the United States  a non-party  merely a rule predicated on reciprocity, not on customary international law. See Reisman Op. at 35-36. It did not, in any event, encompass military use of herbicides. See Anderson Decl. ¶ 49. There is "no indication that the 1925 [Geneva] Protocol was designed to encompass herbicides." See Reisman Op. at 34. The "travaux preparatoires are silent on this exact point." Id.; see also Anderson Decl. ¶ 54. The French text of the Protocol, which is as authentic as the English text, supports the restrictive view that the prohibition extended only to gases deployed for their asphyxiating or toxic effects on man, not to herbicides designed to affect plants, that may have unintended harmful side-effects on people. Reisman Op. at 34.
National practice supports this restrictive reading. The British military used herbicides chemically similar to Agent Orange in the 1950s during the Malayan Emergency, to deprive enemy guerrilla fighters of their crops. See WILLIAM A. BUCKINGHAM, JR., OPERATION RANCH HAND: THE AIR FORCE AND HERBICIDES IN SOUTHEAST ASIA 1961-1971, at 4-5 (1982), http://www.airforcehistory.hq. af.mil/Publications/fulltext/ operation_ranch_hand.pdf. The United States considered British precedent in deciding that the use of defoliants was a legally accepted tactic of war. Secretary of State Dean Rusk advised President John F. Kennedy that herbicide use in Vietnam would be lawful, because "[p]recedent has been established by the British ... in Malaya in their use of helicopters for destroying crops by chemical spraying." Memorandum of Secretary of State Dean Rusk to President John F. Kennedy (Nov. 24, 1961), reprinted in 1 FOREIGN RELATIONS OF THE UNITED STATES, 1961-1963, VIETNAM 1961, at 663, 663 (1988), available at http://www.state.gov/www/ about_state/history/ vol_i_1961/z.html.
As the Court of Appeals for the Second Circuit explained, "it is highly unlikely that a purported principle of customary international law in direct conflict with the recognized practices and customs of the United States and/or other prominent players in the community of States could be deemed to qualify as a bona fide customary international law principle." United States v. Yousef, 327 F.3d 56, 92 n. 25 (2d Cir.2003), cert. denied, 540 U.S. 933, 124 S.Ct. 353, 157 L.Ed.2d 241 (2003); see also Reisman Op. at 36 (opining that United States' use of herbicides during the Vietnam War "restricted the transformation of the 1925 [Geneva] Protocol into customary international law"); cf. Flores v. S. Peru Copper Corp., 343 F.3d 140, 164 (2d Cir.2003) (concluding that the American Convention on Human Rights could not be the source of a legally binding norm where the United States, a primary nation in the region, declined to ratify it).
The numerous reservations made by many nations in acceding to the treaty demonstrate that the Protocol's prohibitions, whatever their precise scope, were *121 not compelled by customary international law. Reisman Op. at 35-37. As of the time of the Vietnam War, nineteen ratifying states considered themselves bound only in relation to other ratifying states, and declared that they would not be bound if any enemy state failed to respect the prohibition. Id. at 35-36. Thus, whatever the scope of the norm that ultimately developed post-1975 from the 1925 Geneva Protocol, during the Vietnam War it applied only to first use of proscribed gases as a matter of reciprocity, not international legal obligation. Id.
The 1925 Geneva Protocol provision was designed to outlaw poison gases such as mustard gas used in World War I. It cannot be interpreted to encompass the use of herbicides which were not then a known weapon and were far different in their purpose and effect. The gases outlawed in 1925 had an almost immediate disabling effect on those exposed and were intended to disable or kill human beings. In contrast, herbicides were designed to strip plants of leaves or kill them.
3. 1945 London Charter
Plaintiffs rely on the Agreement for the Prosecution and Punishment of the Major War Criminals of the European Axis and Charter of the International Military Tribunal, Aug. 8, 1945, 59 Stat. 1544, 82 U.N.T.S. 280 ("1945 London Charter"), that was signed by the United States and its allies. It provided for the establishment of an International Military Tribunal to try Nazi war criminals. It is not the source of any norm that outlawed use of herbicides in the Vietnam War. The 1945 London Charter included broad mandates to treat as a war crime the "wanton destruction of cities, towns or villages, or devastation not justified by military necessity." Charter of the International Military Tribunal, Aug. 8, 1945, art. 6(b), 59 Stat. 1546, 1547, 82 U.N.T.S. 280 (emphasis added). Like the 1949 Geneva Conventions, none of the Charter's provisions proscribed use of any particular weapons. To the contrary, the concept of "military necessity" applies only to the use of legal weapons; weapons that are per se illegal cannot be used at all and claims of military necessity cannot justify their use. Herbicide use was not illegal; it had not even been widely considered for use in war up to that time.
The central provisions of the 1945 London Charter relevant to the instant case are as follows:
II. Jurisdiction and General Principles
Article 6.
The Tribunal established by the Agreement referred to in Article 1 hereof for the trial and punishment of the major war criminals of the European Axis countries shall have the power to try and punish persons who, acting in the interests of the European Axis countries, whether as individuals or as members of organizations, committed any of the following crimes.
The following acts, or any of them, are crimes coming within the jurisdiction of the Tribunal for which there shall be individual responsibility:
(a) CRIMES AGAINST PEACE: namely, planning, preparation, initiation or waging of a war of aggression, or a war in violation of international treaties, agreements or assurances, or participation in a common plan or conspiracy for the accomplishment of any of the foregoing;
(b) WAR CRIMES: violation of the laws or customs of war. Such violations shall include, but not be limited to, murder, ill-treatment or deportation to slave labor or for any other *122 purpose of civilian population of or in occupied territory, murder or ill-treatment of prisoners of war or persons on the seas, killing of hostages, plunder of public or private property, wanton destruction of cities, towns or villages, or devastation not justified by military necessity;
(C) CRIMES AGAINST HUMANITY: namely, murder, extermination, enslavement, deportation, and other inhumane acts committed against any civilian population, before or during the war; or persecutions on political, racial or religious grounds in execution of or in connection with any crime within the jurisdiction of the Tribunal, whether or not in violation of the domestic law of the country where perpetrated.
Leaders, organizers, instigators and accomplices participating in the formulation or execution of a common plan or conspiracy to commit any of the foregoing crimes are responsible for all acts performed by any persons in execution of such plan.
Article 7.
The official position of defendants, whether as Heads of State or responsible officials in Government Departments, shall not be considered as freeing them from responsibility or mitigating punishment.
Article 8.
The fact that the Defendant acted pursuant to order of his Government or of a superior shall not free him from responsibility, but may be considered in mitigation of punishment if the Tribunal determines that justice so requires.
Charter of the International Military Tribunal, Aug. 8, 1945, arts. 6-8, 59 Stat. 1546, 1547 (emphasis added). None of these provisions can be construed to cover use of herbicides in Vietnam.
4. United Nations Charter
Plaintiffs rely upon the United Nations Charter. It establishes the structure of the United Nations. It is not the source of a binding norm prohibiting use of herbicides. See Tel-Oren v. Libyan Arab Republic, 726 F.2d 774, 809 (D.C.Cir.1984) (per curiam) (Bork, J., concurring) (noting that Articles 1 and 2 of the U.N. Charter are not self-executing and, moreover, "contain general `purposes and principles,' some of which state mere aspirations and none of which can sensibly be thought to have been intended to be judicially enforceable"). Nor is the United Nations Charter self-executing. E.g., Flores v. S. Peru Copper Corp., 343 F.3d 140, 157 n. 24 (2d Cir.2003) (noting that the United Nations Charter is not self-executing and citing cases). There is nothing in the United Nations Charter outlawing the use of herbicides in Vietnam.
5. 1949 Geneva Conventions
The four 1949 Geneva Conventions address a host of humanitarian concerns arising during war, such as the treatment of children, women, the sick and wounded; the protection of hospitals; evacuations of civilian populations; the treatment of refugees; the protection of relief agencies; and prevention of forced labor. None of these provisions address the type of weapons that may be used in warfare, let alone military use of herbicides. See Flores, 343 F.3d at 165 (stating that a convention addressing environmental pollution could not be the source of a binding norm because it did "not attempt to set [pollution] parameters or regulate it, let alone to proscribe it" (emphasis added)).
Plaintiffs rely upon the 1949 Geneva Convention to Protect Civilian Persons in Time of War. It entered into force for the United State on February 2, 1956. It *123 bears no relation to use of herbicides during the Vietnam War. The Convention was designed to protect civilians from harsh acts such as mutilation during and following war. Article 3, its central provision, reads:
In the case of armed conflict not of an international character occurring in the territory of one of the High Contracting Parties, each Party to the conflict shall be bound to apply, as a minimum, the following provisions:
(1) Persons taking no active part in the hostilities, including members of armed forces who have laid down their arms and those placed hors de combat by sickness, wounds, detention, or any other cause, shall in all circumstances be treated humanely, without any adverse distinction founded on race, colour, religion or faith, sex, birth or wealth, or any other similar criteria.
To this end, the following acts are and shall remain prohibited at any time and in any place whatsoever with respect to the above-mentioned persons:
(a) Violence to life and person, in particular murder of all kinds, mutilation, cruel treatment and torture;
(b) taking of hostages;
(c) outrages upon personal dignity, in particular humiliating and degrading treatment;
(d) the passing of sentences and the carrying out of executions without previous judgment pronounced by a regularly constituted court, affording all the judicial guarantees which are recognized as indispensable by civilized peoples.
(2) The wounded and sick shall be collected and cared for.
An impartial humanitarian body, such as the International Committee of the Red Cross, may offer its services to the Parties to the conflict.
Geneva Convention Relative to the Protection of Civilian Persons in Time of War, Aug. 12, 1949, art. 3, 6 U.S.T. 3516, 3518, 3520, 75 U.N.T.S. 287, 288, 290 (entered into force Oct. 21, 1950) (emphasis added).
The unfortunate indirect effect of shelling or other specifically non-outlawed activities of armed forces operating within rational and proportional limits in offensive or defensive action against the enemy is a risk of war not outlawed by this convention. See id. arts. 13-19 (addressing protection of populations against certain consequences of war). The only reservation the United States made upon ratifying the Convention addressed the death penalty; it is not relevant here.
The 1949 Geneva Conventions'"very general" proscriptions, see Huynh Thi Anh v. Levi, 586 F.2d 625, 629 (6th Cir.1978), are not the source of a norm that bars military use of herbicides with "a specificity comparable to the features of the 18th century paradigms" of piracy, violations of safe conducts, and infringements of the rights of ambassadors  all of which were clearly defined offenses against the law of nations as described by leading treatise writers of the time. See Sosa, 542 U.S. at ___-___, 124 S.Ct. at 2755-57; see also id. at 2761-62.
6. 1969 United Nations General Assembly Resolution
Plaintiffs rely upon a 1969 resolution of the General Assembly of the United Nation. It condemned the use of herbicides in Vietnam, reading:
Question of Chemical and Bacteriological (Biological) Weapons
A
The General Assembly
Considering that chemical and biological methods of warfare have always been *124 viewed with horror and been justly condemned by the international community,
Considering that these methods of warfare are inherently reprehensible because their effects are often uncontrolled and unpredictable and may be injurious without distinction to combatants and non-combatants, and because any use of such methods would entail a serious risk of escalation,
Recalling that successive international instruments have prohibited or sought to prevent the use of such methods of warfare,
Noting specifically in this regard that:
(a) The majority of States then in existence adhered to the Protocol for the Prohibition of the Use in War of Asphyxiating, Poisonous or Other Gases, and of Bacteriological Methods of Warfare, signed at Geneva on 17 June 1925,
(b) Since then, further States have become parties to that Protocol,
(c) Still other States have declared that they will abide by its principles and objectives,
(d) These principles and objectives have commanded broad respect in the practice of States,
(e) The General Assembly, without any dissenting vote, has called for the strict observance by all States of the principles and objectives of the Geneva Protocol,
Recognizing therefore, in the light of all the above circumstances, that the Geneva Protocol embodies the generally recognized rules of international law prohibiting the use in international armed conflicts of all biological and chemical methods of warfare, regardless of any technical developments,
Mindful of the report of the Secretary-General, prepared with the assistance of the Group of Consultant Experts, appointed by him under General Assembly resolution 2454 A (XXIII) of 20 December 1968, and entitled Chemical and Bacteriological (Biological) Weapons and the Effects of Their Possible Use.
Considering that this report and the foreword to it by the Secretary-General add further urgency for an affirmation of these rules and for dispelling, for the future, any uncertainty as to their scope and, by such affirmation, to assure the effectiveness of the rules and to enable all States to demonstrate their determination to comply with them.
Declares as contrary to the generally recognized rules of international law, as embodied in the Protocol for the Prohibition of the Use in War of Asphyxiating, Poisonous or Other Gases, and of Bacteriological Methods of Warfare, signed at Geneva on 17 June 1925, the use in international armed conflicts of:
(a) Any chemical agents of warfare  chemical substances whether gaseous, liquid or solid  which might be employed because of their direct toxic effects on man, animals or plants;
(b) Any biological agents of warfare  living organisms, whatever their nature, or infective material derived from them  which are intended to cause disease or death in many, animals or plants, and which depend for their effects on their ability to multiply in the person, animal or plant attacked.
G.A. Res. 2603-A, U.N. GAOR, 24th Sess., 1836th plen. mtg. at 16 (1969) (emphasis added).
Plaintiffs argue that Resolution 2603-A "evidences the opinion of a great majority of nations that the use in war of chemicals of any kind because of their toxicity to plants was a violation of customary international law at the time." Pls.' Mem. of Law in Opp'n. to Defs.' Mot. at 147.
*125 General Assembly Resolution 2603-A does not provide a basis for plaintiffs' causes of action. The General Assembly is not a law-making body, and  with narrow, defined exceptions not relevant here  is granted only recommendatory powers by the United Nations Charter. See U.N. CHARTER arts. 10-11; see also THE CHARTER OF THE UNITED NATIONS: A COMMENTARY 269 (Bruno Simma ed., 2d ed.2002). As the Court of Appeals for the Second Circuit has explained, "General Assembly resolutions and declarations do not have the power to bind member States because the member States specifically denied the General Assembly that power after extensively considering the issue...." Flores v. S. Peru Copper Corp. 343 F.3d 140, 165 (2d Cir.2003).
This General Assembly resolution did not constitute a statement of applicable international law, nor was it binding on the United States. But cf. BASIC DOCUMENTS ON HUMAN RIGHTS 1 (Ian Brownlie, ed., 3d ed.1998 reprint) ("The [United Nations], and especially the General Assembly and the Economic and Social Council, has given impetus to the development of standards concerning human rights."). It is the Security Council, not the General Assembly, that holds whatever powers the United Nations has to make decisions that are binding on the United States. The General Assembly's resolution on a subject such as the present one is, while important as an indication of the developing international law, precatory only. See, e.g., U.N. CHARTER arts. 9-22.
The General Assembly's limited powers with respect to the formulation of international law are illustrated by the following United Nations Charter provisions:

Article 10
The General Assembly may discuss any questions or any matters within the scope of the present Charter or relating to the powers and functions of any organs provided for in the present Charter, and, except as provided by Article 12, may make recommendations to the Members of the United Nations or to the Security Council or to both on any such questions or matters.

Article 11
1. The General Assembly may consider the general principles of cooperation in the maintenance of international peace and security, including the principles Governing disarmament and the regulation of armaments, and may make recommendations with regard to such principles to the Members or to the Security Council or to both.
2. The General Assembly may discuss any questions relating to the maintenance of international peace and security brought before it by any Member of the United Nations or by the Security Council, or by a state which is not a Member of the United Nations in accordance with Article 35, paragraph 2, and, except as provided in Article 12, may make recommendations with regard to any such questions to the state or states concerned or to the Security Council or to both. Any such question on which action is necessary shall be referred to the Security Council by the General Assembly either before or after discussion.
3. The General Assembly may call the attention of the Security Council to situations which are likely to endanger international peace and security.
U.N. CHARTER arts. 10-11 (emphasis added).
By contrast, the Security Council exercises both legislative and executive powers. As Article 24 and 25 of the Charter put the matter:

*126 Article 24
1. In order to ensure prompt and effective action by the United Nations, its Members confer on the Security Council primary responsibility for the maintenance of international peace and security, and agree that in carrying out its duties under this responsibility the Security Council acts on their behalf.
2. In discharging these duties the Security Council shall act in accordance with the Purposes and Principles of the United Nations. The specific powers granted to the Security Council for the discharge of these duties are laid down in Chapters VI, VII, VIII, and XII.
3. The Security Council shall submit annual and, when necessary, special reports to the General Assembly for its consideration.

Article 25
The Members of the United Nations agree to accept and carry out the decisions of the Security Council in accordance with the present Charter.
U.N. CHARTER arts. 24-25 (emphasis added). Whether or not the Security Council would have considered or would have had the power to consider adoption of Resolution 2603-A, given the veto power of the United States in the Security Council, it can be stated with some assurance that the Security Council would not have taken the same position as the General Assembly had the resolution been presented to it.
A General Assembly resolution, even though it is not binding, Flores, 343 F.3d at 166-67, may provide some evidence of customary international law when it is unanimous (or nearly so) and reflective of actual state practice. General Assembly Resolution 2603-A was neither near unanimous nor a reflection of practice. The resolution was adopted by a vote of 80-3, with thirty-six countries abstaining. Anderson Decl. ¶ 55. Of the eighty nations that voted in favor of the resolution, only forty-one were parties to the 1925 Protocol. Anderson Decl. ¶ 57. The United States, one of the world's largest military powers, voted against the resolution, as did Australia (a U.S. military ally in Vietnam) and Portugal. Anderson Decl. ¶ 55. By abstaining, approximately one-third of the nations addressing the question in effect refused to recognize the existence of a treaty or customary international legal prohibition on military use of herbicides. Anderson Decl. ¶ 57. It is possible, of course, that, apart from the merits, the abstainers had political reasons for not contesting the position of the United States, but, nevertheless, their failure to support the resolution drains it even of precatory force.
Abstaining states included France, the United Kingdom, Denmark, Norway, the Netherlands, and Turkey (almost all the leading NATO allies of the United States), as well as Japan, China, Thailand, Malaysia, Singapore, and Laos (leading Asian countries as well as jungle-covered countries that might expect to be affected by herbicides in war). Anderson Decl. ¶ 57. The fact that a third of all voting nations did not then recognize a prohibition on military use of herbicides suggests that there was no such international legal norm during the Vietnam War. See also Reisman Op. at 51 ("[I]t is clear that, although some states spoke strongly against the use of herbicides, there was no consensus."); cf. Texaco Overseas Petroleum Co. v. Libyan Arab Republic, 17 I.L.M. 1, 29 (1978) (finding General Assembly resolution was not evidence of international law in light of abstentions and negative votes); THE LAWS OF ARMED CONFLICTS 125 (Dietrich Schindler & Jiri Tomans, eds., 3d ed.1988) (suggesting that the fact that resolution 2603-A is not recited in later General Assembly *127 resolutions regarding chemical and biological weapons indicates "a certain reserve ... in regard to it").
The General Assembly was not expressing generally accepted international law in its 1969 resolution on use of herbicides. Major military powers and more than forty other nations either opposed the resolution or abstained. It cannot be viewed as a statement of consensus.
7. Environmental Law
Plaintiffs rely upon international environmental law norms. They cite no international convention or instrument that solely and specifically addresses environmental law relevant to the legality of herbicide use during war up to 1975. Nonetheless, it is useful to examine treaties that became effective post-1975 to assess whether a rule that outlawed the use of herbicides in Vietnam may have come into existence prior to that time.
No treaty or custom affecting environmental protection created a rule effective before 1975 making illegal the use of herbicides as used in Vietnam. Cf. RICHARD J. LAZARUS, THE MAKING OF ENVIRONMENTAL LAW 234 (2004) (indicating that "complex multinational arrangements and understandings [are] necessary for the next generation of international environmental law"). Limited collateral harm to the environment could be justified by the need to provide appropriate defense to soldiers at war. Cf., e.g., Andrew D. McClintock, Comment, The Law of War: Coalition Attacks on Iraqi Chemical and Biological Weapon Storage and Production Facilities, 7 EMORY INT'L L.REV. 633, 682 (1993) ("[A] commander would not be expected to sacrifice a soldier to save a tree." (internal quotation marks omitted)). International environmental law did not bar the use of herbicides in Vietnam.
Standards were just beginning to evolve in 1975. See, e.g., Frank P. Grad, Article 12  Right to Health, in U.S. RATIFICATION OF THE INTERNATIONAL COVENANTS ON HUMAN RIGHTS 206, 217-35 (Hurst Hannum & Dana D. Fischer, eds., 1993) (discussing environmental protection and hygiene); John Alan Cohan, Modes of Warfare and Evolving Standards of Environmental Protection Under the International Law of War, 15 FL. J. INT'L L. 481 (2003); Florencio J. Yuzon, Deliberate Environmental Modification Through the Use of Chemical and Biological Weapons; "Greening" the International Laws of Armed Conflict to Establish an Environmentally Protective Regime, 11 AM. U.J. INT'L L. & POL'Y 793 (1996). The United Nations Conference on the Human Environment held at Stockholm in June, 1972 did foreshadow the 1977 convention; it dealt with world-wide environmental problems in a much broader context than war. It was a warning and planning document rather than a ruling on international law. See Report of the U.N. Conference on the Human Environment, June 5-16, 1972, U.N. Doc. A/CONF. 48/14 and Corr. 1 (1972).
There has been an increasing emphasis on environmental effects of national policies as reflected in the introductory note to the Law of Environment chapter in the Restatement (Third) of the Foreign Relations Law of the United States. See also, e.g., James C. Duncan, A Primer on the Employment of Non-Lethal Weapons, 45 NAVAL L.REV. 1 (1998); Beth Gammie, Human Rights Implications of the Export of Banned Pesticides, 25 SETON HALL L.REV. 558 (1994); Aaron Schwabach, Ecocide and Genocide in Iraq: International Law, the Marsh Arabs, and Environmental Damage in Non-International Conflicts, 15 COLO. J. INT'L ENVTL. L. & POL'Y 1 (2004); cf. RICHARD J. LAZARUS, THE MAKING OF ENVIRONMENTAL LAW 145 (2004) (stating *128 that there were 215 environmental treaties and about one thousand international environmental agreements by 1999).
The introductory note to the Law of the Environment chapter of Restatement (Third) of Foreign Relations Law of the United States primarily reflects the situation post-1975. It does not support the imposition of civil liability for the use of herbicides in Vietnam prior to 1975. In part it reads:
Since the Second World War, the growth of population, the spread of industrialization, and the increase in automobile, air, and maritime traffic have led to a great increase in pollution of land, air, and water. It soon became obvious that unilateral action by states to control pollution was not sufficient, and that international cooperation and regulation to protect the environment were necessary. Strong impetus to the development of international environmental law was given by the Conference on the Human Environment, held in Stockholm in 1972. That Conference adopted the Stockholm Declaration on the Human Environment and an Action Plan....
This Part addresses primarily transfrontier and marine pollution....
Environmental harm may be caused by activities other than pollution: a dam may cause erosion, or irrigation may increase the salinity of a river. Other environmental problems of international concern include the need to improve habitat and human settlements; to protect archaeologic treasures, cultural monuments, nature sanctuaries, endangered fauna and flora, and migratory birds; to lessen the consequences of deforestation, overfishing, and weather modification. Where activities in one state cause environmental injuries in another state, the principles of this Part generally apply.
Sources of environmental law. The principles discussed in this Part are rooted in customary international law. They originated in rules relating to the responsibility of a state for injuries caused to another state or to its property, or to persons within another state's territory or their property. The International Court of Justice has noted that one of the "general and well-recognized principles" of international law is "every State's obligation not to allow knowingly its territory to be used for acts contrary to the rights of other States." The United Nations Survey of International Law[, published in 1948,] concluded that "[t]here has been general recognition of the rule that a State must not permit the use of its territory for purposes injurious to the interests of other States in a manner contrary to international law."
. . . .
In recent years many international agreements have dealt with regional transfrontier pollution. Important guidelines on several aspects of such problems have been adopted, by consensus, by the Organization for Economic Co-operation and Development (OECD).
Marine pollution, International law has established a special regime for marine pollution because of the interdependent character of ocean waters (and air) and the cumulative effect of acts of pollution....
In addition to the provisions in the Law of the Sea Convention, there are numerous international conventions on the protection of the marine environment, both global and regional (see § 603, Reporters' Notes 2-5, and § 604, Reporters' Note 1), and several bilateral agreements (see § 604, Reporters' Note 1).
United States law. International aspects of environmental problems, especially *129 of marine pollution, have been the subject of United States legislation. See, e.g., the Acts relating, respectively, to National Environmental Policy, Clean Air, Federal Water Pollution Control, Toxic Substances Control, Oil Pollution, Ocean Dumping, Deepwater Ports, Rivers and Harbors, Coastal Zone Management, Outer Continental Shelf Lands, Submerged Lands, Fishery Conservation and Management, Deep Seabed Hard Mineral Resources, Resources Conservation and Recovery, Marine Mammals, Endangered Species, and Marine Sanctuaries.
2 RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES, introductory note to pt. VI, at 99-103 (footnotes omitted) (emphasis added).
None of the international environmental protection activities described in the Restatement's introductory note address the use of the herbicides to protect and prosecute military activity as in Vietnam. No environmental rights or international human rights fixed and known in international law was applicable up to 1975.
In the developing area of international environmental law, the United States and other nations have tended to treat protection of the environment on an ad-hoc, situation-by-situation and case-by-case basis. See, e.g., Matthew Preusch, Pollution Dispute in Northwest Straddles the Border, N.Y. TIMES, Mar. 20, 2004, at A8 (discussing reprise of environmental damage by Canadian Corporation to United States and award of damages); Trail Smelter Arbitral Tribunal (U.S.v.Can.) (Apr. 16, 1938), 33 AM J. INT'L L. 182 (1939) (addressing damage to U.S. state by Canadian smelter's fumes); Trail Smelter Arbitral Tribunal (U.S.v.Can.) (Mar. 11, 1941), 35 AM. J. INT'L L. 684 (1941). Such specific activities as protection of whales, endangered species and historical materials as well as protection against world-wide warming because of human activities furnish no basis for a general rule upon which plaintiffs can rely.
Treaties limiting environmental damage in warfare were not in effect during the period of 1961-1975. The United States did not violate any such provision, defendants could not be held liable under them and plaintiffs could not state a claim under them. The United States signed Protocol Additional to the Geneva Conventions of 12 August 1949, and Relating to the Protection of Victims of International Armed Conflict (Protocol I), June 8, 1977, 1125 U.N.T.S. 3 (entered into force Dec. 7, 1978), on December 12, 1977, but never ratified it. See United Nations Treaty Series  Documents Summary: Protocol I, http:// 157.150.195.4/ LibertyIMS::/sidyINug3UAB18PFTU3/ Cmd% 3D % 24% 24AB68y% 5FePB047 bF% 3BC3g8HS% 3D% 23kp % 3B6Vf% 3DE4Gq% 3BQ7ff% 3Dq% 3B6aDTa % 3D lJRJtd Sr% FHtx5hIZfrZhwG% 2DoO. While it might be interpreted to apply to future use of herbicides in the way they were used in Vietnam, it had no application prior to 1975.
Article 35(3) of Protocol I provides:
It is prohibited to employ methods or means of warfare which are intended or may be expected, to cause widespread, long-term and severe damage to the natural environment.
Protocol I, art. 35(3), 1125 U.N.T.S. at 21. Article 55(1) provides:
Care shall be taken in warfare to protect the natural environment against widespread, long-term and severe damage. This protection includes a prohibition of the use of methods or means of warfare which are intended to or may be expected to cause such damage to the natural *130 environment and thereby to prejudice the health and survival of the population.
Id. art. 55, 1125 U.N.T.S. at 28.
It was not until after the conclusion of the Vietnam War that Protocol I articulated for the first time an obligation to take care in warfare "to protect the natural environment against widespread, long-term and severe damages." Id. The explicit recognition only in the late 1970s that this was a new obligation (one which the United States has yet to acknowledge) adds some weight to the conclusion that military use of herbicides did not violate customary international law during the Vietnam War. Anderson Decl. ¶¶ 62-63. Treatise writers remain uncertain whether, even today, customary international law prohibits military use of herbicides when arguably appropriate as an aspect of proportional military force protection. Id. ¶ 60.
The International Court of Justice, the principal judicial organ of the United Nations, has suggested in an advisory opinion that articles 35(3) and 55 of Protocol I do not constitute customary international law that is binding on non-signatories. Legality of the Threat or Use of Nuclear Weapons, 1996 I.C.J. 226, 242 (July 8) ("[Article 35, paragraph 3, and article 55 of Protocol I] are powerful constraints for all the States having subscribed to these provisions." (emphasis added)).
The Convention on the Prohibition of Military or Any Other Hostile Use of Environmental Modification Techniques entered into force on October 5, 1978. Convention on the Prohibition of Military or Any Other Hostile Use of Environmental Modification Techniques, Dec. 10, 1976, 31 U.S.T. 333, 1108 U.N.T.S. 151. The United States did not sign it until May 18, 1977 and it did not come into force for the United States until January 17, 1980. Multilateral Treaties Deposited with the Secretary-General, available at http:// untreaty.un.org/ENGLISH/ bible/englishinternetbible/ partI/chapterXXVI/treaty1.asp. Article I prohibited "hostile use of environmental modification techniques having widespread long-lasting or severe effects as the means of destruction, damage or injury to any other party state." Neither Vietnam nor the United States was a party to the Convention when herbicide use stopped. The strong international condemnation of Iraq's fouling of the air by burning oil wells and of the sea by releasing oil during the 1991 Gulf War occurred after 1978.
D. Customary International Law
1. Generally
Plaintiffs rely upon customary international law to support their claims. It is unavailing.
Customary international law "results from a general and consistent practice of states followed by them from a sense of legal obligation." 1 RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES § 102(2); see also Statute of the International Court of Justice, June 26, 1945, art. 38(1), 59 Stat. 1055, 1060 (entered into force Oct. 24, 1945) (providing that international custom is "evidence of general practice accepted as law"); Flores v. S. Peru Copper Corp., 343 F.3d 140, 154 (2d Cir.2003) ("[I]n order for a principle to become part of customary international law, States must universally abide by it.").
In order for a practice of states to become customary international law, states must appear to follow the practice due to opinio juris, or a sense of legal obligation. 1 RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES § 102 cmt. c; see also Flores, 343 F.3d at 154 ("[A] principle is only incorporated *131 into customary international law if States accede to it out of a sense of legal obligation.... Practices adopted for moral or political reasons, but not out of a sense of legal obligation, do not give rise to rules of customary international law." (citations omitted)). A practice that states initially follow "as a matter of courtesy or habit" may later transform into a rule of customary international law if states generally come to believe that compliance with that practice is a legal obligation. 1 RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES § 102 cmt. c. Opinio juris may be inferred from acts or omissions, as well as from explicit evidence such as official statements. Id.
Customary international law is binding upon all states, even in the absence of a particular state's consent, but may be modified within a state by subsequent legislation or a treaty, provided that the customary international law was not a peremptory norm (jus cogens). Id. § 102 cmts. j, k; id. § 115(1)(a) ("An act of Congress supersedes an earlier rule of international law ... as law of the United States if the purpose of the act to supersede the earlier rule ... is clear or if the act and the earlier rule ... cannot be fairly reconciled."). A peremptory norm, which by definition permits no derogation, prevails over and invalidates any prior conflicting international agreements or other rules of international law, and "can be modified only by a subsequent norm of general international law having the same character." Vienna Convention on the Law of Treaties, May 23, 1969, art. 53, 1155 U.N.T.S. 331, 344 (entered into force Jan. 27, 1980); 1 RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES § 102 cmt. k.
A guide for determining proper sources of international law is the Statute of the International Court of Justice ("ICJ Statute"), to which the United States is a party. Flores, 343 F.3d at 140. Article 38(1) of the ICJ Statute reads:
The Court, whose function is to decide in accordance with international law such disputes as are submitted to it, shall apply:
(a) international conventions, whether general or particular, establishing rules expressly recognized by the contesting states;
(b) international custom, as evidence of a general practice accepted as law;
(c) the general principles of law recognized by civilized nations;
(d) subject to the provisions of Article 59, judicial decisions and the teachings of the most highly qualified publicists of the various nations, as subsidiary means for the determination of the rules of law.
Statute of the International Court of Justice, supra, art. 38(1), 59 Stat. at 1060. Article 59 provides that "[t]he decision of the [International] Court [of Justice] has no binding force except between the parties and in respect of that particular case." Id. art. 59.
Article 38(1) of the ICJ Statute corresponds to the sources of international law enumerated in section 102 of the Restatement (Third) of the Foreign Relations Law of the United States. Section 102 reads:
(1) A rule of international law is one that has been accepted as such by the international community of states
(a) in the form of customary law;
(b) by international agreement; or
(c) by derivation from general principles common to the major legal systems of the world.
(2) Customary international law results from a general and consistent practice *132 of states followed by them from a sense of legal obligation.
(3) International agreements create law for the states parties thereto and may lead to the creation of customary international law when such agreements are intended for adherence by states generally and are in fact widely accepted.
(4) General principles common to the major legal systems, even if not incorporated or reflected in customary law or international agreement, may be invoked as supplementary rules of international law where appropriate.
1 RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES § 102.
Section 701 of the Restatement indicates that the obligation to respect human rights may be reflected in a treaty, customary international law or "general principles of law common to the major legal systems of the world." It declares:
A state is obligated to respect the human rights of persons subject to its jurisdiction
(a) that it has undertaken to respect by international agreement;
(b) that states generally are bound to respect as a matter of customary international law (§ 702); and
(c) that it is required to respect under general principles of law common to the major legal systems of the world.
2 RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES § 701.
Section 702 of the Restatement provides additional guidance on what constitutes customary international law. It declares:
A state violates international law if, as a matter of state policy, it practices, encourages, or condones
(a) genocide,
(b) slavery or slave trade,
(c) the murder or causing the disappearance of individuals,
(d) torture or other cruel, inhuman, or degrading treatment or punishment,
(e) prolonged arbitrary detention,
(f) systematic racial discrimination, or
(g) a consistent pattern of gross violations of internationally recognized human rights.
§ 702 (emphasis added). This list was not meant to be exhaustive. § 702 cmt. a.
The only subdivisions of section 702 that arguably could be relevant to plaintiffs' claims are (a), (d) and (g). None can be construed to apply to the use of herbicides in the Vietnam War. The United States was seeking to aid the Vietnamese, not wipe them out. And there was no internationally recognized human right that would have required an armed force to refrain from using herbicides to protect its troops and those of its allies. No recognized source of international law that might have applied up to 1975 could have been interpreted as outlawing use of herbicides in the way they were utilized in Vietnam.
As to destruction of jungle cover behind which the enemy could move and ambush troops, there appears to have been no generally accepted rule prohibiting the practice. But cf. DAVID J. BEDERMAN ET AL., INTERNATIONAL LAW: A HANDBOOK FOR JUDGES 111-13 (Am. Soc'y of Int'l Law 2001) (discussing destruction of environment during peace). Almost since walled cities were developed the procedure of clearing surrounding areas for outgoing fire and to prevent sneak attacks was accepted military convention. No theoretical basis for distinguishing clearings for military advantage by attackers rather than defenders is apparent.
*133 Nor, as to destruction of food sources, where this tactic has apparent military advantage, was there a generally accepted prohibitory rule of international law. Investiture of cities to starve the occupants (both military and civilian) into surrender was common. Collection of food and fodder from the country to feed troops and deny it to the enemy troops and civilians supporting those troops was accepted. As General Grant put the matter
I regarded it as humane to both sides to protect the persons of those found at their homes, but to consume everything that could be used to supply armies.... [S]uch supplies within the reach of Confederate armies I regarded as much contraband as arms or ordnance stores. Their destruction was accomplished without bloodshed and tended to the same result as the destruction of armies....
This policy I believe exercised a material influence in hastening the end.
PERSONAL MEMOIRS OF U.S. GRANT 192 (E.B. Long ed., 2001) (1952); cf. JOSEPH J. ELLIS, HIS EXCELLENCY GEORGE WASHINGTON 26 (2004) (referring to order of twenty-three year old George Washington in 1755 to his Virginia Regiment fighting the French and Indians, "when constructing stockades, clear the surrounding trees and brush beyond musket range (a lesson he had learned from Fort Necessity)").
In World War I the British by their naval blockade attempted to starve the Germans. See, e.g., ARTHUR HERMAN, TO RULE THE WAVES: HOW THE BRITISH NAVY SHAPED THE MODERN WORLD 493, 513 (2004) (referring to "a long-distance blockade on Germany, in order to `strangle the whole national life of the enemy.'"); BENJAMIN A. VALENTINO, FINAL SOLUTIONS: MASS KILLINGS AND GENOCIDE IN THE TWENTIETH CENTURY 85 (2004) ("During the First World War, ... more than 250,000 people died of starvation and malnutrition when the British blockaded Germany and Austria-Hungary in an effort to starve them into surrender."). In World War II the Germans attempted to starve the British, and the United States to starve the Japanese, by unrestrained submarine warfare. HERMAN, supra, at 535, 545. Particularly where so much of the enemy force is guerilla in nature and lives off the land, as in the Vietnam War, destruction of crops supporting mobile forces can not be said to have been contrary to tradition up to 1975, even if the international view of its appropriateness may have changed subsequently.
No executive or legislative action prior to 1975 showed an understanding of international law that would support plaintiffs' position. Despite the fact that Congress and the President were fully advised of a substantial belief that the herbicide spraying in Vietnam was a violation of international law, they acted on their view that it was not a violation at the time. A jointly held position of the other two independent branches of government should cause a court to reconsider carefully its disagreement. In late 1961 the State Department and the Department of Defense recommended initiation of a "large-scale herbicidal/chemical warfare program" against the efforts of the DRVN and the Vietcong to overthrow by military force the government of South Vietnam. In connection with that joint recommendation, Secretary of State Dean Rusk advised President Kennedy that "successful plant-killing Ops in [Vietnam], carefully coordinated with and incidental to larger Ops, can be of substantial assistance in the control and defeat of the [Vietcong]," and that "the use of defoliant does not violate any rule of international law concerning the conduct of chemical warfare and is an accepted tactic of war." Memorandum from Secretary *134 of State Dean Rusk to President John F. Kennedy (Nov. 24, 1961), supra (emphasis added). President Kennedy accepted a "joint recommendation," and in November 1961 approved the start of military herbicide operations. Defoliation operations began in September 1962, and missions targeting crops that sustained enemy forces commenced in November of that year.
During the relevant time period Congress repeatedly suggested its approval of United States military use of herbicides by its failure to act despite full knowledge of this use. While not decisive, its inaction belies the inference of any legislative belief that the manufacture or sale of those herbicides could or should give rise to liability under international norms applicable to the United States. Congress approved numerous appropriations for combat operations in Vietnam while aware that the military expended some of those funds for the herbicide program. In 1970, the Senate rejected amendments attempting to prohibit the use of government funds for precisely these purposes. In ratifying the 1925 Geneva Protocol in 1975, the Senate emphasized its understanding that the United States' prior use of herbicides in Vietnam had not violated that treaty and that the United States only intended the Protocol to be prospective in effect. See Prohibition of Chemical and Biological Weapons: Hearing on S. Res. Before the S. Comm. on Foreign Relations, 93d Cong. 3 (1974) (statement of Sen. Humphrey) (reassuring the Executive Branch that Congress's adoption of the 1925 Geneva Protocol "would in no way reflect on our past practice with regard to chemical agents. The manner in which herbicides and riot control agents were used in Vietnam was fully in accordance with the United States prevailing interpretation of the protocol.").
Herbicides were tactically used in Vietnam because they were believed to be effective in meeting important United States and allied military objectives. As a spokesman for the Department of Defense told Congress, "the use of ... herbicides [in Vietnam] was appropriate and had one purpose  to [s]ave the lives of Americans and our allies." U.S. Chemical Warfare Policy, Hearing Before the Subcomm. on Nat'l Sec. Policy and Sci. Devs. of the House Comm. on Foreign Affairs, 93d Cong. 154 (1974) (statement of Amos Jordan, Acting Assistant Secretary for International Security Affairs, Department of Defense). Other Executive Branch officials informed Congress that the herbicide program was "effective in enhancing the success of allied combat operations," and that their use was "helpful in protecting the American soldier and contributing to successful accomplishment of the ground combat mission." Chemical-Biological Warfare: U.S. Policies and International Effects, Hearing Before the Subcomm. on Nat'l Sec. Policy and Sci. Devs. of the House Comm. Foreign Affairs, 91st Cong. 223-25, 231-32 (1969) (statement of Rear Admiral William E. Lemos, Director of Policy Plans and National Security Council Affairs). The military instituted policies, even if they were not fully complied with, intended to ensure that the herbicides were applied only to targets of military significance. See, e.g., id. at 230 (noting that in order to continue to protect civilians from herbicide exposure, the Defense Department "has issued instructions to the Joint Chiefs of Staff to reemphasize the already existing policy that 2,4,5-T be utilized only in areas remote from population").
2. Crimes Against Humanity
In the book Crimes of War, Cherif Bassiouni has sought to clarify the meaning of "crimes against humanity." He wrote:
*135 The term crimes against humanity has come to mean anything atrocious committed on a large scale. This is not, however, the original meaning nor the technical one. The term originated in the 1907 Hague Convention preamble, which codified the customary law of armed conflict. This codification was based on existing State practices that derived from those values and principles deemed to constitute the "laws of humanity," as reflected throughout history in different cultures.
After World War I, the Allies, in connection with the Treaty of Versailles, established in 1919 a commission to investigate war crimes that relied on the 1907 Hague Convention as the applicable law. In addition to war crimes committed by the Germans, the commission also found that Turkish officials committed "crimes against the laws of humanity" for killing Armenian nationals and residents during the period of the war. The United States and Japan strongly opposed the criminalization of such conduct on the grounds that crimes against the laws of humanity were violations of moral and not positive law.
In 1945, the United States and other Allies developed the Agreement for the Prosecution and Punishment of the Major War Criminals of the European Axis and Charter of the International Military Tribunal (IMT), sitting at Nuremberg, which contained the following definition of crimes against humanity in Article 6(c):
Crimes against humanity: murder, extermination, enslavement, deportation, and other inhumane acts committed against civilian populations, before or during the war; or persecutions on political, racial or religious grounds in execution of or in connection with any crime within the jurisdiction of the Tribunal, whether or not in violation of the domestic law of the country where perpetrated.
The Nuremberg Charter represents the first time that crimes against humanity were established in positive international law. The International Military Tribunal for the Far East, at Tokyo, followed the Nuremberg Charter, as did Control Council Law No. 10 of Germany, under which the Allies prosecuted Germans in their respective zones of occupation. Curiously, however, there has been no specialized international convention since then on crimes against humanity. Still, that category of crimes has been included in the statutes of the International Criminal Tribunal for the Former Yugoslavia (ICTY) and the International Criminal Tribunal for Rwanda (ICTR), as well as in the statute of the International Criminal Court (ICC). In fact, there are eleven international texts defining crimes against humanity, but they all differ slightly as to their definition of that crime and its legal elements. However, what all of these definitions have in common is: (1) they refer to specific acts of violence against persons irrespective of whether the person is a national or nonnational and irrespective of whether these acts are committed in time of war or time of peace, and (2) these acts must be the product of persecution against an identifiable group of persons irrespective of the make-up of that group or the purpose of the persecution. Such a policy can also be manifested by the "widespread or systematic" conduct of the perpetrators, which results in the commission of the specific crimes contained in the definition.
The list of the specific crimes contained within the meaning of crimes against humanity has been expanded since Article 6(c) of the IMT to include, in the *136 ICTY and the ICTR, rape and torture. The statute of the ICC also expands the list of specific acts. In particular, the ICC statute adds the crimes of enforced disappearance of persons and apartheid. Further, the ICC statute contains clarifying language with respect to the specific crimes of extermination, enslavement, deportation or forcible transfer of population, torture, and forced pregnancy.
To some extent, crimes against humanity overlap with genocide and war crimes. But crimes against humanity are distinguishable from genocide in that they do not require an intent to "destroy in whole or in part," as cited in the 1948 Genocide Convention, but only target a given group and carry out a policy of "widespread or systematic" violations. Crimes against humanity are also distinguishable from war crimes in that they not only apply in the context of war  they apply in times of war and peace.
Crimes against humanity have existed in customary international law for over half a century and are also evidenced in prosecutions before some national courts. The most notable of these trials include those of Paul Touvier, Klaus Barbie, and Maurice Papon in France, and Imre Finta in Canada. But crimes against humanity are also deemed to be part of jus cogens  the highest standing in international legal norms. Thus, they constitute a non-derogable rule of international law.
Cherif Bassiouni, Crimes Against Humanity, in CRIMES OF WAR: WHAT THE PUBLIC SHOULD KNOW 107, 107-08 (Roy Gutman & David Rieff, eds., 1999), http:// www.crimesofwar.org/ thebook/crimes-against-humanity.html (emphasis added).
Even given the broad definition of crimes against humanity provided by Bassiouni and others, the use of herbicides in Vietnam prior to 1975 would not have been characterized as coming within the definition. Except as discussed under specific treaties, statutes or specific rules, the general concept had no application to pre-1975 use of herbicides in Vietnam.
3. Proportionality
The concept of military necessity or proportionality is a well accepted international norm governing the conduct of war. The United States Army's manual, The Law of Land Warfare, states the rule succinctly: "[L]oss of life and damage to property must not be out of proportion to the military advantage to be gained." U.S. DEP'T OF THE ARMY, FIELD MANUAL NO. 27-10, THE LAW OF LAND WARFARE ¶ 41 (1956); cf. Protocol on Prohibitions or Restrictions on the Use of Incendiary Weapons (Protocol III) to the 1980 Conventional Weapons Convention, Oct. 10, 1980, art. 2(4), 1342 U.N.T.S. 171, 172 (providing that forest cover may be the object of incendiary attack when "such natural elements are used to cover, conceal or camouflage combatants or other military objectives, or are themselves military objectives"); Protocol I, supra, art. 52(2), 1125 U.N.T.S. at 27 (permitting dual-use crop destruction if it does not lead to starvation of individuals prohibited by Article 54).
Applying the principle presents difficulties, as the final report on the NATO bombing in the Kosovo war to the Prosecutor for the International Criminal Tribunal for the former Yugoslavia ("ICTY") noted:
The main problem with the principle of proportionality is not whether or not it exists but what it means and how it is to be applied. It is relatively simple to state that there must be an acceptable relation between the legitimate destructive effect and undesirable collateral effects.... *137 It is much easier to formulate the principle of proportionality in general terms than it is to apply it to a particular set of circumstances because the comparison is often between unlike quantities and values. One cannot easily assess the value of innocent human lives as opposed to capturing a particular military objective.
Final Report to the Prosecutor by the Committee Established to Review the NATO Bombing Campaign Against the Federal Republic of Yugoslavia ¶ 48 (June 13, 2000), available at www.un.org/icty/pressreal/ nato061300.htm [hereinafter ICTY Final Report]; see also Anderson Decl. ¶¶ 67-68 (stating that the calculation of whether military action was necessary or proportional is an "open-ended, imprecise and subjective" task and that, because of its "inherent subjectivity and imprecision, people with different backgrounds and in different circumstances can easily reach different but equally legitimate conclusions on exactly the same facts"); FRITS KALSHOVEN & LIESBETH ZEGVELD, CONSTRAINTS ON THE WAGING OF WAR: AN INTRODUCTION TO INTERNATIONAL HUMANITARIAN LAW 46 (3d ed.2001) (noting the "lack of precision inherent in [the proportionality rule]"), http://www.icrc.org/Web/Eng/ siteeng0.nsf/htmlall/p0793/$File/ ICRC_002_0793.PDF!Open.
Defendants claim that a norm that is so "open-ended, imprecise and subjective," Anderson Decl. ¶ 67, that international bodies charged with its enforcement often cannot say "what it means and how it is to be applied," ICTY Final Report 48, is not defined with the specificity required by Sosa. It is contended that the norm of proportionality is so subjective that, like judgments in the field concerning military necessity, they are often "not considered suitable for second-guessing by courts, international, military or otherwise." Anderson Decl. ¶ 73. This may explain, according to defendants, why no prosecutions based on violations of that norm seem to have occurred since World War II. Anderson Decl. ¶ 75 ("I have followed this body of law for many years, discussing it repeatedly with military lawyers, human rights lawyers, and scholars, and I am not aware of any court martial or other legal case since the Second World War that directly turns on disproportionate devastation by a commander  meaning a case where the legal issue is disproportionality as a war crime as such." (emphasis added)).
The ICTY Final Report's recommendation against prosecution lends some slight support for the proposition proffered by defendants that a factor militating against recognition of a private cause of action in the instant case is proportionality. The Court explained in Sosa that courts should be especially cautious about creating a private right of action due to considerations such as whether to "permit enforcement [of a norm] without the check imposed by prosecutorial discretion." 542 U.S. at ___, 124 S.Ct. at 2763. The ICTY Report reflects the assumption that, when criminal prosecutorial discretion is exercised, "proportionality" violations usually will not be prosecuted since the prosecutor acts as a gatekeeper to protect the accused against unfair or ambiguous charges. The ICTY Report's recommendation against prosecution of an alleged violation based, in part, on the imprecision and subjectivity of the proportionality concept, see Anderson Decl. ¶ 78, does point to a possible danger in permitting such claims to proceed on a wholesale basis in civil courts without any prosecutorial discretionary check.
American courts are fully capable of applying the proportionality concept in civil litigations as demonstrated by their handling *138 of comparative negligence, proximate cause and other sophisticated doctrines. Nevertheless, the criminal procedural aspects of proportionality, the inherently subjective judgments necessary to determine whether the concept applies, and the dearth of illustrative prosecutions, all demonstrate that federal courts should pause before recognizing a civil private cause of action under the ATS on the theory that the United States may have properly used herbicides in some situations for legitimate military purposes, but that it used too much of them in too many places. See, e.g., Robert A. Shade, Management of the Department of Defense Vietnam Herbicide Program 44 (1969) ("The personnel in Vietnam [commented] that any alternative changing the application rate from three gallons of undiluted Orange per acre was unacceptable. Their reasons were that experience in Vietnam, as well as the test program conducted in Thailand by personnel from Fort Detrick, showed that maximum leaf fall and duration of defoliation was obtained at this application rate. Shorter duration of defoliation would necessitate respraying more often. Because of the need to respray more often, these alternatives would not, in the long run, result in any significant overall decrease in herbicide requirements. In fact, sortie requirements would increase, subjecting the air crews to a greater hazard from enemy ground fire and increasing the cost.") (Ex. 10 to Aff. of Michael M. Gordon in Opp'n to Pls.' Second Am. Mot. for Recons. of Ct.'s Decision Granting Summ. J. to Defs. on Basis of the Government Contractor Defense, Feb. 8, 2005). It cannot be shown that the military in the field  or the executive and legislative branches at home  violated proportionality norms when using herbicides in the Vietnam War.
As plaintiffs argue, a consensus among nations may gradually solidify into recognized international law provided that such consensus is reflected in state practice accompanied by opinio juris. No such understanding or consensus existed with respect to herbicides prior to 1975  possibly in part because of the proportionality problem.

XII. 1975 Presidential and Congressional Action

A. President
Following considerable Congressional debate beginning at least as early as 1970, in 1975 President Ford, by Executive Order 11850, adopted the United States policy of renouncing first use of herbicides in warfare. This action was taken almost simultaneously with the Senate's ratification of the 1925 Geneva Protocol. See infra Part XII.B.; see also supra Part XI.C.2. (discussing 1925 Geneva Protocol). The order read as follows:

Executive Order 11850

Renunciation of Certain Uses in War of Chemical Herbicides and Riot Control Agents

April 8, 1975
The United States renounces, as a matter of national policy, first use of herbicides in war except use, under regulations applicable to their domestic use, for control of vegetation within U.S. bases and installations or around their immediate defense perimeters, and first use of riot control agents in war except in defensive military modes to save lives such as:
(a) Use of riot control agents in riot control situations in areas under direct and distinct U.S. military control, to include controlling rioting prisoners of war.
(b) Use of riot control agents in situations in which civilians are used to mask *139 or screen attacks and civilian casualties can be reduced or avoided.
(c) Use of riot control agents in secure missions in remotely isolated areas, of downed aircrews and passengers, and escaping prisoners.
(d) Use of riot control agents in rear echelon areas outside the zone of immediate combat to protect convoys from civil disturbances, terrorists and paramilitary organizations.
I have determined that the provisions and procedures prescribed by this Order are necessary to ensure proper implementation and observance of such national policy.
NOW, THEREFORE, by virtue of the authority vested in me as President of the United States of America by the Constitution and laws of the United States and as Commander-in-Chief of the Armed Forces of the United States, it is hereby ordered as follows:
SECTION 1. The Secretary of Defense shall take all necessary measures to ensure that the use by the Armed Forces of the United States of any riot control agents and chemical herbicides in war is prohibited unless such use has Presidential approval, in advance.
SEC[TION] 2. The Secretary of Defense shall prescribe the rules and regulations he deems necessary to ensure that the national policy herein announced shall be observed by the Armed Forces of the United States.
GERALD R. FORD
Exec. Order No. 11,850, 40 Fed.Reg. 16,187 (April 8, 1975) (emphasis added).
Congressional hearings leading up to this order gave no indication that herbicide use was outlawed by general consensus as a weapon of war before 1975. Whatever the post-1975 effect of President Ford's executive order, it had no retroactive effect. See EUGENE DAVIDSON, THE NUREMBERG FALLACY 285 (University of Missouri Press 1998) ("[T]he United States has also stopped using defoliants but it has not renounced their possible future employment...."). Use of herbicides by the United States in Vietnam had ceased years before President Ford's 1975 order was issued.
No treaty or agreement, express or implied, of the United States operated to make use of herbicides in Vietnam a violation of the laws of war or any other form of international law until at the earliest April of 1975. See also supra Part XI.C.2. on ratification by United States of the Geneva Convention.
Whether even President Ford's order, without the consent of the Senate, could have had the effect of confirming a rule of international law binding on the United States is a matter that need not now be decided. As Commander-in-Chief of the armed forces he had the power to order that herbicide use be limited in war, but that order alone would not bind future presidents. Cf. 1 RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 303(4) ("[T]he President, on his own authority, may make an international agreement dealing with any matter that falls within his independent powers under the Constitution."). Subsequent events leave the matter somewhat up in the air. The 1993 Chemical Weapons Convention did not outlaw the use of herbicides even though it prohibited use of tear gas. The 1972 Additional Protocol I to the Geneva Conventions covered protection of natural resources, but the United States has not ratified it. See Message of President Ronald Reagan to United States Senate, Jan. 29, 1987, reprinted in 26 I.L.M. 561 (1987).
B. Congress
Congress ratified the 1925 Geneva Protocol on December 16, 1974, making us a *140 party to that treaty. But that ratification itself did not constitute an acknowledgment that the 1925 Geneva Protocol outlawed the use of herbicides as a weapon. See supra Part XI.C.2. for terms of the ratification.
The issue of the legality of herbicide use during war was thoroughly debated by congressional committees before, and contemporaneously with, President Ford's declaration. See, e.g., Report of the Subcommittee on National Security Policy and Scientific Developments of the Committee on Foreign Affairs, House of Representatives, Chemical-Biological Warfare: U.S. Policies and International Effects, with an Appended Study on the Use of Tear Gas in War: A Survey of International Negotiations and U.S. Policy and Practice pursuant to H. Res. 143 (1970) [hereinafter House Report]; Hearings before the Subcommittee on National Security Policy and Scientific Developments of the Committee on Foreign Affairs, House of Representatives, 91st Cong., 1st Sess., Chemical-Biological Warfare: U.S. Policies and International Effects (1970) [hereinafter House Subcomm. Hearings]; Hearings before the Committee on Foreign Relations, United States Senate, 92nd Cong., 1st Sess., The Geneva Protocol of 1925: The Protocol for the Prohibition of the Use in War of Asphyxiating, Poisonous, or Other Gases, and of Bacteriological Methods of Warfare (1972) [hereinafter Senate Hearings].
As Chairman Fulbright of the Senate Committee on Foreign Relations put the matter in his foreword to the Senate Hearings, he thought the United States should not use herbicides because they were not effective and their use was opposed by most nations. He wrote in October 1972 (after use of herbicides in Vietnam by the United States had ceased):
A year and a half ago, in March, 1971, the Committee on Foreign Relations held extensive hearings on the Geneva Protocol of 1925, which the President had resubmitted for the Senate's advice and consent. Following those hearings the Committee expressed to the President its strong support for the objectives of the Protocol but asked the President to reconsider the Administration's interpretation that the Geneva Protocol does not prohibit the use of tear gas and herbicides in warfare.
These views were set forth in a letter which I sent to the President on behalf of the Committee on April 15, 1971. .... In the same letter, the Committee expressed its desire to have available to it before acting on the Protocol several studies then in progress within the Executive Branch relating to the use of herbicides and tear gas in Vietnam and their possible utility in other situations. Our letter also indicated that the Committee would await the President's response before taking further action on the Protocol.
. . . .
Since March, 1971, there have been several developments related to the issues raised in the hearings. Despite assurances given by the Secretary of State to the Committee that American military use of herbicides in Vietnam would be phased out, the use of herbicides by American forces has been reduced but not eliminated [But see Figure 1, supra Part II]. Similarly, the use of tear gas, particularly of the potent CS2 form, also continues, both by American and by South Vietnamese forces, the latter being trained and supplied by the Americans. There have also been reports of the use of tear gas by the North Vietnamese, this being the almost inevitable and, indeed, the predicted consequence of our own use of such gas.
*141 During this interim period there have also been positive developments relating to the control of chemical and biological weapons. The United States and many other nations have concluded a Convention for the Prohibition of Development, Production and Stockpiling of Bacteriological and Toxin Weapons. This treaty was signed in Washington on April 10, 1972, and was submitted to the Senate for its advice and consent on August 10, 1972. In addition, discussion has now begun in the U.N. Conference of the Committee on Disarmament at Geneva regarding a chemical weapons convention.
It is unfortunate that while these efforts have been going forward that the Administration has not demonstrated any interest in removing the cloud which it has placed over the Geneva Protocol by virtue of its interpretation regarding tear gas and herbicides. This inflexibility coupled with the fact of our continued use of these agents in Vietnam threatens to undermine the ultimate effectiveness of the new conventions.
The preamble of the Bacteriological Convention reaffirms the significance of the Geneva Protocol as the foundation for subsequent international agreements in this area. Most nations of the world take the view that our use of tear gas and herbicides in Vietnam is contrary to the provisions of the Geneva Protocol. Indeed, the preamble of the Convention specifically notes that the General Assembly "has repeatedly condemned all actions contrary to the principles and objectives" of the Protocol. It is difficult in light of these circumstances to see how the United States adherence to the Convention can be reconciled with the Administration's rejection of the universally accepted interpretation of the Protocol.
In my view it is regrettable that the Executive Branch has ignored the Committee's efforts to resolve the difficulties posed by its interpretation of the Protocol. It is now more important than ever that the Executive Branch come to grips with the question of U.S. adherence to the Protocol in order that this issue not complicate consideration of the Bacteriological Convention.
The Executive Branch studies relating to tear gas and herbicides which the Secretary of State told the Committee were in progress at the time of the 1971 hearings are reported to have been completed. Yet to date none of these studies has been made available to or discussed with the Committee.
Similarly the Executive Branch has ignored the Committee's requests for its comments on two proposals relating to the interpretation of the Geneva Protocol, S. Res. 154 and S. Res. 158, introduced by Senators Humphrey and Brooke in July 1971. .... While the Committee has not taken a position on these resolutions and could hardly be expected to do so in the face of continued Executive Branch silence, these resolutions do represent constructive efforts to resolve the question of the Protocol's interpretation.
We are hopeful that the appearance of these hearings coupled with the President's submission of the Bacteriological Convention to the Senate will stimulate new interest on the part of the public and the Executive Branch in full U.S. adherence to the Geneva Protocol. It would appear that the only impediment to such progress is the reluctance of the Administration to forego the option to employ tear gas and herbicides in future wars. It is difficult to reconcile this position with our knowledge that their military utility is open to serious questions, that their actual use in Vietnam *142 is undermining the restraints inherent in the Geneva Protocol, and that the opprobium which attaches to their use is nearly universal.
A decision on the part of the Administration to [seek] ratification of the Geneva Protocol without any special exceptions for the use of herbicides and tear gas in warfare would, in my view, be a constructive act. A renunciation of the option to use these weapons would not adversely affect our national security and, indeed, it would represent the single greatest contribution which our nation could make now to the creation of truly effective and universal barriers against one of the most repugnant of all forms of warfare.
Senate Hearings, supra, at iii-iv (emphasis added).
While some senators, including Senator Fulbright, were of the view that use of herbicides were or should be outlawed, Congress was not prepared to take a position contrary to that of the Administration  that their use in Vietnam had not been outlawed by the 1925 Geneva Convention or by any other development. See, e.g., id. at iii (stating Administration's position that herbicides are not covered by the Geneva Protocol); id. at 241-44 (arguing against use of herbicides); id. at 315-17 (discussing U.S. military's interpretation of the 1907 Hague Convention as being inapplicable to herbicides); id. at 430-31 (stating Administration's policies); House Subcomm. Hearings, supra, at 31 (discussing Administration's rejection of Representative Richard D. McCarthy's position against use of herbicides); id. at 52 (discussing use to kill rice crops); id. at 75 (discussing effect on unborn children); id. at 96 (discussing analysis of costs and benefits of use of herbicides); id. at 107 (discussing opposition to use of herbicides); id. at 109 (discussing damage to soil); id. at 111 (discussing harm to people); id. at 113 (discussing effect on birth defects).
The House Report suggested how difficult the legislature found the herbicide issue. It declared:
The most controversial issue to emerge from our consideration of America's chemical-biological warfare policies and their international effects concerns the use of chemical agents by the United States and its allies in the Vietnam conflict. More specifically, those agents are tear gases such as the widely used CS which causes tears, coughing, and burning and stinging of the skin, and herbicides which are used to defoliate the jungle and destroy food sources of the enemy. Since each of these classes of chemical agents presents its own particular problems, separate consideration is generally accorded them.
. . . .
Herbicides.  The principal objective of herbicide use in Vietnam has been to produce a significant improvement in vertical and horizontal visibility in jungle areas. Areas defoliated have included our own base perimeters; roads, trails, and waterways; infiltration routes; and enemy base camps. A secondary use of herbicides is to destroy crops in order to deny food supplies to Vietcong forces. According to the Department of Defense, herbicide operations have been helpful in protecting American soldiers and have contributed to successful accomplishment of ground combat missions.
Questions have been raised both internationally and domestically about the widespread use of herbicides because of fears about their effects on Vietnam's natural settings and on its people. No country has ever been subjected to such intensive use of herbicides as has South Vietnam since 1962. According to Department *143 of Defense figures, as of the end of July, 1969, the United States has sprayed with herbicides 5,070,800 acres, a figure equivalent to more than 10 percent of the total land area of South Vietnam.
When defoliating operations were begun, herbicidal chemicals were not believed to be permanently damaging to plants or toxic to human beings. With the passage of time, however, evidence has grown that concentrated applications may have drastic effects on the environment and on people intensively exposed. Laboratory tests have indicated, for example, that one frequently used herbicide, 2,4,5-T, causes birth malformations in mice and rats. As a result its use in Vietnam recently was halted, at least temporarily. Other chemicals still commonly used in Vietnam also have been questioned by members of the scientific community for their environmental effects and safety for human beings. Among those herbicidal agents are 2, 4, D, picloram, and cacodylic acid.
Collateral issues related to the use of herbicides concern the possibility of U.S. liability for expensive damage claims in the future, and the belief of some observers that the destruction of food supplies primarily hurts women, children, and other noncombatants rather than hostile forces.
Internationally, the use of nonlethal gases and herbicides in Vietnam has resulted in considerable criticism of the United States. Our Nation has been charged with violating international law including the Geneva Protocol, and with breaking down the barriers to chemical and biological warfare which have existed since World War I. In December 1969, the United Nations General Assembly approved a resolution, by 80 votes to 3, with 36 abstentions, declaring that the Geneva Protocol prohibits all chemical agents which have direct toxic effect on men, animals, and plants. The resolution was aimed primarily at U.S. practice in Vietnam.
One of the three nations which voted against the resolution was the United States.... With respect to herbicides, the U.S. position is that neither the language of the protocol nor the negotiating history indicates an intention to cover antivegetation chemical agents. Moreover, the United States, although not a party to the protocol, has rejected the right of the General Assembly to interpret or declare principles of international law embodied in the protocol or other treaties "where the rules are ambiguous and where universal consensus is lacking."
House Report, supra, at 4-6 (footnote omitted).
The House Report concluded in part
[T]he continued, large-scale use of chemical agents in Vietnam by the United States creates troublesome political problems. Those problems are virtually certain to be central to Senate consideration of the protocol, if it is submitted as expected with an interpretation that the treaty's prohibitions do not cover the use in war of tear gas or chemical herbicides. To the extent that approval of such an interpretation would constitute endorsement of current CW activities, it could provoke opposition. Opponents would include (1) those who believe that CS employment in Vietnam goes significantly beyond the restricted usage justified by U.S. officials at the time the decision was made; (2) those who feel that current evidence about toxicity of some herbicides to man and nature require more thorough investigation; (3) those who believe the Geneva Protocol *144 prohibits the use of tear gas and herbicides in warfare; and (4) those who are sensitive to international concerns that American activities have eroded barriers against CBW erected after World War I. On that last point, it is possible that other signatory nations would not accept the United States as a party to the protocol if they find that the U.S. interpretation strikes into the heart of the treaty and masks what they would consider to be essentially a reservation. This dilemma may seriously complicate Senate consideration of the protocol and is a legitimate cause for concern.
The difficulty might be resolved if the United States were to take a position, or make an interpretation, that the use of tear gas and herbicides in warfare is an open question, given the apparent ambiguity of the protocol on the subject. Our stance could be that the problem of tear gas and herbicides is not a moral issue, but rather an important technical and legal question which relates to the prevention of proliferation and escalation of chemical-biological capabilities. Since the question is an open one, current chemical warfare activities in Vietnam cannot be considered illegitimate or in violation of the protocol. We then could go on to declare our willingness as a nation to abide by whatever uniform and workable rule which we and other signatories to the protocol eventually could decide upon. Such an approach, it appears, would speed approval of the protocol itself and reduce significantly the possibilities of international repercussions over the U.S. interpretation of the treaty. Moreover, as U.S. combat activities wane in Vietnam, it might be possible to scale down substantially CW operations as testimony to our good faith.
. . . .

RECOMMENDATIONS
. . . .
(3) The question of the use of tear gas and herbicides in warfare should be left open in any formal or informal interpretation of the protocol made by the executive branch or the Senate, and once the United States becomes a party to the treaty it should seek agreement with the other parties on the uniform interpretation of the scope of the protocol, either through a special international conference among the parties or through established international juridicial procedures.
Id. at 9-10 (emphasis added).
The general legislative position that international law did not forbid use of herbicides in Vietnam, although it probably should in the future, represented the United States view until 1975. Based upon executive decisions and the hearings in both the Senate and House, the official position of this country up to 1975 could be summarized as follows: On the one hand, many scientists, political figures and others opposed the use by the United States of herbicides in Vietnam because of possible health dangers to those exposed directly or indirectly, because of the possible damage to the land and the continued hazards of toxic contamination to future generations, because of possible teratological effects on children of those who had been exposed, because of substantial opposition from the international community of nations, and because of doubts about efficacy. On the other hand, the armed forces, the State Department, the President, and a substantial number of legislators opposed characterizing the use of herbicides, as they were utilized in Vietnam, as a violation of international law, and particularly as a violation of the 1925 Geneva Convention. The result was deadlock and the status quo ante. Related issues were widely debated in the literature. See, e.g., *145 Paul G. Cassell, Note, Establishing Violations of International Law: "Yellow Rain" and the Treaties Regulating Chemical and Biological Warfare, 35 STAN. L.REV. 259, 261 (1983) ("[A] fear of highly technological invisible weapons able to kill in mysterious ways with unpredictable consequences." Yellow Rain was believed to have been used by the Russians, but was found to be a harmless natural phenomenon); cf. Jonathan P. Edwards, The Iraqi Oil "Weapon" in the 1991 Gulf War: A Law of Armed Conflict Analysis, 40 NAVAL L.REV. 105, 130 (1992) (concluding that Iraq's setting fire to oil wells and releasing crude oil into the Persian Gulf were violations of international law of armed combat).
The Kennedy, Johnson and Nixon administrations, which actively prosecuted the war in Vietnam, were unwilling to declare utilization of herbicides illegal even though the United States effectively ended use by our military by 1971. It was not until the Ford administration that this country was ready to officially come to grips with the international law issue. Until the matter was resolved in 1975 by President Ford and the Senate it is fair to conclude that proscription of the use of herbicides in Vietnam was not recognized by the United States (and by implication its allies in Vietnam including Australia, New Zealand, South Korea, Turkey, and others) as a violation of international law. Cf. 1 JAMES BROWN SCOTT, THE HAGUE PEACE CONFERENCES OF 1899 AND 1907, at 37 (1909) ("[T]he support of the larger nations is necessary in order to give international force and effect to a proposition...."). That was also the position of the British who had used helicopters to spray herbicides in their Malaya military operations. See PETER H. SCHUCK, AGENT ORANGE ON TRIAL: MASS TOXIC DISASTERS IN THE COURTS 16 (enlarged ed.1987); Memorandum from Secretary of State Dean Rusk to President John F. Kennedy (Nov. 24, 1961), supra.
Since the herbicide use by the United States complained of by plaintiffs ended years before 1975, the April 1975 declaration of President Ford and the action of the Senate in ratifying the 1925 Geneva Protocol and the Biological Weapons Convention in April 1975 did not retroactively make illegal United States' use of herbicides in Vietnam. The defendants in the instant case had no connection with, or foreknowledge of, South Vietnam forces' alleged use of herbicides in the 1970s so they are not responsible for what those forces did independently after the United States abandoned the program in 1971. Nor do defendants have a retroactive obligation to detoxify the land or to gather up discarded empty dioxin contaminated barrels or other implements long since abandoned by the United States. Defendants are not culpable civilly under international law. The reasons and techniques for modern mass killings are not in any way comparable to the reasons and techniques in the use of herbicides in Vietnam. See, e.g., DAVID CHUTER, WAR CRIMES: CONFRONTING ATROCITY IN THE MODERN WORLD 3 (2003) (discussing war crimes as including murder, torture, rape and theft on a huge scale); BENJAMIN A. VALENTINO, FINAL SOLUTIONS: MASS KILLING AND GENOCIDE IN THE TWENTIETH CENTURY 81 (2004) (discussing use of mass killings "to coerce large numbers of civilians or their leaders into submission").

XIII. Conclusion

There is no basis for any of the claims of plaintiffs under the domestic law of any nation or state or under any form of international law. The case is dismissed. No costs or disbursements to any party.
SO ORDERED.